# EXHIBIT A

FILED
1/22/2019 12:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L000717

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, LAW DIVISION

TIMOTHY K. YOCUM,               )
                                )
        Plaintiff,              )
                                )
    v.                          )          Case No.
                                )
INTERNATIONAL BUSINESS MACHINES )
CORPORATION, a New York corporation,  )
                                )
        Defendant.              )

## COMPLAINT AT LAW

Plaintiff, Timothy K. Yocum ("Yocum") complaining of Defendant, International Business Machines Corporation ("IBM"), alleges as follows:

## INTRODUCTION

1.  This is an action for money damages brought pursuant to the Illinois Wage Claim and Collection Act, 820 ILCS 115/1 *et seq.*, based on IBM's failure to pay $325,000 of earned compensation to Yocum.

## PARTIES

2.  Yocum is a resident of Cook County, Illinois.

3.  Defendant IBM is a private corporation formed under the laws of New York and which is a resident of Illinois.

## JURISDICTION AND VENUE

4.  This court has jurisdiction over this matter pursuant to 735 ILCS 5/2-209 (a) (1) and (7) because this cause of action arises from IBM's transaction of business within Illinois, including the making and performance of contracts substantially connected with this State. Jurisdiction is

1

FILED DATE: 1/22/2019 12:00 AM 2019L000717

also conferred by 735 ILC 5/2-209(b)(4) because IBM is a corporation doing business within this State.

5. Venue is appropriate in Cook County because the Defendant (a) is a private foreign corporation authorized to transact business in Illinois, and (b) does business and maintains its registered office in Cook County.

## FACTS COMMON TO ALL COUNTS

### Yocum's pre-IBM Employment

6. Yocum is a software operations manager. In 2014, he was hired by MongoHQ, Inc. ("MongoHQ"), a start-up database company that had launched in 2010. Yocum worked for MongoHQ as an at-will employee pursuant to a written employment agreement. A copy of that Employment Agreement is attached hereto as Exhibit 1.

7. From the outset of his employment at MongoHQ, Yocum had numerous duties including, among other things, managing datacenter projects, purchasing, and advancing MongoHQ's customer facing operations, communications efforts and preventive maintenance -- *i.e.*, identifying and crafting responses to potential risks to MongoHQ and its customers.

8. In 2014, MongoHQ expanded the scope of its services and changed its name to Compose, Inc. ("Compose"). Compose became a multi-Database-as-a-service (DBaaS) vendor, whose mission was to enable developers to choose the best database for their needs and then help those developers get to production quickly. As a Compose employee, Yocum continued to be employed pursuant to Exhibit 1.

### IBM Becomes Compose's Successor-In-Interest

9. In 2015, IBM expressed interest in acquiring Compose, and the two corporations negotiated the terms of the acquisition. The deal closed and IBM acquired Compose on or about

2

FILED DATE: 1/22/2019 12:00 AM 2019L000717

July 23, 2015. IBM issued a news release that day, which is available online at https://www-03.ibm.com/press/us/en/pressrelease/47363.wss (last visited October 29, 2018) (hereafter, "News Release"). A copy of the News Release is attached hereto as Exhibit 2.

10. As set forth in the News Release, IBM saw tremendous value in Compose:

> The cloud database arena is projected to be worth $14 billion by 2019, and open source databases like MongoDB are a significant part—and rapidly growing portion—of this sector.
> "Compose's breadth of database offerings will expand IBM's Bluemix platform for the many app developers seeking production-ready databases built on open sources," said Derek Schoettle, General Manager, IBM Could Data Services. "Compose furthers IBM's commitment to ensuring developers have access to the right tools for the job by offering the broadest set of DBaaS service and the flexibility of hybrid cloud deployment."
> IBM's Cloud Data Services offerings are composable, integrated services for developers that run on the secure, high-performance IBM Cloud platform, Bluemix, with highly accessible Devops support teams. Compose provides IBM with an enhanced framework to deliver highly sought after, production ready, cloud database services for developers. IBM's containerized data services approach will further drive the introduction of new Cloud Data Services offerings.

(See Exh. 2.)

11. Upon closing the acquisition on July 23, 2015 (the "Closing"), IBM assumed the obligations and liabilities Compose owed to Yocum pursuant to both (a) his 2014 written Employment Agreement, and (b) a bonus program that Compose launched approximately 1 week prior to the Closing.

12. IBM and Yocum also executed an "Agreement Regarding Confidential Information, Intellectual Property, and Other Matters" (hereafter, the "Rights Agreement"). Yocum signed the Rights Agreement on August 19, 2015. A copy of the Rights Agreement is attached hereto as Exhibit 3.

13. The Rights Agreement required Yocum to, *inter alia*, give up various rights both during and after his employment at IBM, including but not limited to his:

3

FILED DATE: 1/22/2019 12:00 AM  2019L000717

    a.  right to work for an employer of his choosing;

    b.  right to speak with IBM employees regarding employment opportunities outside of IBM;

    c.  right, title, and interest in computer programs and other works of authorship;

    d.  right of attribution; and

    e.  right of privacy.

14. Upon its acquisition, Compose became "An IBM Company" but retained its pre-acquisition identity and corporate culture -- *e.g.*, its tools, policies and procedures -- until it was time for the "Transfer of Business." "Transfer of Business" or "ToB" is an IBM term used to describe when an acquired company has officially crossed over from its pre-acquisition tools, policies and procedures to IBM's tools, policies and procedures.

15. Compose and IBM delayed the ToB date until (at least) May 2018, in part to prevent the attrition of Compose's key employees. To this day, Compose has kept its name.

16. As another means of retaining key Compose employees and incentivizing them to continue their high-level performance, IBM instituted a second bonus program (to supplement the Compose bonus program referenced in ¶ 11 (b) above).

17. Yocum was thus eligible for and participated in two bonus programs at IBM:

    a.  the Compose, Inc. 2015 Bonus Plan (hereafter, "Founder Bonus Plan"), which Compose and Yocum executed on July 22, 2015, and for which IBM assumed Compose's obligations at Closing (a copy of the Founder Bonus Plan is attached hereto as Exhibit 4); and

FILED DATE: 1/22/2019 12:00 AM   2019L000717

b. the Milestone Achievement Program (hereafter, the "Milestone Bonus Plan"), which IBM and Yocum entered into on August 3, 2015. A copy of the Milestone Bonus Plan is attached hereto as Exhibit 5.

**The Founder Bonus Plan**

18. Yocum's eligibility under the Founder Bonus Plan was based on the length of his employment at Compose prior to June 1, 2015. Specifically, because Yocum had been employed at Compose on or before June 1, 2014, he was entitled to receive, *inter alia*, twenty-four "Monthly Bonuses" each equal to $6,250. These Monthly Bonuses vested, one-at-a-time, beginning on the 12-month anniversary of the Closing -- *i.e.*, July 23, 2015 -- and each month thereafter for the following 23 months. (See Exhibit 4.)

19. The Founder Bonus Plan provides that if IBM terminates an otherwise eligible Compose employee for a reason other than "cause" prior to the 36-month anniversary of the Closing (*i.e.*, prior to July 23, 2018), that employee shall receive 100% of his then unpaid Total Bonus. (See Exhibit 4.)

20. In contrast, the Founder Bonus Plan further provides that if IBM terminates an otherwise eligible Compose employee for "cause", then that employee's unpaid portion of the Total Bonus is forfeited upon termination. (See Exhibit 4.)

**The Milestone Bonus Plan**

21. Approximately one week after the Closing, IBM sent Yocum a letter dated July 30, 2015. The letter was an offer to participate in IBM's Milestone Bonus Plan. Yocum signed the Milestone Bonus Plan on August 3, 2015. (See Exhibit 5.)

5

FILED DATE: 1/22/2019 12:00 AM 2019L000717

22. Pursuant to the Milestone Bonus Plan, Yocum was eligible to receive bonuses provided that he (a) remained an employee of IBM and its subsidiaries for the certain "milestone" periods defined therein, and (b) met defined "milestone" targets. (See Exhibit 5.)

23. The third milestone period began on the two-year anniversary of the Closing and ended on the three-year anniversary of the Closing, *i.e.*, July 23, 2018. Yocum's Milestone bonus for the third milestone period is $300,000. (See Exhibit 5.)

24. The Milestone Bonus Plan provides that if IBM terminates an otherwise eligible employee without "cause" at any point prior to the completion of the period of time covered under the plan, then the milestone payment for then then-current milestone period will be paid to the employee within a reasonable period of time after such termination. (See Exhibit 5.)

25. In contrast, the Milestone Bonus Plan further provides that if IBM terminates an employee for "cause" at any point prior to the completion of the period of time covered under that plan, then the employee will not receive any further payments, partial or otherwise, from the date of the termination notice. (See Exhibit 5.)

**IBM Terminates Yocum Without "Cause"**

26. Yocum's employment at IBM officially started on October 1, 2015. Yocum's title at IBM was "Director, Operations, IBM Cloud Databases". Yocum performed all the important functions of his job well, as is reflected in his annual Performance Assessments for years 2016 and 2017, which are attached hereto as Exhibit 6 and Exhibit 7, respectively.

27. Part of Yocum's job included addressing both present and prospective security and performance concerns. One such security concern was a pair of "vulnerabilities" -- *i.e.*, bugs in computers' central processing units ("CPUs") that pose a security risk. These two vulnerabilities,

6

FILED DATE: 1/22/2019 12:00 AM 2019L000717

known as "Spectre" and "Meltdown", targeted performance features of Intel CPUs commonly used by Compose and its customers.

28. In or around January 1, 2018, "patches" -- *i.e.*, remedial programs intended to eliminate or mitigate vulnerabilities -- for Spectre and Meltdown were released to the public. Within a few days of the release of the "Spectre/Meltdown patches", users who applied the patches to their computers reported performance concerns, specifically that the patches drastically reduced their computers' processing speeds.

29. Yocum decided to test the effects that the Spectre/Meltdown patches could have on some of Compose's clients' more heavily stressed systems. In order to safely conduct such an experiment, Yocum had to create an isolated test environment in which the Spectre/Meltdown patches were applied to a similarly stressed system.

30. One effective way of test-stressing a system is to run cryptocurrency software like Monero, which runs ASIC-resistant software, *i.e.*, software designed to use as much CPU time as possible. Yocum in fact installed Monero on several CPUs in a secure research environment in order to gauge effects of the Spectre/Meltdown patches on extremely stressed systems.

31. On April 24, 2018, Yocum spoke on the telephone with Jozef De Vries, the Massachusetts-based Engineering Director to whom Yocum reported at IBM. Yocum and De Vries discussed the broad scope of Yocum's role at Compose and his many responsibilities. De Vries said that Yocum was integral to the success of the Compose team, and that Yocum's work was very good. De Vries said that he had no complaints about or criticism of Yocum's work. Later that afternoon, however, De Vries called Yocum and said that Yocum had to go on paid leave while IBM conducted an internal investigation. De Vries said he could not discuss any details of the investigation.

FILED DATE: 1/22/2019 12:00 AM 2019L000717

32. On April 27, 2018, Yocum spoke with De Vries on the telephone. De Vries told Yocum that the investigation involved the computers that Yocum designated for use in his tests on the effects of the Spectre/Meltdown patches.

33. On June 26, 2018, IBM terminated Yocum's employment without cause.

34. In order to confirm that his termination was without cause:

(a) On June 27, 2018, Yocum delivered to IBM a written request for his entire personnel file, and all other personnel documents IBM used to determine his qualifications for any kind of employment action, pursuant to the Personnel Record Review Act, 820 ILCS 40/1, *et seq.*;

(b) Yocum specifically requested documents used to determine whether at any time his employment would be terminated for cause or without cause;

(c) on July 2, 2018, IBM advised Yocum that it received his request and was gathering requested documents, which it would produce to Yocum on or before July 13, 2018;

(d) on July 13, 2018, IBM produced documents in response to Yocum's request, which IBM had Bates Stamped IBM000001 through IBM000115 ("IBM Document Production"); and

(e) the IBM Document Production contains no record of IBM terminating Yocum "for cause."

Copies of Yocum's June 27, 2018 personnel file request and the IBM Document Production are attached hereto as Group Exhibit 8.

35. The distinction between termination "for cause" and "without cause" is significant to both bonus programs. As explained at paragraphs 19-20 and 24-25, above, Yocum is entitled to both bonuses if (as here) he is terminated without cause. Thus, Yocum is entitled to the full amount of his Founder Bonus and his Milestone Bonus.

FILED DATE: 1/22/2019 12:00 AM  2019L000717

36. IBM did not pay Yocum the full amount of his Founder Bonus. IBM withheld Yocum's Monthly Bonus of $6,250 for the months of April, May, June and July of 2018.

37. IBM did not pay Yocum the full amount of his Milestone Bonus. IBM withheld Yocum's bonus of $300,000 for the third milestone period.

38. The last paycheck that IBM issued to Yocum was dated June 29, 2018. The June 29, 2018 paycheck included only payment for Yocum's unused vacation pay. IBM did not pay Yocum his outstanding Founder Bonus -- the Monthly Bonuses -- or his outstanding Milestone Bonus. A copy of the June 29, 2018 paycheck is attached hereto as Exhibit 9

**The Illinois Wage Claim and Protection Act**

39. The Illinois Wage Payment and Collection Act (hereafter, the "Wage Payment Act") allows employees to sue for the timely and complete payment of earned wages or final compensation. *Andrews v. Kowa Printing Corp.*, 351 Ill. App. 3d 668, 675 (2004). The Wage Payment Act defines "final compensation" as "wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. To establish a violation of the Wage Payment Act, a plaintiff must allege that "(1) the defendant was an 'employer' as defined in the Wage Payment Act; (2) the parties entered into an 'employment contract or agreement'; and (3) the plaintiff was due 'final compensation.' *Catania v. Local 4250/5050*, 359 Ill. App. 3d 718, 724 (1st Dist. 2005).

40. An employee has a right to an earned bonus when there is an unequivocal promise by the employer and the employee has performed the requirements set forth in the bonus agreement between the parties and all of the required conditions for receiving the bonus set forth in the bonus agreement have been met. Unless one of the conditions for the bonus that the employee be on the

9

FILED DATE: 1/22/2019 12:00 AM    2019L000717

payroll at the time of the bonus payout, the bonus is due and owing to the employee at the time of separation. 56 Ill. Adm. Code 300.500.

41. The Wage Payment Act applies to "all employers and employees in this State", *i.e.*, Illinois. 820 ILCS 115/1. An "employer" includes "any . . . corporation . . . for which one or more persons is gainfully employed." 820 ILCS 115/2.

42. The Illinois Administrative Code states that the Wage Payment Act applies to employers that reside outside of Illinois. 56 Ill. Admin. Code 300.440(a). The phrase "in this State" as used in Section 1 of the Wage Payment Act does not require the employer to have residency in the State. 56 Ill. Admin. Code 300.440(a). The Wage Payment Act considers out-of-state defendants to be "employers" where (a) the work was performed in Illinois and (b) the employer has sufficient contacts in the State, such as performing substantial business in the State, maintaining a principal place of business in the State, marketing its services in the State or maintaining a registered agent within the State. 56 Ill. Admin. Code 300.400(c).

43. IBM is "in this State" and subject to the Wage Payment Act. IBM is and at all relevant times has been a resident of Illinois. IBM operates a principal place of business, markets its services, and maintains a registered agent in Illinois.

44. Yocum was IBM's "employee . . . in this State". Throughout his employment at IBM, Yocum worked at IBM's principal regional office or remotely from his residence, both of which are in Chicago, Illinois. Yocum's last paycheck from IBM identifies Illinois both as Yocum's Work State and his Residence State. (See Exhibit 9.)

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## COUNT I
### IBM'S FAILURE TO PAY YOCUM HIS MONTHLY BONUSES DUE UNDER THE FOUNDER BONUS PLAN VIOLATES THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820 ILCS 115/1 *et seq.*

45. Yocum realleges and incorporates paragraphs 1 through 44 of this Complaint as though fully set forth herein.

46. IBM agreed to pay Yocum compensation that included but was not limited to the bonus compensation set forth in the Founder Bonus Plan. (See Exhibit 4.)

47. The bonus compensation due to Yocum pursuant to the Founder Bonus Plan was based on Yocum's length of service prior to IBM's acquisition of Compose and Yocum's length of service following IBM's acquisition of Compose. (See Exhibit 4.)

48. Yocum's length of service prior to IBM's acquisition of Compose was used to determine the total bonus compensation to which Yocum was eligible under the Founder Bonus Plan. Yocum was entitled to the "full amount" of the bonus available under Founder Bonus Plan because he had been employed at Compose prior to June 1, 2015. (See Exhibit 4.)

49. Yocum's length of service after IBM's acquisition of Compose is used to determine which categories of bonus Yocum earned. As an employee due the "full amount" under the Founder Bonus Plan, Yocum earned a "Monthly Bonus" of $6,250.00 every month for 24 months starting one year from the Closing. (See Exhibit 4.)

50. Yocum remined employed at and performed services for IBM from the date of the Closing on June 23, 2015 through the date of his termination on June 26, 2018. During this time, Yocum continued to provide assistance to IBM and fulfill his obligations set forth in the Rights Agreement.

51. IBM terminated Yocum's employment on June 26, 2018 without cause, which requires IBM to pay Yocum the total amount for which he is eligible under the Founder Bonus Plan. (See Exhibit 4 at Art. 4.1.)

FILED DATE: 1/22/2019 12:00 AM    2019L000717

52. IBM failed to pay Yocum $25,000 earned under the Founder Bonus Plan, which comprises his Monthly Bonus payments of $6,250 for each of April, May, June and July of 2018.

53. IBM's failure to pay Yocum the $25,000 in bonus payments for April, May, June and July of 2018 violates the Wage Payment Act.

**COUNT II**
**IBM'S FAILURE TO PAY YOCUM THE BONUS FOR THE THIRD**
**MILESTONE PERIOD PURSUANT TO THE MILESTONE BONUS PLAN**
**VIOLATES THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT, 820**
**ILCS 115/1 *et seq.***

54. Yocum realleges and incorporates paragraphs 1 through 44 of this Complaint as though fully set forth herein.

55. IBM agreed to pay Yocum compensation that included but was not limited to the bonus compensation set forth in the Milestone Bonus Plan. (See Exhibit 5.)

56. The bonus compensation due to Yocum pursuant to the Milestone Bonus Plan was based on Yocum's length of service following IBM's acquisition of Compose.

57. Pursuant to the Milestone Bonus Plan, IBM was obligated to pay Yocum $300,000 -- equal to 75% of the $400,000 maximum bonus -- with ten days of the third anniversary of the Closing.

58. The third anniversary of the Closing was July 23, 2018. IBM did not pay Yocum his earned bonus of $300,000 pursuant to the Milestone Bonus Plan.

59. IBM terminated Yocum's employment without cause on June 26, 2018.

60. The Milestone Bonus Plan states that in cases in which IBM terminates an employee without cause at any point prior to the completion of the period time covered under the Milestone Bonus Plan, the milestone payment for the then-current milestone period must be paid in full to the employee within a reasonable period of time after such termination.

12

FILED DATE: 1/22/2019 12:00 AM  2019L000717

61. IBM cannot predicate its failure to pay Yocum his $300,000 bonus under the Milestone Bonus Plan on his termination prior to July 23, 2018. IBM employed Yocum for 92% of the third milestone period and is obligated to pay Yocum the full milestone payment for that period within a reasonable period of time after such termination.

62. IBM cannot predicate its failure to pay Yocum his $300,000 bonus under the Milestone Bonus Plan on Yocum's not having executed "IBM's standard release of claims" after termination. IBM never identified nor produced to Yocum any release of claims for execution.

63. Moreover, Illinois does not permit IBM to settle claims relating to its violation of the Wage Payment Act by requiring departed or departing employees to sign a release, as such releases are prohibited. 820 ILCS 115/9; *Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140 at ¶ 35.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, Timothy K. Yocum, respectfully requests that this Court enter a judgment order in his favor and against IBM Corporation, awarding Yocum his final compensation of:

    a. $25,000, comprising the total unpaid Monthly Bonus Payments that IBM wrongfully withheld from him; and

    b. $300,000, comprising the total unpaid Milestone Plan Bonus that IBM wrongfully withheld from him; plus

pre-judgment interest, penalties, reasonable attorney's fees and costs, pursuant to the Illinois Wage Payment and Collection Act, and such further and additional relief as may be awarded by the Court.

13

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Respectfully submitted,

TIMOTHY K. YOCUM,

By: _____

One of His Attorneys.

Edward T. Joyce
Jacob L. V. Armstrong
THE LAW OFFICES OF
EDWARD T. & ASSOCIATES, P.C.
135 S. LaSalle Street, Suite 2200
Chicago, Illinois 60603
(312) 641-2600
(312) 641-0360 – Fax
Attorney No. 47922

14

FILED
1/22/2019 12:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 1

FILED DATE: 1/22/2019 12:00 AM   2019L000717



273 Railroad Ave, San Mateo CA 94403

**January 29, 2014**

Dear Tim Yocum:

MongoHQ Inc., a Delaware corporation (the "Company"), is pleased to of-
fer you employment with the Company on the terms described below.

1.  **Position.** You will start in a full-time position as Operations
Engineer and you will report to the Company's CEO, Kurt Mackey. Your primary
duties, among other things, will be to manage datacenter projects, purchasing,
and advancing the Company's customer facing operations and communication
efforts. By signing this letter, you confirm with the Company that you are under
no contractual or other legal obligations that would prohibit you from perform-
ing your duties with the Company.

2.  **Compensation and Employee Benefits.** You will be paid a starting
salary at the rate of $150,000 per year, payable on the Company's regular pay-
roll dates.

3.  **Stock Options.** Subject to the approval of the Company's Board of
Directors, you will be granted an option to purchase 135,905 (of 27,181,156
outstanding) shares of the Company's common stock. The option will be sub-
ject to the terms and conditions applicable to options granted under the Com-
pany's 2012 Stock Plan, as described in that plan and the applicable stock op-
tion agreement, which you will be required to sign. You will vest in 25% of the
option shares on the 12-month anniversary of your vesting commencement
date and 1/48th of the total option shares will vest in monthly installments
thereafter during continuous service, as described in the applicable stock option
agreement.

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

The exercise price per share will be equal to the fair market value per share on the date the option is granted, as determined by the Company's Board of Directors in good faith compliance with applicable guidance in order to avoid having the option be treated as deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended. There is no guarantee that the Internal Revenue Service will agree with this value. You should consult with your own tax advisor concerning the tax risks associated with accepting an option to purchase the Company's common stock.

4.    **Confidential Information and Invention Assignment Agreement.** Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement.

5.    **Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

6.    **Outside Activities.** While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

7.    **Withholding Taxes.** All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

8.    **Entire Agreement.** This letter supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

[Signature Page Follows]

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM    2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on February 3, 2014.

We look forward to having you join us no later than February 14, 2014.

Very truly yours,

MongoHQ Inc.

By: _____

Name: <u>Kurt Mackey</u>
Title: <u>Chief Executive Officer</u>

ACCEPTED AND AGREED:

Tim Yocum
_____
(Print Employee Name)

_____
(Signature)

02 / 03 / 2014
_____
Date

Anticipated Start Date:_____

<u>Attachment A</u>: Confidential Information and Invention Assignment Agreement

Doc ID: a93c395a6af2de9615373ca93708086c859ddc68

IBM CONFIDENTIAL

IBM 000066

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## ATTACHMENT A

**CONFIDENTIAL INFORMATION AND
INVENTION ASSIGNMENT AGREEMENT**

(See Attached)

IBM CONFIDENTIAL

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

IBM 000067

FILED DATE: 1/22/2019 12:00 AM 2019L000717

**MongoHQ Inc.**

## CONFIDENTIAL INFORMATION ANDINVENTION ASSIGNMENT AGREEMENT

*Employee Name:* <u>Tim Yocum</u>

*Effective Date:* <u>2/14/2014</u>

As a condition of becoming employed (or my employment being continued) by MongoHQ Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "<u>Company</u>"), and in consideration of my employment with the Company and receipt of the compensation now and hereafter paid by the Company, I agree to the following:

1.    1.    **Relationship.** This Confidential Information and Invention Assignment Agreement (this "<u>Agreement</u>") will apply to my employment relationship with the Company. If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, this Agreement will also apply to such later employment or consulting relationship, unless the parties hereto otherwise agree in writing. Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "<u>Relationship</u>."

2.    2.    **Duties.** I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship and not contrary to instructions from the Company. During the Relationship, I will devote my entire best business efforts to the interests of the Company and will not engage in other employment or in any activities detrimental to the best interests of the Company without the prior written consent of the Company.

3.    3.    **Confidential Information.**

     a.    (a)    **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the

Doc ID: a93c395a6af2de9615373ca93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM  2019L000717

Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

b.      (b)    **Confidential Information.** I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

c.      (c)    **Third Party Information.** My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physical material to the Company in confidence.

d.      (d)    **Other Rights.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

e.    4.    **Ownership of Inventions.**

f.      (a)    **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or

Doc ID: a93c395a6a12de9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM   2019L000717

research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

g.     (b)   **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

h.     (c)   **Inventions.** I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship, except as otherwise provided in Section 4(g) below.

i.     (d)   **Assignment of Company Inventions.** I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary.

j.     (e)   **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches,

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM  2019L000717

drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole discretion of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 5 and 6.

        k.     (f)   **Patent and Copyright Rights.**  I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such instruments and papers and to do all other lawfully permitted acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney is coupled with an interest and shall not be affected by my subsequent incapacity.

        l.     (g)   **Exception to Assignments.**  Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention which qualifies fully for exclusion under the provisions of applicable state law, if any. In order to assist in the determination of which inventions may qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the

Doc ID: a93c395a6af2de9615373ca93708086c859ddc68

period of the Relationship.

m.     5.     **Company Property; Returning Company Documents.**
I acknowledge and agree that I have no expectation of privacy with respect
to the Company's telecommunications, networking or information processing
systems (including, without limitation, files, e-mail messages, and voice
messages) and that my activity and any files or messages on or using any of
those systems may be monitored or reviewed at any time without notice. I
further agree that any property situated on the Company's premises and
owned by the Company, including disks and other storage media, filing
cabinets or other work areas, is subject to inspection by Company personnel
at any time with or without notice. I agree that, at the time of termination of
the Relationship, I will deliver to the Company (and will not keep in my
possession, recreate or deliver to anyone else) any and all devices, records,
data, notes, reports, proposals, lists, correspondence, specifications,
drawings, blueprints, sketches, laboratory notebooks, materials, flow charts,
equipment, other documents or property, or reproductions of any of the
aforementioned items developed by me pursuant to the Relationship or
otherwise belonging to the Company, its successors or assigns.

n.     6.     **Termination Certification.** In the event of the
termination of the Relationship, I agree to sign and deliver the "Termination
Certification" attached hereto as Exhibit B; however, my failure to sign and
deliver the Termination Certification shall in no way diminish my continuing
obligations under this Agreement.

o.     7.     **Notice to Third Parties.** I agree that during the periods
of time during which I am restricted in taking certain actions by the terms of
this Agreement (the "Restriction Period"), I shall inform any entity or person
with whom I may seek to enter into a business relationship (whether as an
owner, employee, independent contractor, or otherwise) of my contractual
obligations under this Agreement. I also understand and agree that the
Company may, with or without prior notice to me and during or after the
term of the Relationship, notify third parties of my agreements and
obligations under this Agreement. I further agree that, upon written request
by the Company, I will respond to the Company in writing regarding the
status of my employment or proposed employment with any party during the
Restriction Period.

p.     8.     **Solicitation of Employees, Consultants and Other
Parties.** As described above, I acknowledge and agree that the Company's
Confidential Information includes information relating to the Company's
employees, consultants, customers and others, and that I will not use or
disclose such Confidential Information except as authorized by the Company.
I further agree as follows:

IBM CONFIDENTIAL

Doc ID: a93c395a6af2de9615373a93708086c859ddc68

q.     (a)    **Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

r.     (b)    **Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. In addition, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

s.     9.    **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly provided in a separate written agreement between the Company and me, my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability, other than those provisions of this Agreement that explicitly survive the termination of the Relationship.

t.     10.    **Representations and Covenants.**

u.     (a)    **Facilitation of Agreement.** I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

v.     (b)    **No Conflicts.** I represent that my performance of all

Doc ID: a93c395a6af2de9615373a93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on <u>Exhibit A</u> all agreements (*e.g.*, non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

w.      (c)      **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

x.      11.      **General Provisions.**

y.      (a)      **Governing Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Alabama, without giving effect to the principles of conflict of laws.

z.      (b)      **Entire Agreement.** This Agreement sets forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior discussions between the parties to this Agreement. No amendment to this Agreement will be effective unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

Doc ID: a93c395a6af2de9615373ca93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM   2019L000717

aa.   (c)   **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

bb.   (d)   **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

cc.   (e)   **Remedies.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

dd.   (f)   **Advice of Counsel.** I acknowledge THAT, IN EXECUTING THIS AGREEMENT, I Have HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I Have read and understood ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

*[Signature Page Follows]*

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**the company:**

MongoHQ Inc.

By: _____
(Signature)

Name: Kurt Mackey
_____

Title: CEO
_____

Address:_____
_____ _____ United States Fax:
_____

Date:
_____

**Employee:**

Tim Yocum
_____
(Print Name)

_____
(Signature)

Address:

_____ _____
United States

Date:
02 / 03 / 2014
_____

## EXHIBIT A

## LIST OF PRIOR INVENTIONS AND ORIGINAL WORKS OF AUTHORSHIP EXCLUDED UNDER SECTION 4(a)

| Title | Date | Identifying Number or Brief Description |
|-------|------|------------------------------------------|

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

\_\_\_ No inventions, improvements, or original works of authorship

\_\_\_ No agreements under Section 10(b)\_\_\_ Additional sheets attached

Signature of Employee:_____

Print Name of Employee:  _____

Date:_____

## EXHIBIT B

### TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to MongoHQ Inc., a Delaware corporation, its subsidiaries, affiliates, successors

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any Inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject-matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from the date of this Certification, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

Further, I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months from the date of this Certification for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company and that, thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

Date:_____     **Employee:**

_____
(Print Employee's Name)

_____(Signature)

Doc ID: a93c395a6af2de4615373a937080866c859ddc68

FILED DATE: 1/22/2019 12:00 AM  2019L000717

Page 1 of 1



FILED DATE: 1/22/2019 12:00 AM  2019L000717

# Audit Trail

Unique document ID:  a93c395a6af2de9615373cc93708086c859ddc68
Document name: Now with e-signature amazingness
Status:  Signed and closed

### 01/30/2014

19:21:28 UTC    Document (tim-yocum-offer-letter.pdf) uploaded by
                       hello@mongohq.com
                       IP: 67.180.97.12

19:21:31 UTC    Document (Yocum, Tim - CIIAA.rtf) uploaded by
                       hello@mongohq.com
                       IP: 67.180.97.12

19:26:21 UTC    Document signed by hello@mongohq.com
                       IP: 67.180.97.12

19:26:21 UTC    Document sent for signature to: Tim Yocum
                       (tim@yocum.org)
                       IP: 67.180.97.12

### 02/03/2014

16:54:52 UTC    Document viewed by Tim Yocum (tim@yocum.org)
                       IP: 205.234.237.186

16:56:56 UTC    Document signed by Tim Yocum (tim@yocum.org)
                       IP: 205.234.237.186

16:56:56 UTC    The document has been signed and is now closed.

IBM CONFIDENTIAL

IBM 000079

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 2

FILED DATE: 1/22/2019 12:00 AM   2019L000717

IBM.

News room   News releases

# IBM Acquires Compose to Expand Cloud Data Services

**Select a topic or year**

**News release**                                    **Related XML feeds**

**ARMONK, N.Y. - 23 Jul 2015:** IBM (NYSE: IBM) today announced the acquisition of San Mateo, CA-based Compose, Inc., a privately held company that provides MongoDB, Redis, Elasticsearch, PostgreSQL, and other database as a service (DBaaS) offerings targeted at web and mobile app developers. The acquisition furthers IBM's commitment to accelerating developer productivity and innovation around open source and cloud data services. Financial terms were not disclosed.

The cloud database arena is projected to be worth $14 billion by 2019, and open source databases like MongoDB are a significant part —and rapidly growing portion —of this sector. Driving this popularity among developers is the ability to make web and mobile applications easy to build and grow, without the distraction and monotony of back-end database and systems administration. Thousands of clients across a variety of industries, including retail, IoT, higher education, marketing services and ecommerce have created over 100,000 databases with Compose.

"Compose's breadth of database offerings will expand IBM's Bluemix platform for the many app developers seeking production-ready databases built on open source," said Derek Schoettle, General Manager, IBM Cloud Data Services. "Compose furthers IBM's commitment to ensuring developers have access to the right tools for the job by offering the broadest set of DBaaS service and the flexibility of hybrid cloud deployment."

IBM's Cloud Data Services offerings are composable, integrated services for developers that run on the secure, high-performance IBM Cloud platform, Bluemix, with highly accessible DevOps support teams. Compose provides IBM with an enhanced framework to deliver highly sought after, production ready, cloud database services for developers. IBM's containerized data services approach will further drive the introduction of new Cloud Data Services offerings.

"By joining IBM, we will have an opportunity to accelerate the development of our database platform and offer even more services and support to developer teams," said Kurt Mackey, co-founder and CEO of Compose. "As developers, we know how hard it can be to manage databases at scale, which is exactly why we built Compose –to take that burden off of our customers and allow them to get back to the engineering they love."

Companies are eager to leverage new managed database technologies, but are not always equipped to dedicate the budget and resources necessary to acquire database administration expertise. Compose removes the difficulty and risk associated with setting up, administering, scaling and integrating new DBMS technologies.

In addition to providing 24x7 monitoring and management by DBaaS DevOps experts, Compose features:

· "Containerized" DBaaS platform technology –enabling fast deployment and scaling of popular open source DBaaS services for customers;

· Auto-scaling with predictable performance;

· Built-in redundancy, backup, failover for uninterrupted DBaaS service & application uptime;

· Valuable add-ons including Compose Transporter, which helps developers move data between services like MongoDB and Elasticsearch for easier application development and to provide a better end-user experience.

The acquisition of Compose continues IBM's commitment to open source technology and communities across the entire cloud stack. In addition to this latest announcement, and the announcement to make the company's container technology available through Docker last month, IBM serves as a founding member of The Cloud Foundry and OpenStack Foundations, a platinum sponsor of the Node.js Foundation and a sponsor of the Open Container Project.

## About Compose

Founded in 2010, Compose offers auto-scaling, production-ready databases to help software development teams deploy data services quickly and easily. Compose currently supports five popular open source databases including MongoDB, Redis, Elasticsearch, PostgreSQL and RethinkDB. Each database is provisioned in minutes and includes high availability (HA), failover, and daily backups. In addition, Compose offers Transporter for moving and syncing data continuously between data stores —available both as a service and as a free open source application. More than 3600 companies rely on Compose-hosted databases for keeping their apps in production 24/7.

For information about how IBM Cloud Data Services is changing the way services are created for and delivered to developers, follow us on Twitter at @getdashDB and @IBMcloudant, and visit www.dashdb.com and www.cloudant.com.

**Related XML feeds**

**Topics**                                                          **XML feeds**

FILED DATE: 1/22/2019 12:00 AM   2019L000717

| Topics | XML feeds |
|---|---|
| **IBM Cloud Computing**<br>Gain access to your applications from anywhere, at any time. | Feed |
| **IBM MobileFirst** | Feed |

**Build your own feed**

New to RSS?

Back to top

**IBM News Room Twitter**

Join the conversation

**Share**

Facebook

Twitter

LinkedIn

**Engage IBM**

Contact a media relations representative

Site feedback

**RSS**

Subscribe to our latest news releases

View more news room feeds

FILED DATE: 1/22/2019 12:00 AM 2019L000717

# Exhibit 3

FILED DATE: 1/22/2019 12:00 AM    2019L000717

IBM Serial Number: 3G7958    IBM Date of Hire (MM-DD-YYYY): 10 - 01 - 2015

# IBM

## Agreement Regarding Confidential Information, Intellectual Property, and Other Matters

In consideration of my employment or my continued employment by International Business Machines Corporation or one of its subsidiaries or affiliates (collectively, "IBM"), which I acknowledge is employment at will, and the payment to me of a salary or other compensation during my employment, I agree as follows:

1. I will not, without IBM's prior written permission, disclose to anyone outside of IBM or use in other than IBM's business, either during or after my employment, any confidential information or material of IBM, or any information or material received by IBM in confidence from third parties, such as suppliers or customers. If I leave the employ of IBM or at the request of IBM, I will return to IBM all property in my possession belonging to IBM or received by IBM from any third party, whether or not containing confidential information and whether stored on an IBM owned asset or a personally owned asset, including, but not limited to, electronic data, electronic files, diskettes and other storage media, drawings, notebooks, reports, and any other hard copy or electronic documents or records.

Confidential information or material of IBM is any information or material: (a) generated or collected by or utilized in the operations of IBM; received from any third party; obtained from an entity IBM acquired or in which IBM purchased a controlling interest (including information or material received by that entity from a third party); or suggested by or resulting from any task assigned to me or work performed by me for or on behalf of IBM; and (b) which has not been made available generally to the public, whether or not expressed in a document or other medium and whether or not marked "IBM Confidential" or with any similar legend of IBM or any third party. Confidential information or material may include, but is not limited to, information and material related to past, present and future development, manufacturing activities, or personnel matters; marketing and business plans; pricing information; customer lists; technical specifications, drawings, and designs; prototypes; computer programs; and databases.

2. (a) During my employment with IBM and for two years following the termination of my employment from IBM for any reason, I will not directly or indirectly within the Restricted Area solicit, or attempt to or participate or assist in any effort to solicit, any employee of IBM to be employed or perform services outside of IBM. For purposes of this Paragraph 2(a), "Restricted Area" shall mean any geographic area in the world in which I worked or for which I had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of my employment with IBM. Also, for purposes of this Paragraph 2(a), "employee of IBM" shall mean any employee of IBM who worked within the Restricted Area at any time in the 12-month period immediately preceding any actual or attempted solicitation.

   (b) I agree that during my employment with IBM and for one year following the termination of my employment for any reason, I will not directly or indirectly solicit for competitive business purposes any customer with which I was directly or indirectly involved as part of my job responsibilities during the twelve (12) months prior to the termination of my employment with IBM. This paragraph 2(b) does not apply to any IBM employee whose work location as reflected in IBM records is within the state of California.

I acknowledge that IBM would suffer irreparable harm if I fail to comply with Paragraph 2(a) or (b), and that IBM would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees.

3. I will not disclose to IBM, use in its business, or cause it to use, any information or material which is confidential to any third party unless authorized by IBM. In addition, I will not incorporate into any product used and/or sold by IBM, any copyrighted materials or patented inventions of any third party, unless authorized by IBM.

4. I will comply, and do all things necessary for IBM to comply, with (a) the laws and regulations of all governments under which IBM does business, (b) the provisions of contracts between any such government or its contractors and IBM that relate to intellectual property or to the safeguarding of information, and (c) IBM's corporate directives, including, without limitation, policies and information technology security standards issued from time to time as well as the IBM Business Conduct Guidelines as amended from time to time.

5. I hereby assign to IBM my entire right, title, and interest in any idea, concept, technique, invention, design (whether the design is ornamental or otherwise), computer programs and related documentation, other works of authorship, mask works, and the like (all hereinafter called "Developments"), hereafter made, conceived, written, or otherwise created solely or jointly by me, whether or not such Developments are patentable, subject to copyright or trademark protection or susceptible to any other form of protection which: (a) relate to the actual or anticipated business or research or development of IBM or its subsidiaries or (b) are suggested by or result from any task assigned to me or work performed by me for or on behalf of IBM or its subsidiaries. Also, I hereby assign to IBM my entire right, title and interest in any such Developments that were suggested by or resulted from any task assigned to me or work performed by me for or on behalf of any entity that IBM acquired or in which IBM purchased a controlling interest.

In the case of any "other works of authorship", such assignment shall be limited to those works of authorship which meet both conditions (a) and (b) above.

   *California Notice: For Developments subject to California law, notwithstanding anything above to the contrary, I understand that this assignment does not apply to a Development which qualifies fully under the provisions of Section 2870 of the California Labor Code.*

The above provisions concerning assignment of Developments apply to Developments created while I am employed by IBM in an executive, managerial, professional, product or technical planning, technical, research, programming, or engineering capacity (including development, product, manufacturing, systems, applied science, and field engineering).

Excluded are any Developments that I cannot assign to IBM because of prior agreement with (select one): ☒ None ☐ Have Prior Agreements
List Prior Agreements: _____

_____

_____

With (Give Name): _____    Effective Date (Give Date): Select -    -

I acknowledge that the copyright and any other intellectual property right in designs, computer programs and related documentation, and other works of authorship, created within the scope of my employment, belong to IBM by operation of law.

6. In connection with any of the Developments assigned by Paragraph 5: (a) I will promptly disclose them in writing to the IBM Intellectual Property Law Department; and (b) I will, on IBM's request, promptly execute a specific assignment of title to IBM or its designee, and do anything else reasonably necessary to enable IBM or such designee to secure a patent, copyright or other form of protection therefore in the United States and in other countries. In addition, I agree to promptly notify the IBM Intellectual Property Law Department in writing of any patent or patent application in which I am an inventor but which is not assigned by Paragraph 5 and which discloses or claims any Development made, conceived, or written while I am employed by IBM. I also agree to promptly notify the IBM Intellectual Property Law Department if, after I leave the employ of IBM, I am contacted by anyone or any entity outside of IBM regarding any transaction, legal or governmental proceeding, litigation or other legal dispute concerning or relating to any of the Developments assigned by Paragraph 5.

*PERSONNEL COPY*
Updated October 2013

IBM CONFIDENTIAL

IBM 000038

FILED DATE: 1/22/2019 12:00 AM   2019L000717

IBM Serial Number: **3G7958**   Date of Hire: 10 - 01 - 2015

# IBM  Agreement Regarding Confidential Information, Intellectual Property, and Other Matters

7. IBM and its licensees, successors, or assigns (direct or indirect) are not required to designate me as an author of any Development which is subject to Paragraph 5, when it is distributed, publicly or otherwise, or to secure my permission to change or otherwise alter its integrity. I hereby waive and release, to the extent permitted by law, all rights in and to such designation and any rights I may have concerning modifications of such Developments.

I understand that any rights, waivers, releases, and assignments herein granted and made by me are freely assignable by IBM and are for the benefit of IBM and its subsidiaries, licensees, successors, and assigns.

8. I have identified all Developments not assigned by Paragraph 5 in which I have any right, title, or interest, and which were previously made or conceived solely or jointly by me, or written wholly or in part by me, but neither published nor filed in any patent office.
If I do not have any to identify, I have written "none" on this line (Select one): ☒ None ☐ Identify

_____ None _____

9. I consent to IBM (or authorized services providers on IBM's behalf) collecting, using, storing, transferring, and making available information about me, such as my name, photo, contact information, career development and skills, in internal and external IBM databases or websites (including, without limitation, its online directories) anywhere in the world for legitimate business purposes.

IBM provides numerous opportunities for social computing through blogs, wikis, social networks, virtual worlds and other social media. I agree to comply with all IBM policies and practices regarding use of social computing tools and I understand that I am personally responsible for the content I post on any social computing tools (whether on IBM's internal platforms or on third party sites) and that any information I post, including any of my personal information, may be made broadly available to others, potentially inside or outside IBM, who have access to these tools.

10. The term "subsidiaries", as used in this Agreement, includes any entity owned or controlled, directly or indirectly, by International Business Machines Corporation.

11. The term "employment at will", as used in this Agreement, means the employment at the mutual consent of both me and IBM. Accordingly, either IBM or I can terminate the employment relationship at will, at any time, with or without cause or advance notice.

12. This Agreement supersedes all previous oral or written communications, representations, understandings, undertakings, or agreements relating to the subject matter hereof, except as expressly agreed otherwise by IBM in writing upon my hire or transfer of employment to IBM. Any waiver of a term in this Agreement and any amendment to this Agreement may only be made in a writing signed by the Senior Vice President of Human Resources for International Business Machines Corporation and myself.

13. This Agreement shall be governed by the laws of the State of New York, as if it had been executed and fully performed within such state, without regard to choice of law principles of New York or any other state. If any provision of this Agreement is unenforceable at law, the remainder shall remain in effect.

14. I recognize that any violation of my obligations described herein would cause IBM to suffer irreparable harm and can result in disciplinary action, including dismissal from IBM, and any other appropriate relief for IBM including money damages, equitable relief and attorneys fees.

My agreement, and my acknowledgment of receipt of a copy of this Agreement, are indicated by my signature below.   9-19-15   Select - Select

| Timothy K Yocum | Tim K Yo | 3G7958 | 9-19-15 | Select - Select |
|---|---|---|---|---|
| Employee's Full Name (please type or print) | Employee's Signature | Employee IBM Serial | Date (MM-DD-YYYY) | |

(If you have entered "none" in Paragraph 8, do not fill in this section.)

The following are Developments not covered by Paragraph 5, in which I have any right, title, or interest, and which were previously conceived or written either wholly or in part by me, but neither published nor filed in any Patent Office:

Description of Documents (if applicable):

| Title on Document | Date on Document | Name of Witness on Document |
|---|---|---|
| _____ | Select - - | _____ |
| _____ | Select - - | _____ |
| _____ | Select - - | _____ |
| _____ | Select - - | _____ |

Signed: _____
Employee's Full Name

Date (MM-DD-YYYY): Select - - Select

(It is in your interest to establish that any of the above were made, conceived, or written before your employment by IBM. You should not disclose them in detail, but identify them only by the titles and dates of documents describing them. If you wish to interest IBM in any of them, you may contact the Intellectual Property and Licensing Department at Corporate Headquarters, which will provide you with instructions for submitting them to IBM.)

*PERSONNEL COPY*
Updated October 2013

IBM CONFIDENTIAL                                              IBM 000039

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 4

FILED DATE: 1/22/2019 12:00 AM  2019L000717

## COMPOSE, INC.
## 2015 BONUS PLAN

### ARTICLE 1 – PURPOSE

The purpose of this Compose, Inc. 2015 Bonus Plan (this "**Plan**") is to retain the services of certain employees and consultants of Compose, Inc. (the "**Company**") and to motivate them to remain in service with the Company, the Buyer or one of their affiliates following the Closing.

### ARTICLE 2 – DEFINITIONS

As used herein, the following terms shall have the meaning specified below:

"**2016 Bonus**" shall mean the bonus named the 2016 Bonus in a Participant's Bonus Schedule and earned if a Participant remains in Service until January 1, 2016.

"**Bonus Pool**" shall mean $5,316,986.

"**Bonus Schedule**" shall mean the exhibit to this Plan that sets forth the bonuses that a Participant may earn under this Plan and must be signed by a Participant to participate in this Plan.

"**Closing**" shall mean the closing date of the sale of the shares of the Company to International Business Machines Corporation (the "**Buyer**"), as contemplated by that Stock Purchase Agreement to be dated on or about July 22nd, 2015 (the "**SPA**") by and amongst the Buyer, the Company and the Company's stockholders (the "**Stock Sale**").

"**Closing Bonus**" shall mean the bonus named the Closing Bonus in a Participant's Bonus Schedule and earned if a Participant remains in Service until the Closing.

"**Committee**" shall mean the committee that administers the Plan and consists of Buyer.

"**Employer**" shall mean the Company, the Buyer or one of their affiliates for whom a Participant provides Service.

"**Founders**" shall mean Kurt Mackey, Jason McCay and Ben Wyrosdick.

"**Monthly Bonus**" shall mean each of the twenty-four equal monthly bonuses named the Monthly Bonus in a Participant's Bonus Schedule, and the applicable Monthly Bonus shall be earned to the extent a Participant remains in Service until the twelve-month anniversary of the Closing and each of the twenty-three months of Service thereafter.

"**Participant**" shall mean each Company employee or consultant who has been selected by the Company for participation in this Plan, is listed on Exhibit A to this Plan and remains in Service with the Company until the Closing. In each case, Participants must execute and return to the Company the Bonus Schedule attached to this Plan in order to participate in this Plan.

1

FILED DATE: 1/22/2019 12:00 AM 2019L000717

"**Plan**" shall have the meaning set forth in Article 1 of this Plan and, with respect to each Participant, such Participant's Bonus Schedule.

"**Service**" shall mean the performance of services for the Employer until and subsequent to the Closing. If a Participant transfers Service between the Company or the Buyer and/or one of their affiliates, then the Participant's Service shall be deemed to continue. The Service termination date of any Participant who provides Service in Canada shall be the later of (i) the date that such Participant ceases to perform Service and (ii) the end of any statutory notice period for such Participant, without regard to whether the Participant continues to receive any compensatory payments from the Employer or is paid salary in lieu of notice of termination of such Service, whether under contract or as otherwise required by applicable law.

"**Total Bonus**" for each Participant shall mean the maximum amount of bonuses that such Participant shall be eligible to earn and receive under this Plan and shall consist of one or more the following types of bonuses: Closing Bonus, 2016 Bonus and twenty-four Monthly Bonuses, each as defined in Section 4.1 below.

## ARTICLE 3 – ELIGIBILITY

The Participants are the Company's employees and certain consultants set forth on Exhibit A to this Plan who remain in Service with the Company until the Closing and have been selected by the Company for participation under this Plan.

## ARTICLE 4 – BENEFITS

4.1     Bonuses. The Bonus Pool shall be equal to the aggregate Total Bonuses that all Participants shall be eligible to earn under this Plan. Each Participant's Bonus Schedule and Exhibit A shall set forth the amount of each Participant's Total Bonus and one or more of the following bonuses to the extent that a Participant is eligible to earn such a bonus: Closing Bonus, 2016 Bonus and Monthly Bonus. Each Participant shall be eligible to earn one or more of the following bonuses, provided that such Participant remains in Service through each of the following vesting dates: (a) the Closing Bonus, provided that Participant remains in Service until the Closing; (b) the 2016 Bonus, provided that Participant remains in Service until January 1, 2016; and (c) each of twenty-four (24) Monthly Bonuses, provided that Participant remains in Service until the 12-month anniversary of the Closing and each monthly anniversary thereafter for the next 23 months; provided, however, that in the event that a Participant is terminated from Service by the Employer for a reason other than "cause" (as determined by Buyer in accordance with its standard policies and procedures) or due to a Participant's death or disability, each prior to the 36-month anniversary of the Closing, such Participant shall receive 100% of his or her then unpaid Total Bonus within 61 days after such Participant's Service termination date, provided that the Participant signs a general release of claims in the form prescribed by the Employer and such general release has become effective no later than the 60th day after such termination.

4.2     Timing of Payments. Each of the earned Closing Bonus, 2016 Bonus and Monthly Bonuses shall be paid within ten (10) days following the applicable vesting date and, for the avoidance of doubt, shall be paid, even if the Participant has terminated from Service

2

FILED DATE: 1/22/2019 12:00 AM   2019L000717

prior to the applicable payment date, so long as the Participant has remained in Service until the applicable vesting date.

4.3     Forfeitures.  For the avoidance of doubt, in the event that any Participant resigns from Service for any reason or is terminated by the Employer for "cause" (as determined by Buyer in accordance with its standard policies and procedures), each prior to the 36-month anniversary of the Closing, then such Participant shall not be eligible to earn any portion of such Participant's Total Bonus that has not been paid to the Participant due to the fact that the Participant has not provided Service until the remaining vesting dates, and such unpaid amounts shall be automatically forfeited upon such termination.

## ARTICLE 5 – MISCELLANEOUS

5.1     Amendment.  The Committee reserves the right to amend this Plan at any time and in its sole discretion, provided that no such amendment shall adversely affect a Participant's rights under this Plan without the Participant's consent.

5.2     Right to Terminate Service.  Except as otherwise required by applicable law, the employment of each Participant remains at will, and each Participant and the Employer have the right to terminate a Participant's employment at any time for any or no reason, with or without cause or notice.  Except as otherwise required by applicable law, nothing in this Plan shall confer upon any Participant the right to continue in Service or affect any right that the Employer may have to terminate the Service of such person at will.

5.3     Benefits not Transferable.  Benefits under this Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge or encumbrance by any Participant and any attempt to do so shall be null and void.  Benefits under this Plan shall not be subject to or liable for the debts, contracts, liabilities, engagements or torts of any Participant, nor may the same be subject to attachment or seizure by any creditor of any Participant under any circumstances.

5.4     Plan Administration.  This Plan shall be administered by, and in the sole discretion of, the Committee, provided that, the Committee may, in its sole discretion, consult with any one or more of the Founders in connection with the administration of this Plan.  The Committee shall have full discretionary authority to establish such rules and regulations as it deems necessary, make amendments in a manner consistent with Section 5.1 above, interpret this Plan, make factual findings and determinations, and otherwise make all determinations and take such action in connection with this Plan as it, in its sole discretion, deems appropriate.  The decisions of the Committee shall be final, conclusive and binding upon all parties and all decisions of the Committee shall be accorded the maximum deference under applicable law.  The Committee shall not be liable for any action or determination made in good faith with respect to this Plan.  Each person to whom duties and responsibilities have been delegated by the Committee shall be indemnified and held harmless by the Company or the Buyer against all claims, demands, damages, costs, liabilities, fines, and penalties, and all expenses reasonably incurred by or imposed upon such individuals (including, but not limited to, reasonable attorneys fees) that arise as a result of actions or failure to act in good faith in connection with the operation and administration of this Plan.

3

FILED DATE: 1/22/2019 12:00 AM    2019L000717

5.5    Governing Law.  This Plan shall be construed, administered, and governed in all respects in accordance with the laws of the State of California without regard to California conflicts of law or choice of law principles.

5.6    Successors.  All obligations of the Company under this Plan and the Bonus Schedules shall be binding on any successor to the Company, including the Buyer or one of its affiliates.

5.7    Captions; Construction of Terms.  Captions and headings are given to the sections and subsections of this Plan solely as a convenience to facilitate reference.  Such headings will not be deemed in any way material or relevant to the construction or interpretation of this Plan or any provision thereof.  Whenever the context may require, any pronouns used in this Plan shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns and pronouns shall include the plural, and vice versa.

5.8    Severability.  The invalidity or unenforceability of any provision or portion thereof of this Plan shall not affect the validity or enforceability of any other provision or portion thereof.

5.9    Notices.  Except as specifically provided otherwise, any notice required or permitted to be given hereunder shall be in writing sent by either personal delivery, overnight delivery, or United States, registered or certified mail, return receipt requested, all of which shall be properly addressed with postage or delivery charges prepaid, to the Committee or Participant at such addresses as either the Company or Participant may hereafter designate to the other in writing.

Notices sent by personal delivery shall be deemed given upon actual receipt.  Notices sent by overnight delivery shall be deemed given on the next business day.  Notices sent via United States registered or certified mail shall be deemed given two business days from mailing.

5.10    Withholding.  Any provision herein to the contrary notwithstanding, the Company shall deduct from any payment otherwise due pursuant to this Plan an amount sufficient to satisfy any federal, state and/or employment tax withholding requirements with respect to such payment.

5.11    Effective Date and Term.  This Plan shall be effective as of the Closing and shall continue until the last payment date under this Plan.

5.12    Entire Agreement.  This Plan and each Participant's Bonus Schedule contain the entire understanding between each Participant and the Company concerning the terms and conditions described herein.  This Plan and each Participant's Bonus Schedule supersede all prior letters, agreements, plans or arrangements (whether oral or written and whether express or implied) that provide for payment of bonuses, commissions or other incentive compensation or similar compensation that were implemented, executed or adopted by the Company.  For the avoidance of doubt, effective as of the Closing, this Plan and each Participant's Bonus Schedule represent the only arrangement under which a Participant may earn

4

FILED DATE: 1/22/2019 12:00 AM 2019L000717

a bonus or any incentive compensation from the Company. Furthermore, payments pursuant to this Plan will not be considered part of a Participant's earnings for purposes of calculating current or future benefits under any compensation or benefit programs maintained or sponsored by the Employer, including retirement plans, 401(k) plans and the like.

5.13 Code Section 409A. It is intended that any amounts payable under this Plan and the Company's exercise of authority or discretion hereunder shall either be exempt from or comply with Internal Revenue Code Section 409A, including the Treasury Regulations and other published guidance relating thereto (collectively, "Code Section 409A") so as not to subject any Participant to payment of any interest or additional tax imposed under Code Section 409A. To the extent that any amount payable under this Plan would trigger the additional tax, penalty or interest imposed by Code Section 409A, this Plan shall be modified to avoid such additional tax, penalty or interest yet preserve (to the nearest extent reasonably possible) the intended benefit payable to a Participant. Notwithstanding the preceding, the Employer makes no representations concerning the tax consequences of this Plan or any payments hereunder under Code Section 409A or any other federal, state, local, foreign or other taxes.

OHSUSA:762481344.4

**IN WITNESS WHEREOF**, the Company has caused this Plan to be executed by its duly authorized officer, effective as of the Closing.

COMPOSE, INC.

By:_____

Name:_____

Its:_____

SMRH:418167863.2

FILED DATE: 1/22/2019 12:00 AM   2019L000717

6

OHSUSA:762481344.4

**Exhibit A**

[List of Participants and Amounts of Total Bonus, Closing Bonus, 2016 Bonus and Monthly
Bonus, as applicable]

FILED DATE: 1/22/2019 12:00 AM   2019L000717

7

OHSUSA:762481344.4

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## Bonus Schedule[1]

This Bonus Schedule is subject to the terms and conditions outlined in the attached Compose, Inc. 2015 Bonus Plan (the "**Plan**"). All capitalized terms not defined in this Bonus Schedule are defined in the Plan.

**Participant Name:** _____

**The Total Bonus that you may earn under this Plan is equal to $_____, which consists of the following:**

1. **Closing Bonus: $_____**
2. **2016 Bonus: $_____**
3. **24 Monthly Bonuses each equal to: $_____**

I have read, understand and accept the terms of the Plan and this Bonus Schedule.

_____     Dated: _____
Signature

_____
Print Name

---

[1] NTD: All amounts to be denominated in local currency (US Dollar, Canadian Dollar, South African Rand and UK Pound Sterling), as applicable.

8

OHSUSA:762481344.4

FILED DATE: 1/22/2019 12:00 AM 2019L000717

## Bonus Schedule

This Bonus Schedule is subject to the terms and conditions outlined in the attached Compose, Inc. 2015 Bonus Plan (the "**Plan**"). All capitalized terms not defined in this Bonus Schedule are defined in the Plan.

**Participant Name: Timothy Yocum**

**The Total Bonus that you may earn under this Plan is equal to $300,000, which consists of the following:**

1. Closing Bonus: $50,000
2. 2016 Bonus: $100,000
3. 24 Monthly Bonuses each equal to: $6,250

I have read, understand and accept the terms of the Plan and this Bonus Schedule.

*Tim Yocum*

Dated:  07 / 22 / 2015

Signature

Timothy Yocum
Timothy Yocum

OHSUSA:762735708.1

IBM CONFIDENTIAL

Doc ID: 07506f94506ac0c97aa1625ba0f4e50a043b9ca8

IBM 000016

**▽ HELLOSIGN**                                                    Audit Trail

FILED DATE: 1/22/2019 12:00 AM 2019L000717

| | |
|---|---|
| TITLE | Founder bonus agreement (Tim) |
| FILE NAME | Compose 2015 Bonu...Timothy Yocum.pdf |
| DOCUMENT ID | 07506f94506ac0c97aa1625ba0f4e50a043b9ca8 |
| STATUS | * Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | 7/22/15 20:42:50 UTC | Sent for signature to Timothy Yocum (tim@compose.io) IP: 67.180.238.86 |
| **VIEWED** | 7/22/15 20:44:34 UTC | Viewed by Timothy Yocum (tim@compose.io) IP: 98.223.131.146 |
| **SIGNED** | 7/22/15 20:44:58 UTC | Signed by Timothy Yocum (tim@compose.io) IP: 98.223.131.146 |
| **COMPLETED** | 7/22/15 20:44:58 UTC | The document has been completed. |

IBM CONFIDENTIAL                                            IBM 000017

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 5

FILED DATE: 1/22/2019 12:00 AM   2019L000717



397958
10|1|15

Personal and Confidential

July 30, 2015.

Timothy Yocum

Dear Timothy,

As you know, IBM Corporation has completed its acquisition of Compose, Inc. IBM is very excited about the addition of Compose and the important role you will play in driving IBM's strategy.

Enclosed you will find the details of the offer to participate in the special Milestone Achievement Program (the "Program"). We recognize your valuable contributions and role within Compose and feel you will play a critical role in the successful integration into IBM. I am confident that you will enjoy the business, the people and the opportunities associated with joining our team. There is still much work ahead of us in integrating Compose, its processes, and its technology. As we work through these challenges, you will discover you have much in common with your new IBM colleagues. Like you, they are highly creative, innovative people who enjoy what they do. They share your passion, commitment to excellence and quality, and focus for your clients' success.

I am confident we have the right team in place to accomplish great things together. Even more exciting is the long-term future and the prospect to positively impact the business of our clients. I look forward to this exciting new chapter and to working closely with you to enable our success. Please send the signed letter back to Pamela Gage, IBM HR Transition Lead, by August 13, 2015.

Once again, welcome! IBM is glad to have you as part of this team.

Sincerely,

Derek Schoettle
General Manager, Cloud Data Services
IBM Analytics

Attachment A: Program description
Attachment B: Program milestones

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

IBM CONFIDENTIAL

IBM 000040

FILED DATE: 1/22/2019 12:00 AM  2019L000717

2

# ATTACHMENT A

As you know, IBM Corporation has completed its acquisition of Compose. This is an exciting time for us all. We recognize that your active involvement is critical to a successful integration of Compose into IBM.

It's my pleasure to confirm that you will be eligible to participate in and potentially receive payments under the Milestone Achievement Program (the "Program"). This Program was developed exclusively for a select group of Compose employees. The Program milestones are contained in Attachment "B."

The start date of this Program is the date of the closing of IBM's acquisition of Compose (the "Closing").

The intent of this Program is to recognize key contributions that Compose and IBM believe will be necessary for the successful integration of our two businesses. Since the opportunity to receive payments is being offered only to a limited number of Compose employees, you should treat your participation in the Program and any award under it with appropriate sensitivity and in strict confidence.

The terms and conditions of the Program are as follows:

You will be eligible to receive payments under the Program up to, but not to exceed, $400,000 (the "Total Maximum Potential Payment") as set forth below, provided that (1) you remain an employee of IBM and its subsidiaries for the periods listed below and (2) the relevant milestone targets are met as determined by IBM. The milestone targets are contained in Attachment B and the relevant milestone targets are met as determined by the Compose Integration Executive.

Payments may become payable to you under the Program pursuant to the following schedule:

- The first milestone period will begin on the Closing and will end on the one-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 10% of the Total Maximum Potential Payment.

- The second milestone period will begin on the one-year anniversary of the Closing and end on the two-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 15% of the Total Maximum Potential Payment.

- The third milestone period will begin on the two-year anniversary of the Closing and will end on the three-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 75% of the Total Maximum Potential Payment.

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

IBM 000041

3

The additional terms and conditions of the Program are as follows:

- Except as expressly provided below (i) you must be employed on the payment date in order to be eligible to receive payment under the program, and (ii) if you cease to be an active full-time employee of IBM or its subsidiaries for any reason (including your voluntary resignation), during the period of time covered under the Program, then you will no longer participate in the Program and no further payments, partial or otherwise, will be made or be payable including, without limitation, any payment under the Program for the then current milestone period.

- If you are terminated by IBM with "cause" (as determined by IBM in accordance with its standard policies and procedures, which includes, among other things, any violation of IBM's policies and/or failure to perform satisfactorily, and without regard to how "cause" is defined in any plan, policy or program, any offer letter, any agreement between you and Compose, or any amendment thereto) at any point prior to the completion of the period of time covered under the Program, then you will no longer participate in the Program and no further payments, partial or otherwise, will be made or be payable as from the date you are given notice of termination.

- If you are terminated by IBM without cause (as described above) at any point prior to the completion of the period of time covered under the Program, the milestone payment for the then current milestone period will be paid in full to you within a reasonable period of time after such termination, in full satisfaction of IBM's obligations under this Program; provided, however, that (i) IBM's standard release of claims must be executed after termination of your employment and (ii) such release must become effective and irrevocable no later than the 61st day after termination of your employment. You shall not be entitled to receive any other payments under the Program. Failure to execute IBM's standard release of claims within a period sufficient to allow it to become effective and irrevocable as set forth above shall preclude any entitlement to benefits under this paragraph.

- If you cease to be an employee of IBM due to death or long term disability (the latter to be determined under IBM's generally applicable process) during the period of time covered under the Program, and a release of claims (as described in the preceding paragraph) has been received and is effective and irrevocable within the time period specified in the preceding paragraph, IBM will pay the milestone payment for the then current milestone period (if any) to you or your estate. You shall not be entitled to receive any other payments under the Program. Failure to execute IBM's standard release of claims within a period sufficient to allow it to become effective and irrevocable as set forth above shall preclude any entitlement to benefits under this paragraph.

- Payments under this Program are subject to applicable tax withholdings and other requirements set by mandatory law.

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

4

- Payments under this Program are not considered part of your earnings for purposes of
  calculating current or future benefits under any compensation or benefit programs
  maintained or sponsored by Compose, or IBM, including retirement plans, etc.

This letter shall be interpreted such that the payments made under this offer letter comply with,
or are exempt from, Section 409A. To help ensure compliance with the short-term deferral
exception of Section 409A, any payment or benefit that you become entitled to receive pursuant
to the Program will be paid to you no later than March 15th of the year following the first taxable
year in which the amount is no longer subject to a substantial risk of forfeiture (within the
meaning of Section 409A and the Treasury Regulations thereunder). To the extent that IBM
determines that any payment or benefit pursuant to the Program constitutes deferred
compensation (within the meaning of Section 409A), such payment or benefit shall be made at
such times such in such forms as IBM determines are required to comply with Section 409A and
the Treasury Regulations and any applicable guidance thereunder (including, without limitation,
in the case of a "specified employee" within the meaning of Section 409A, the six-month delay
for amounts payable upon a separation from service). However, nothing in this letter shall be
interpreted or construed to transfer any liability for any tax (including a tax or penalty due as a
result of a failure to comply with Section 409A) from you to IBM or to any other individual or
entity, and IBM shall not pay any additional payment or benefit in the event that IBM changes
the time or form of your payments or benefits in accordance with this section.

Please sign and return the duplicate copy of this letter to Pamela Gage, IBM HR Transition Lead
to indicate your acceptance of the terms set out.

Accepted: _Tim Yocum_____ Date:08 / 03 / 2015____

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

IBM 000043

5

## Attachment B

### IBM Retention Agreement Milestones - Applies To All Periods of Retention

**Customers: (Sales, Marketing, and Services only)** Establish and maintain positive customer and business partner relationships and team closely with the combined Compose/IBM customer facing teams to quickly assist in resolving customer/partner issues as required in accelerating and closing sales. Further, with the broader Cloud Data Services (CDS) and IBM Sales and Marketing teams, help to enable sales and marketing staff by transferring knowledge, educating the sales team, and contributing to marketing and sales collateral.

**Business Results: (All)** Align your Personal Business Commitments (PBC's) to IBM CDS and Analytics business objectives; and maintain a PBC rating of "Solid Contributor" or better (numerically a "2" or better) during the milestone periods; remain focused in disciplined execution to drive business results for your business unit delivering revenue & expense targets. In addition, familiarize yourself with and adhere to IBM's Business Conduct Guidelines.

**Effective Integration: (All)** Act as a leader in your functional area, positively influencing morale and contribution to CDS and IBM; learn and integrate into IBM's policies, practices and procedures; follow all IBM Business Conduct Guidelines; and be accountable for the implementation of appropriate IBM programs.

**Teaming: (All)** Foster teaming and networking within your own organization, across the CDS Group, and throughout the broader IBM to drive cross brand synergy and sales.

**Product delivery: (Development only)** Together with the broader CDS and IBM development teams, assist in meeting all product delivery milestones including the "bluewashing" of activities (as applicable), integration of Compose offerings with the Bluemix platform, enabling Compose offerings to be sold via IBM Bluemix/CDS platforms, support of the Sales team with development expertise to close business, and support our customers (post-sales) with timely action to resolve critical problems, ensure satisfactory resolution of all open source and IP issues

**Management: (Managers only)** Demonstrate leadership in managing the employee side of the transition into CDS and IBM, including attracting, developing, motivating and retaining employees; effectively executing people related programs such as performance commitments, professional development plans, base pay plans, technical resources, etc.; and effectively and proactively communicate in appropriate forums the status of changes and new developments to keep your teams up to date. Encourage people managers in your organization to do the same.

**Retention: (Senior Leaders)** Act to maintain high employee morale of all employees joining IBM CDS from Compose and help to retain a high % of all former Compose personnel over the retention period. Appropriate consideration will be given to actions related to business decisions, poor or marginal performance.

**All milestones will be assessed by the Integration Executive.**

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

FILED DATE: 1/22/2019 12:00 AM 2019L000717

▽ **HELLOSIGN**                                                    Audit Trail

**TITLE**              Compose Retention Letter - Tim Yocum
**FILE NAME**          Compose retention...othy Yocum v1.pdf
**DOCUMENT ID**        ae253fdac18f1569c7a2c03e82370b53d2275870
**STATUS**             ● Completed

Document History

⟳              8/3/15              Sent for signature to Tim Yocum (tim@compose.io)
**SENT**       22:25:56 UTC        IP: 71.12.188.45

◎              8/3/15              Viewed by Tim Yocum (tim@compose.io)
**VIEWED**     22:34:48 UTC        IP: 98.223.131.146

↙              8/3/15              Signed by Tim Yocum (tim@compose.io)
**SIGNED**     22:36:19 UTC        IP: 98.223.131.146

☑              8/3/15              The document has been completed.
**COMPLETED**  22:36:19 UTC

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 6

FILED DATE: 1/22/2019 12:00 AM 2019L000717

# IBM Confidential: 2016 Performance Assessment for Tim Yocum

## Discussing Performance

Your global manager will assess your performance across multiple dimensions. The assessment will be reviewed by your upline (and in-country manager, if different than global manager), and then reviewed with you. Below is an example of how your goal feedback relates to the dimension assessments. If you need to update your goal feedback, go to your Goals page, and the updates will auto-sync to your performance form.



|  **Goals** |  **Performance Feedback** | **Dimensions** | **Ratings** |
|---|---|---|---|
| Throughout the year, you have identified your goals to define your work. | By documenting your accomplishments (e.g., ACE, Checkpoint), you show what you did and how you did it relative to your goals. | The dimensions are the lenses through which performance is viewed. What dimensions do your results best illustrate? | Your dimension ratings are based off of your performance across all of your goals throughout the year. |

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Tim | Title | Director, Compose Operations |
| Last Name | Yocum | Band | 10 |
| Global Manager | Jozef de Vries | | |

## Accomplishment Details

Accomplishment details provide a final snapshot of the goals and progress you have been updating throughout the year, along with the feedback against your goals your manager has been providing to you. These elements, combined with feedback provided through other means (ACE app, etc.) along with your manager's own observations, become the basis for your annual performance assessment. If you need to make any final updates, please access your Goal plan to do so. Updates will automatically sync to this performance form.

GOALS (IBM Confidential)
Maintain positive customer experience through constant evaluation of support/ops procedure and output.

[ Ongoing ]

### Goal Details

| Goal Description | Maintain positive customer experience through constant evaluation of support/ops procedure and output. | Status | Ongoing |
|---|---|---|---|
| Progress/Feedback | 1. Tim Yocum 01/09/2017 We've done a good job maintaining an excellent support reputation with our customers throughout the past year. Through new products (Bluemix offerings, Enterprise) we've been able to stay ahead of the curve and support users with the same quick, accurate, and empathetic standards that we've always considered mandatory. We've integrated changes suggested by others to establish better defect workflow and tracking as well as refined stand-ups to focus on making beneficial changes for the platform and driving customer satisfaction. | | |

GOALS (IBM Confidential)
Bring Compose support documentation, process, and culture from "in our heads" to written form.

[ Ongoing ]

### Goal Details

Bring Compose support documentation,

FILED DATE: 1/22/2019 12:00 AM 2019L000717

| Goal Description | process, and culture from "in our heads" to written form. | Status | Ongoing |
|---|---|---|---|

1. Tim Yocum
01/09/2017
This has been a bit hamstrung by the fact that various Bluemix services are in a support system state of flux. When this goal was originally set up, we were hoping to leverage integration with Parature. A few months later, a migration to IMS was proposed. Now, Salesforce is being investigated as a replacement. We remain on HelpScout and plan to continue, however it's difficult to bring more knowledge and workflow efficiencies to the Bluemix support staff with tooling being in a constant state of unknown. Drop a reorg into the mix and this effort has been stalled repeatedly while the dust settles from the Analytics->WDP change and what that means to the products, current and future.

Progress/Feedback

Despite the moving targets, we are still working to bring solutions and workflows that we use in support to the Bluemix team. Documentation has been getting better, but remains poorly fragmented in various systems. Hiring, while slow, will help free up individuals with writing talent to assist in building the knowledge base we need to share internally.

2. Jason McCay
06/26/2016
How have Don's calls been going? Have they been useful to you?

3. Tim Yocum
02/18/2016
We have so much knowledge broken up between at least two systems, and with product changes that documentation is in many cases outdated.

Getting involved in Don's regular calls will help steer the way forward to effectively bring our knowledge into the IBM fold.

## Dimension Ratings

Below are the five dimension definitions, for continued reference. Once this performance form is moved from the employee to the global manager, the manager will rate the employee against each of the five dimensions.

### Business Results

Your achievement against agreed goals. In order for the employee to be rated;
- Exceeds, they will have exceeded all objectives and delivered outstanding results on all relevant measures.
- Achieves, they will have accomplished agreed upon goals and outcomes delivering key committed business and financial objectives
- Expects more, they will have fallen short of the Business Results standard described above.

**Rating**

Achieves

### Client Success

You are passionate about every client's success, so you put them first, listen for need and find opportunities to bring new ideas and add value. Partnering with all relevant IBM stakeholders, you focus on outcomes –helping every client succeed however they measure success. In order for the employee to be rated;
- Exceeds, they will have exceeded client expectations on all measures while delivering outstanding client outcomes.
- Achieves, they will have consistently put the client first. Delivered successful outcomes as experienced by the client.
- Expects more, they will not have achieved the Client Success standard described above.

**Rating**

Achieves

### Innovation

You are a forward thinker. You seek out grand challenges as well as incremental improvements — whether in technology or in

how you work and in what you deliver. In order for the employee to be rated;
- Exceeds, they will have achieved eminence through delivering high impact or breakthrough innovation.
- Achieves, they will have demonstrated innovation that matters by consistently bringing new ideas to solve business or technical problems.
- Expects more, they will not have achieved the Innovation standard described above.

### Rating

Achieves

### Responsibility to Others

You prioritize collaboration and focus on building trust and earning it anew every day, in every relationship -- with IBMers, clients, partners and more. For those of you entrusted with management or executive responsibility, this includes your effective leadership and showing personal interest in IBMers, their careers and their development. In order for the employee to be rated:
- Exceeds, they will have sought out and known for collaboration and helping others to succeed.
- Achieves, they will have built trust and collaborated effectively. For people managers, helped their teams excel through feedback, development, progression, and improved engagement.
- Expects more, they will not have achieved the Responsibility to Others standard described above.

### Rating

Exceeds

### Skills

IBMers are dedicated to growing skills that matter to our business and to being essential now and in the future. You continuously find opportunities to learn and apply new skills strategic to IBM and needed to be successful in your role. You are recognized for your expertise and you share it with others. In order for the employee to be rated:
- Exceeds, they will have learned, applied, and transferred relevant skills to others, consistently leading to exceptional business results.
- Achieves, they will have developed new, relevant skills or deepened existing skills, and applied them to deliver business results.
- Expects more, they will not have achieve the Skills standard described above.

### Rating

Achieves

### Summary

**Optional: Tim Yocum, any other comments for the year?**

The year has flown by. We've had a reorg (or two...), changed product direction on Enterprise more than once, hired a slew of new people, and switched up responsibilities. We end the year a completely different team than we started. To measure success amidst the change, I'm looking at our ops/support from an external view. Has our support changed? Is it worse than before, better than before, or same? Have our ops practices slacked? Is our response time better, same, or worse?

Overall, we are remaining consistent with our high expectations despite the change - positive and negative - so we are coming out ahead. I often feel like I'm treading water because we're on such uncertain ground. I wonder if others feel the same sense of "change paralysis" such that the thought of a new initiative is, at first, exciting but later gets shelved by fear of another reorg obviating the initiative itself.

I am excited to help elevate the ops team and fold support engineers into the larger ops/support group. We've already started doing this with many (Shane, Jonathan, etc.) and it's working nicely. Bridging ops and support will help us share responsibilities and cross-train, ultimately providing customers with a better experience by way of a better, more stable product.

**Comments by Jason McCay**

Amidst a lot of change and a number of unknowns, Tim has delivered in both the Support focus as well as Operational Engineering focus. He is a stalwart that provides direction that is effective but not overbearing and shares knowledge. Also, he is willing to dig into the less-than-fun grunt work for the sake of the focus and energy of the team.

A suggested improvement is being more deliberate about communicating as well as being an advocate for and pushing forward with clear improvements that the team needs regardless of resistance that he might face.

### Availability Indicator

To support career development and discussion, the manager should indicate whether the employee could be ready and available for a new opportunity in the next year. An IBMer is eligible to move to a new job after they have successfully performed their current job for 12 months. The purpose of this indicator is to ensure discussion and alignment on skill and career growth, and when new opportunities could be pursued.

☑ This employee could be ready and available for a new opportunity in the next calendar year.

### Enablement Materials and Training

As a manager, it's your responsibility to help your team members establish goals, provide ongoing feedback throughout the year, give fair and accurate annual assessments and differentiate performance. You may refer to the Manager Assessment Preparation topic on IBM Leadership Academy for additional guidance.

☑ I completed the education and received certification prior to assessing this employee.

### Upline Review (and In-Country Acknowledgement, if in-country manager is different than global manager)

**Upline manager:** Please confirm that you have reviewed the assessment decisions of the global manager. You may also leave comments for the employee (optional) below. These comments will be visible to anyone.

**In-country manager (if different than global manager):** You will receive the employee's assessment for your awareness. You may also leave comments for the employee below (optional). These comments will be visible to anyone.

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Please note: If the employee's in-country and global manager are the same person, then the in-country manager step will not occur in the performance assessment route.

☑ Upline Manager: I acknowledge that I've reviewed the assessment decisions of the global manager.

Optional: Upline Manager Comments

Optional: In-Country Manager Comments

| Acknowledgement |
|---|

IMPORTANT: By clicking "Agree" you are confirming that you have had a discussion with your employee about their assessment, and are digitally signing the form.  A copy of the document will be sent to your Completed folder, and your employee's Completed folder.

Global Manager: ─────────────────────────

Global Manager:   Jozef de Vries                                       01/29/2018

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**IBM CONFIDENTIAL**                                                    IBM 000012

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 7

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**IBM Confidential: 2017 Performance Assessment for Tim Yocum**

### Discussing Performance

Your global manager will assess your performance across multiple dimensions. The assessment will be reviewed by your upline (and in-country manager, if different than global manager), and then reviewed with you. Below is an example of how your goal feedback relates to the dimension assessments. If you need to update your goal feedback, go to your Goals page, and the updates will auto-sync to your performance form.

        

| Goals | Performance Feedback | Dimensions | Ratings |
|---|---|---|---|
| Throughout the year, you have identified your goals to define your work. | By documenting your accomplishments (e.g. ACE, Checkpoint), you show what you did and how you did it relative to your goals. | The dimensions are the lenses through which performance is viewed. What dimensions do your results best illustrate? | Your dimension ratings are based off of your performance across all of your goals throughout the year. |

### Employee Information

| | | | |
|---|---|---|---|
| First Name | Tim | Title | Director, Compose Operations |
| Last Name | Yocum | Band | 10 |
| Global Manager | Jozef de Vries | | |

### Accomplishment Details

Accomplishment details provide a final snapshot of the goals and progress you have been updating throughout the year, along with the feedback against your goals your manager has been providing to you. These elements, combined with feedback provided through other means (ACE app. etc.) along with your manager's own observations, become the basis for your annual performance assessment. If you need to make any final updates, please access your Goal plan to do so. Updates will automatically sync to this performance form.

Goals
Bring Compose support documentation, process, and culture from "in our heads" to written form.

Ongoing

### Goal Details

Dimension(s) related to this goal

Progress/Feedback

Goals
Maintain positive customer experience through constant evaluation of support/ops procedure and output.

Ongoing

### Goal Details

Dimension(s) related to this goal

Progress/Feedback

### Dimension Ratings

Below are the five dimension definitions, for continued reference. Once this performance form is moved from the employee to the global manager, the manager will rate the employee against each of the five dimensions.

### Business Results

Your achievement against agreed goals. In order for the employee to be rated:
- EXCEEDS: Exceeded all objectives and delivered outstanding results on all relevant measures.
- ACHIEVES: Accomplished agreed upon goals and outcomes delivering key committed business and financial objectives.
- EXPECTS MORE: Delivered on some but not all key committed business and financial objectives, demonstrated progress towards agreed upon goals.

### Rating

Exceeds

### Client Success

You are passionate about every client's success, so you put them first, listen for need and find opportunities to bring new ideas and add value. Partnering with all relevant IBM stakeholders, you focus on outcomes --helping every client succeed however they measure success. In order for the employee to be rated;

FILED DATE: 1/22/2019 12:00 AM   2019L000717

- EXCEEDS: Exceeded client expectations on all measures while delivering outstanding client outcomes.
- ACHIEVES: Consistently put the client first. Delivered successful outcomes as experienced by the client.
- EXPECTS MORE: Demonstrated an inconsistent understanding of the client needs. Delivered some successful outcomes as experienced by the client.

**Rating**

Exceeds

## Innovation

You are a forward thinker. You seek out grand challenges as well as incremental improvements – whether in technology or in how you work and in what you deliver. In order for the employee to be rated;
- EXCEEDS: Achieved eminence through delivering high impact or breakthrough innovation.
- ACHIEVES: Demonstrated innovation that matters by consistently bringing new ideas to solve business or technical problems.
- EXPECTS MORE: Inconsistently applied innovative thinking to solve business or technical problems, with varying degrees of success and/or impact.

**Rating**

Achieves

## Responsibility to Others

You prioritize collaboration and focus on building trust and earning it anew every day, in every relationship – with IBMers, clients, partners and more. For those of you entrusted with management or executive responsibility, this includes your effective leadership and showing personal interest in IBMers, their careers and their development. In order for the employee to be rated;
- EXCEEDS: Sought out and known for collaboration and helping others to succeed.
- ACHIEVES: Built trust and collaborated effectively. For people managers, helped their teams excel through feedback, development, progression, and improved engagement.
- EXPECTS MORE: Demonstrated effectiveness collaborating with others varies. For managers, actions to foster engagement yielded inconsistent results.

**Rating**

Achieves

## Skills

IBMers are dedicated to growing skills that matter to our business and to being essential now and in the future. You continuously find opportunities to learn and apply new skills strategic to IBM and needed to be successful in your role. You are recognized for your expertise and you share it with others. In order for the employee to be rated;
- EXCEEDS: Learned and applied new, relevant skills to own role, and successfully transferred relevant skills to others.
- ACHIEVES: Developed new, relevant skills or deepened existing skills, and applied them consistently in own job role.
- EXPECTS MORE: Demonstrated efforts to build new, relevant skills, but did not translate consistently to own job role.

**Rating**

Exceeds

### Summary

**Optional: Tim Yocum, any other comments for the year?**

Since these goals were added, I've largely transitioned the support team over to Jason and have started to work exclusively within the ops realm. The transition went smoothly – there was no noticeable change in support quality or cadence, and team members were happy with the shift [back] to Jason's leadership.

In ops, we've struggled with attrition and inability to backfill positions. That, combined with increased workload around compliance activity, has made for a challenging environment. Keeping team members motivated is an ongoing task. Consistently dependable leaders like Terry and Dusty were heavily loaded with tasks and continue to have a lot of work on the horizon. New teammates from support will lighten that load and allow them to do more long-term strategy and higher level work (e.g., Armada/Genesis/Wanda/etc.) as well as more in-depth compliance efforts (e.g., retrofitting systems with encrypted disks)

Many of the support staff that has joined the ops team have come up to speed tremendously fast – Shane is now running nearly all deployments and maintainance of Terraform scripts, and we work closely every day to set future direction and do one-on-one tutoring on technologies he's interested in learning. Simon has taken on several long-standing issues (Sensu performance, RethinkDB) and driven toward solutions that have benefitted the entire team. Jonathan is focusing on learning Kubernetes and has already helped Joe deploy some apps on the internal k8s stack.

Getting Merrill back from STD is a relief. Prior to her leave, she'd been focused on helping bring out more of an SRE approach to the team from her experience and I look forward to making progress in 2018.

From a customer-deliverables standpoint, we've hit our marks well. Despite less staff and frequent priority shifts, we've deployed numerous clusters, scaled others, and maintained excellant uptime for multitenant and enterprise. We continua to work toward financial optimization, however. this is a difficult task to leave to "10% time" and could benefit from more focused attention.

Looking inward, I feel as though I've done an adequate job focusing on the staff and their needs, though there's room for improved communication, specifically communication cadence. Some prefer more frequent check-ins than others; balancing everyone's preference is a bit tricky. I'm quite proud of the achievements made by Shane and Jonathan in particular. Both are self-starters, though Shane has asked for more direction and communication. I've enjoyed working with him very much and find that his inquisitive nature lends itself well to all the new technologies we're able to expose him to; his ability to consistently make end users happy is a tremendous asset.

I'd like to work on my own skills more in 2018. Throughout 2017, I've frequently felt as though my skillset is stagnant. While there's a demarcation between a technical manager and a people manager, I don't want to fully check-out on the technical aspect otherwise I'm doing my team a disservice by not fully understanding the work I'm asking of them. It's difficult finding the time to spend focused on learning. I encourage everyone on my team to take time to learn, but I don't give myself the same benefit.

**Required action: Jozef de Vries's comments to support the rating decisions**

Tim has continued to be the core nucleus of our operational efforts spanning compose.com through to bluemix and compose enterprise. Much of Tim's work and contributions goes unnoticed, ranging anywhere from maintaining cost optimization through our infra accounts, keeping systems healthy, and mentoring the jr operators in the team, and unnoticed in a good way. He is addressing problems before they are problems. Conversely, Tim is equally active in an external facing capacity, regularly address any number of customer issues, challenges, or inquiries. He engages productively and regularly with his peers across the Cloud organization, and is consistently viewed as one of Compose's technical leaders. Going into 2018, we'll want to continue fine tuning the balance between technical contribution and team management as Tim wants to progress his career on both fronts. It is a tricky balance to navigate, and always requires adjustments one way or another. He certainly is well adept on both fronts, so the focus is just to make sure he continues to be a positive contributor on both fronts. He's a great resource to have in the team!

## Enablement Materials and Training

FILED DATE: 1/22/2019 12:00 AM   2019L000717

As a manager, it's your responsibility to help your team members establish goals, provide ongoing feedback throughout the year, give fair and accurate annual assessments and differentiate performance. You may refer to the <u>Manager Assessment Preparation</u> <u>topic on IBM Leadership Academy</u> for additional guidance.

☑ I completed the education and received certification prior to assessing this employee.

## Upline Review (and In-Country Acknowledgement, if in-country manager is different than global manager)

**Upline manager:** Please confirm that you have reviewed the assessment decisions of the global manager. You may also leave comments for the employee (optional) below. These comments will be visible to anyone.

**In-country manager (if different than global manager):** You will receive the employee's assessment for your awareness. You may also leave comments for the employee below (optional). These comments will be visible to anyone.

Please note: If the employee's in-country and global manager are the same person, then the in-country manager step will not occur in the performance assessment route.

☑ Upline Manager: I acknowledge that I've reviewed the assessment decisions of the global manager.

Optional: Upline Manager Comments

Optional: In-Country Manager Comments

## Acknowledgement

IMPORTANT: By clicking "Agree" you are confirming that you have had a discussion with your employee about their assessment, and are digitally signing the form.  A copy of the document will be sent to your Completed folder, and your employee's Completed folder.

Global Manager:  Jozef de Vries                                02/14/2018

FILED
1/22/2019 12:00 AM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 8

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**From:** Jozef F Devries <devriesj@us.ibm.com>
**Sent:** Friday, July 13, 2018 10:17 AM
**To:** Tim Yocum
**Cc:** Jozef F Devries
**Subject:** *Confidential: Re: Re: Corporate Concerns and Appeals Office

Tim

In response to your request for your personnel file, I am attaching responsive documents. As some of them contain confidential information, I trust that you will care for them accordingly. Let me know if you have any questions.

Regards,
Jozef


Jozef de Vries
Director, IBM Cloud Databases


| From: | Jozef F Devries/Lexington/IBM |
| To: | Tim Yocum <tim@yocum.org> |
| Cc: | Jozef F Devries <devriesj@us.ibm.com> |
| Date: | 07/02/2018 09:10 PM |
| Subject: | *Confidential: Re: Corporate Concerns and Appeals Office |

Tim - I received your request to provide your personnel file. Please know that we are internally working on this request; given the holiday and scheduling, we will provide the documentation on or before Friday, July 13th. Once we assemble the responsive documents, I will send a copy to you.


Jozef de Vries
Director, IBM Cloud Databases


| From: | Tim Yocum <tim@yocum.org> |
| To: | Jozef F Devries <devriesj@us.ibm.com> |
| Date: | 06/27/2018 01:48 PM |
| Subject: | Re: Corporate Concerns and Appeals Office |

Thank you, Jozef.

I am requesting an opportunity to inspect and copy (1) my personnel file in its entirety; and (2)

FILED DATE: 1/22/2019 12:00 AM   2019L000717

any and all other personnel documents which IBM is using, has ever used, or intends to use in determining my qualifications for employment, promotion, transfer, additional compensation, withheld compensation, discharge or other disciplinary action, and reinstatement or other remedial action.

With regard to category (2), above, such documents include but are not limited to those documents used to determine whether at any time (a) I would be placed on leave of absence, (b) IBM would withhold my wages, bonuses, unused paid vacation and sick days, and other earned compensation, (d) IBM would inform my coworkers that I was being disciplined for "malicious" acts or any other reason, (e) IBM would terminate my employment, and (f) my employment would be "terminated for cause" or "terminated without cause". IBM must produce the records by July 9, 2018, per Illinois's Personnel Record Review Act.

Please contact me on or before July 6 to coordinate the time, location and means of inspection and copying of the requested documents.

Thanks,

- Tim

FILED DATE: 1/22/2019 12:00 AM  2019L000717

**MongoHQ Inc.**
4093 Helena Rd
Helena, AL
United States

September 23, 2012

Tim Yocum

Dear Tim Yocum:

MongoHQ Inc., a Delaware corporation (the "Company"), is pleased to offer you employment with the Company on the terms described below.

1.    1.    **Position.** You will start in a full-time position as Devops Engineer and you will initially report to the Company's founders. Your primary duties will be managing datacenter builds, improving technical operations, and establishing support procedures. By signing this letter, you confirm with the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties with the Company.

2.    2.    **Compensation and Employee Benefits.** You will be paid a starting salary at the rate of $130,000 per year, payable on the Company's regular payroll dates.

3.    3.    **Stock Options.** Subject to the approval of the Company's Board of Directors, you will be granted an option to purchase a number of shares of Common Stock equal to 0.5% of the Company's fully diluted capitalization immediately after the Series A financing. The option will be subject to the terms and conditions applicable to options granted under the Company's 2012 Stock Plan, as described in that plan and the applicable stock option agreement, which you will be required to sign. You will vest in 25% of the option shares on the 12-month anniversary of your vesting commencement date and 1/48th of the total option shares will vest in monthly installments thereafter during continuous service, as described in the applicable stock option agreement. The exercise price per share will be equal to the fair market value per share on the date the option is granted, as determined by the Company's Board of Directors in good faith compliance with applicable guidance in order to avoid having the option be treated as deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended. There is no guarantee that the Internal Revenue Service will agree with this value. You should consult with your own tax advisor concerning the tax risks associated with accepting an option to purchase the Company's common stock.

4.    4.    **Confidential Information and Invention Assignment Agreement.** Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement.

5.    5.    **Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM   2019L000717

superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Chief Executive Officer.

6.    6.    **Outside Activities**. While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

7.    7.    **Withholding Taxes**. All forms of compensation referred to in this letter are subject to applicable withholding and payroll taxes.

8.    8.    **Entire Agreement**. This letter supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

*[Signature Page Follows]*

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM  2019L000717

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on September 28, 2012.

We look forward to having you join us no later than October 15, 2012.

Very truly yours,

MongoHQ Inc.

By: _____
(Signature)

Name: Kurt Mackey
Title: Cofounder

ACCEPTED AND AGREED:

Tim Yocum (Print Employee Name)

_____ (Signature)

_____ Date

Anticipated Start Date: _____

Attachment A: Confidential Information and Invention Assignment Agreement

## ATTACHMENT A

## CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

*(See Attached)*

IBM CONFIDENTIAL



**Health Benefit Services**

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Welcome **KRISTINE TOONE**

### Add a New Accountholder - Confirmation

**OK**   **Your enrollment request for the employee is pending review.**

If additional information is needed to complete the application, the employee will be contacted by a Wells Fargo representative within 2-3 business days. Otherwise, the employee will receive a final determination via mail in 7-10 days.

You can view the result on your HSA Enrollment Report under Reports section of CEO HBS. HBS4559

Confirmation Number:      OLM1669819

**Accountholder Information**

| | |
|---|---|
| Name: | Yocum, Timothy, K |
| SSN: | ███████ |
| Date of Birth: | ██████ |
| Employee ID: | |
| Country of Citizenship: | **United States** |
| Residency Status: | **US Citizen** |

**Physical Address**

| | |
|---|---|
| Address1: | ████████ |
| Address2: | |
| City: | **Chicago** |
| State: | **IL** |
| ZIP: | ███ |

**Preferred Mailing Address**

| | |
|---|---|
| Address1: | ████████ |
| Address2: | |
| City: | **Chicago** |
| State: | **IL** |
| ZIP: | ███ |
| Country: | **US** |

**Email and Telephone**

| | |
|---|---|
| Email Address: | |
| Primary Telephone : | |
| Alternate Telephone: | |

IBM CONFIDENTIAL

IBM 000004

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Employer Information**

| | |
|---|---|
| Company Name: | **MONGOHQ, INC.** |
| Health Insurance Carrier: | **UNITED HEALTH GROUP** |
| HSA Fee Responsibility: | **000 - Paid By Accountholder** |
| Monthly Service Fee: | **$3.75** |
| Division Code: | |
| Employee ID: | |

**HSA Information**

| | |
|---|---|
| Health Care Coverage Type: | **Single** |

< Add Another Accountholder

Privacy Policy
Health Benefit Services, A Division of Wells Fargo Bank, N.A.
© Copyright 2014 Wells Fargo. All rights reserved.

IBM CONFIDENTIAL

IBM 000005

FILED DATE: 1/22/2019 12:00 AM 2019L000717

## Enrollee Detail Report

| | | **Print Date** | 02/20/2014 |
|---|---|---|---|
| **Policy Information** | | **Last Update Date** | 02/20/2014 |
| **Policy Number** | 08P7689 | | |
| **Policy Name** | MONGOHQ | | |
| **Policy Status** | ACTIVE | **Policy Anniversary** | 12/01 |

### Enrollee Information - TIMOTHY K YOCUM

| | | | |
|---|---|---|---|
| **Original Eff Date** | 02/19/2014 | **Status** | ACTIVE |
| **Termination Date** | | | |
| **Termination Reason** | | | |
| **Relationship** | Employee | **Gender** | MALE |
| **Date of Birth** | ▓▓▓▓▓▓ | | |
| **Address 1** |  | | |
| **Address 2** | | | |
| **City, State, Zip** | CHICAGO, IL, 60607 | | |
| **Home Phone** | | | |

### Employee Information - TIMOTHY K YOCUM

| | | | |
|---|---|---|---|
| **Social Security #** | ▓▓▓▓▓ | **Date of Hire** | 02/19/2014 |
| **Alternate ID** | ▓▓▓▓▓ | **Retirement Date** | |

### Coverage Information

| **Type** | **Description** | **Begin Date** | **End Date** |
|---|---|---|---|
| MEDICAL | CHOICE+/INS | 02/19/2014 | |

### COBRA / State Benefit Continuation Information

**Effective Date**
**Enrollee Type**

IBM CONFIDENTIAL

IBM 000006

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Enrollee Detail Report

**Print Date**    02/20/2014

### Policy Information

**Last Update Date**    02/20/2014

| | |
|---|---|
| **Policy Number** | 08P7689 |
| **Policy Name** | MONGOHQ |
| **Policy Status** | ACTIVE |

**Policy Anniversary**    12/01

---

### Enrollee Information - TIMOTHY K YOCUM

| | | | |
|---|---|---|---|
| **Original Eff Date** | 02/19/2014 | **Status** | ACTIVE |
| **Termination Date** | | | |
| **Termination Reason** | | | |
| **Relationship** | Employee | **Gender** | MALE |
| **Date of Birth** | ■■■■■■ | | |
| **Address 1** | ■■■■■■■■■■■ | | |
| **Address 2** | | | |
| **City, State, Zip** | CHICAGO, IL, 60607 | | |
| **Home Phone** | | | |

---

### Employee Information - TIMOTHY K YOCUM

| | | | |
|---|---|---|---|
| **Social Security #** | ■■■■■ | **Date of Hire** | 02/19/2014 |
| **Alternate ID** | ■■■■■ | **Retirement Date** | |

---

### Coverage Information

| Type | Description | Begin Date | End Date |
|---|---|---|---|
| **MEDICAL** | CHOICE+/INS | 02/19/2014 | |

---

### COBRA / State Benefit Continuation Information

**Effective Date**
**Enrollee Type**

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Enrollee Detail Report

| | | **Print Date** | 01/05/2015 |
|---|---|---|---|
| **Policy Information** | | **Last Update Date** | 01/05/2015 |
| Policy Number | 08P7689 | | |
| Policy Name | MONGOHQ | | |
| Policy Status | ACTIVE | **Policy Anniversary** | 12/01 |

**Enrollee Information -** █████████████

| | | | |
|---|---|---|---|
| Original Eff Date | 01/01/2015 | Status | ACTIVE |
| Termination Date | | | |
| Termination Reason | | | |
| Relationship | ███ | Gender | ██████ |
| Date of Birth | ███████ | | |
| Address 1 | ██████████████████████ | | |
| Address 2 | | | |
| City, State, Zip | █████████████ | | |
| Home Phone | █████████ | | |

**Employee Information -** TIMOTHY K YOCUM

| | | | |
|---|---|---|---|
| Social Security # | ████████ | Date of Hire | 02/19/2014 |
| Alternate ID | ████████ | Retirement Date | |

**Coverage Information**

| Type | Description | Begin Date | End Date |
|---|---|---|---|
| MEDICAL | CHOICE+/INS | 01/05/2015 | |
| MEDICAL | CHOICE+/INS | 01/01/2015 | 01/04/2015 |

**COBRA / State Benefit Continuation Information**

Effective Date
Enrollee Type

FILED DATE: 1/22/2019 12:00 AM 2019L000717

## IBM Confidential: 2016 Performance Assessment for Tim Yocum

### Discussing Performance

Your global manager will assess your performance across multiple dimensions. The assessment will be reviewed by your upline (and in-country manager, if different than global manager), and then reviewed with you. Below is an example of how your goal feedback relates to the dimension assessments. If you need to update your goal feedback, go to your <u>Goals page</u>, and the updates will auto-sync to your performance form.





| Goals | ➡ | Performance Feedback | ➡ | Dimensions | ➡ | Ratings |
|---|---|---|---|---|---|---|
| Throughout the year, you have identified your goals to define your work. | | By documenting your accomplishments (e.g., ACE, Checkpoint), you show **what** you did and **how** you did it relative to your goals. | | The dimensions are the lenses through which performance is viewed. What dimensions do your results best illustrate? | | Your dimension ratings are based off of your performance across all of your goals throughout the year. |

Dimensions: Business Results, Client Success, Innovation, Responsibility to Others, Skills

### Employee Information

| | | | |
|---|---|---|---|
| First Name | Tim | Title | Director, Compose Operations |
| Last Name | Yocum | Band | 10 |
| Global Manager | Jozef de Vries | | |

### Accomplishment Details

Accomplishment details provide a final snapshot of the goals and progress you have been updating throughout the year, along with the feedback against your goals your manager has been providing to you. These elements, combined with feedback provided through other means (ACE app, etc.) along with your manager's own observations, become the basis for your annual performance assessment. If you need to make any final updates, please access your <u>Goal plan</u> to do so. Updates will automatically sync to this performance form.

GOALS (IBM Confidential)
**Maintain positive customer experience through constant evaluation of support/ops procedure and output.**

| Ongoing |
|---|

### Goal Details

| | |
|---|---|
| Goal Description | Maintain positive customer experience through constant evaluation of support/ops procedure and output. |
| Status | Ongoing |
| Progress/Feedback | 1. Tim Yocum 01/09/2017 We've done a good job maintaining an excellent support reputation with our customers throughout the past year. Through new products (Bluemix offerings, Enterprise) we've been able to stay ahead of the curve and support users with the same quick, accurate, and empathetic standards that we've always considered mandatory. We've integrated changes suggested by others to establish better defect workflow and tracking as well as refined stand-ups to focus on making beneficial changes for the platform and driving customer satisfaction. |

GOALS (IBM Confidential)
**Bring Compose support documentation, process, and culture from "in our heads" to written form.**

| Ongoing |
|---|

### Goal Details

Bring Compose support documentation,

FILED DATE: 1/22/2019 12:00 AM 2019L000717

| Goal Description | process, and culture from "in our heads" to written form. | Status | Ongoing |
|---|---|---|---|

Progress/Feedback

1. Tim Yocum
   01/09/2017
   This has been a bit hamstrung by the fact that various Bluemix services are in a support system state of flux. When this goal was originally set up, we were hoping to leverage integration with Parature. A few months later, a migration to IMS was proposed. Now, Salesforce is being investigated as a replacement. We remain on HelpScout and plan to continue, however it's difficult to bring more knowledge and workflow efficiencies to the Bluemix support staff with tooling being in a constant state of unknown. Drop a reorg into the mix and this effort has been stalled repeatedly while the dust settles from the Analytics->WDP change and what that means to the products, current and future.

   Despite the moving targets, we are still working to bring solutions and workflows that we use in support to the Bluemix team. Documentation has been getting better, but remains poorly fragmented in various systems. Hiring, while slow, will help free up individuals with writing talent to assist in building the knowledge base we need to share internally.

2. Jason McCay
   06/26/2016
   How have Don's calls been going? Have they been useful to you?

3. Tim Yocum
   02/18/2016
   We have so much knowledge broken up between at least two systems, and with product changes that documentation is in many cases outdated.

   Getting involved in Don's regular calls will help steer the way forward to effectively bring our knowledge into the IBM fold.

## Dimension Ratings

Below are the five dimension definitions, for continued reference. Once this performance form is moved from the employee to the global manager, the manager will rate the employee against each of the five dimensions.

### Business Results

Your achievement against agreed goals. In order for the employee to be rated;
- Exceeds, they will have exceeded all objectives and delivered outstanding results on all relevant measures.
- Achieves, they will have accomplished agreed upon goals and outcomes delivering key committed business and financial objectives
- Expects more, they will have fallen short of the Business Results standard described above.

**Rating**
Achieves

### Client Success

You are passionate about every client's success, so you put them first, listen for need and find opportunities to bring new ideas and add value. Partnering with all relevant IBM stakeholders, you focus on outcomes --helping every client succeed however they measure success. In order for the employee to be rated;
- Exceeds, they will have exceeded client expectations on all measures while delivering outstanding client outcomes.
- Achieves, they will have consistently put the client first, Delivered successful outcomes as experienced by the client.
- Expects more, they will not have achieved the Client Success standard described above.

**Rating**
Achieves

### Innovation

You are a forward thinker. You seek out grand challenges as well as incremental improvements -- whether in technology or in

IBM CONFIDENTIAL

IBM 000010

FILED DATE: 1/22/2019 12:00 AM   2019L000717

how you work and in what you deliver, in order for the employee to be rated;
- Exceeds, they will have achieved eminence through delivering high impact or breakthrough innovation.
- Achieves, they will have demonstrated innovation that matters by consistently bringing new ideas to solve business or technical problems.
- Expects more, they will not have achieved the Innovation standard described above.

Rating

Achieves

## Responsibility to Others

You prioritize collaboration and focus on building trust and earning it anew every day, in every relationship -- with IBMers, clients, partners and more. For those of you entrusted with management or executive responsibility, this includes your effective leadership and showing personal interest in IBMers, their careers and their development. In order for the employee to be rated;
- Exceeds, they will have sought out and known for collaboration and helping others to succeed.
- Achieves, they will have built trust and collaborated effectively. For people managers, helped their teams excel through feedback, development, progression, and improved engagement.
- Expects more, they will not have achieved the Responsibility to Others standard described above.

Rating

Exceeds

## Skills

IBMers are dedicated to growing skills that matter to our business and to being essential now and in the future. You continuously find opportunities to learn and apply new skills strategic to IBM and needed to be successful in your role. You are recognized for your expertise and you share it with others. In order for the employee to be rated;
- Exceeds, they will have learned, applied, and transferred relevant skills to others, consistently leading to exceptional business results.
- Achieves, they will have developed new, relevant skills or deepened existing skills, and applied them to deliver business results.
- Expects more, they will not have achieve the Skills standard described above.

Rating

Achieves

Summary

Optional: Tim Yocum, any other comments for the year?

The year has flown by. We've had a reorg (or two...), changed product direction on Enterprise more than once, hired a slew of new people, and switched up responsibilities. We end the year a completely different team than we started. To measure success amidst the change, I'm looking at our ops/support from an external view. Has our support changed? Is it worse than before, better than before, or same? Have our ops practices slacked? Is our response time better, same, or worse?
Overall, we are remaining consistent with our high expectations despite the change - positive and negative - so we are coming out ahead. I often feel like I'm treading water because we're on such uncertain ground. I wonder if others feel the same sense of "change paralysis" such that the thought of a new initiative is, at first, exciting but later gets shelved by fear of another reorg obviating the initiative itself.
I am excited to help elevate the ops team and fold support engineers into the larger ops/support group. We've already started doing this with many (Shane, Jonathan, etc.) and it's working nicely. Bridging ops and support will help us share responsibilities and cross-train, ultimately providing customers with a better experience by way of a better, more stable product.

Comments by Jason McCay

Amidst a lot of change and a number of unknowns, Tim has delivered in both the Support focus as well as Operational Engineering focus. He is a stalwart that provides direction that is effective but not overbearing and shares knowledge. Also, he is willing to dig into the less-than-fun grunt work for the sake of the focus and energy of the team.

A suggested improvement might be more deliberate about communicating as well as being an advocate for and pushing forward with clear improvements that the team needs regardless of resistance that he might face.

## Availability Indicator

To support career development and discussion, the manager should indicate whether the employee could be ready and available for a new opportunity in the next year.  An IBMer is eligible to move to a new job after they have successfully performed their current job for 12 months. The purpose of this indicator is to ensure discussion and alignment on skill and career growth, and when new opportunities could be pursued.

☐This employee could be ready and available for a new opportunity in the next calendar year.

## Enablement Materials and Training

As a manager, it's your responsibility to help your team members establish goals, provide ongoing feedback throughout the year, give fair and accurate annual assessments and differentiate performance. You may refer to the Manager Assessment Preparation topic on IBM Leadership Academy for additional guidance.

☑I completed the education and received certification prior to assessing this employee.

## Upline Review (and In-Country Acknowledgement, if in-country manager is different than global manager)

Upline manager: Please confirm that you have reviewed the assessment decisions of the global manager. You may also leave comments for the employee (optional) below. These comments will be visible to anyone.

In-country manager (if different than global manager): You will receive the employee's assessment for your awareness. You may also leave comments for the employee below (optional). These comments will be visible to anyone.

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Please note: If the employee's in-country and global manager are the same person, then the in-country manager step will not occur in the performance assessment route.

☑Upline Manager: I acknowledge that I've reviewed the assessment decisions of the global manager.

Optional: Upline Manager Comments

Optional: In-Country Manager Comments

## Acknowledgement

IMPORTANT: By clicking "Agree" you are confirming that you have had a discussion with your employee about their assessment, and are digitally signing the form.  A copy of the document will be sent to your Completed folder, and your employee's Completed folder.

Global Manager:

Global Manager:   Jozef de Vries                                01/29/2018

FILED DATE: 1/22/2019 12:00 AM  2019L000717

**IBM Confidential: 2017 Performance Assessment for Tim Yocum**

## Discussing Performance

Your global manager will assess your performance across multiple dimensions. The assessment will be reviewed by your upline (and in-country manager, if different than global manager), and then reviewed with you. Below is an example of how your goal feedback relates to the dimension assessments. If you need to update your goal feedback, go to your Goals page, and the updates will auto-sync to your performance form.

      

| Goals | Performance Feedback | Dimensions | Ratings |
|---|---|---|---|
| Throughout the year, you have identified your goals to define your work. | By documenting your accomplishments (e.g., ACE, Checkpoint), you show **what** you did and **how** you did it relative to your goals. | The dimensions are the lenses through which performance is viewed.  What dimensions do your results best illustrate? | Your dimension ratings are based off of your performance across all of your goals throughout the year. |

Dimensions header icons: **Business Results**, **Client Success**, **Innovation**, **Responsibility to Others**, **Skills**

## Employee Information

| | | | |
|---|---|---|---|
| First Name | Tim | Title | Director, Compose Operations |
| Last Name | Yocum | Band | 10 |
| Global Manager | Jozef de Vries | | |

## Accomplishment Details

Accomplishment details provide a final snapshot of the goals and progress you have been updating throughout the year, along with the feedback against your goals your manager has been providing to you.  These elements, combined with feedback provided through other means (ACE app, etc.) along with your manager's own observations, become the basis for your annual performance assessment.  If you need to make any final updates, please access your Goal plan to do so. Updates will automatically sync to this performance form.

Goals
Bring Compose support documentation, process, and culture from "in our heads" to written form.

[ Ongoing ]

## Goal Details

| Dimension(s) related to this goal | Progress/Feedback |
|---|---|

Goals
Maintain positive customer experience through constant evaluation of support/ops procedure and output.

[ Ongoing ]

## Goal Details

| Dimension(s) related to this goal | Progress/Feedback |
|---|---|

## Dimension Ratings

Below are the five dimension definitions, for continued reference. Once this performance form is moved from the employee to the global manager, the manager will rate the employee against each of the five dimensions.

### Business Results

Your achievement against agreed goals. In order for the employee to be rated;
- EXCEEDS: Exceeded all objectives and delivered outstanding results on all relevant measures.
- ACHIEVES: Accomplished agreed upon goals and outcomes delivering key committed business and financial objectives.
- EXPECTS MORE: Delivered on some but not all key committed business and financial objectives, demonstrated progress towards agreed upon goals.

Rating
Exceeds

### Client Success

You are passionate about every client's success, so you put them first, listen for need and find opportunities to bring new ideas and add value. Partnering with all relevant IBM stakeholders, you focus on outcomes --helping every client succeed however they measure success. In order for the employee to be rated;

FILED DATE: 1/22/2019 12:00 AM   2019L000717

- EXCEEDS: Exceeded client expectations on all measures while delivering outstanding client outcomes.
- ACHIEVES: Consistently put the client first. Delivered successful outcomes as experienced by the client.
- EXPECTS MORE: Demonstrated an inconsistent understanding of the client needs. Delivered some successful outcomes as experienced by the client.

Rating

Exceeds

## Innovation

You are a forward thinker. You seek out grand challenges as well as incremental improvements -- whether in technology or in how you work and in what you deliver, in order for the employee to be rated;
- EXCEEDS: Achieved eminence through delivering high impact or breakthrough innovation.
- ACHIEVES: Demonstrated innovation that matters by consistently bringing new ideas to solve business or technical problems.
- EXPECTS MORE: Inconsistently applied innovative thinking to solve business or technical problems, with varying degrees of success and/or impact.

Rating

Achieves

## Responsibility to Others

You prioritize collaboration and focus on building trust and earning it anew every day, in every relationship -- with IBMers, clients, partners and more. For those of you entrusted with management or executive responsibility, this includes your effective leadership and showing personal interest in IBMers, their careers and their development. In order for the employee to be rated;
- EXCEEDS: Sought out and known for collaboration and helping others to succeed.
- ACHIEVES: Built trust and collaborated effectively. For people managers, helped their teams excel through feedback, development, progression, and improved engagement.
- EXPECTS MORE: Demonstrated effectiveness collaborating with others varies. For managers, actions to foster engagement yielded inconsistent results.

Rating

Achieves

## Skills

IBMers are dedicated to growing skills that matter to our business and to being essential now and in the future. You continuously find opportunities to learn and apply new skills strategic to IBM and needed to be successful in your role. You are recognized for your expertise and you share it with others. In order for the employee to be rated;
- EXCEEDS: Learned and applied new, relevant skills to own role, and successfully transferred relevant skills to others.
- ACHIEVES: Developed new, relevant skills or deepened existing skills, and applied them consistently in own job role.
- EXPECTS MORE: Demonstrated efforts to build new, relevant skills, but did not translate consistently to own job role.

Rating

Exceeds

## Summary

Optional: Tim Yocum, any other comments for the year?

Since these goals were added, I've largely transitioned the support team over to Jason and have started to work exclusively within the ops realm. The transition went smoothly -- there was no noticeable change in support quality or cadence, and team members were happy with the shift [back] to Jason's leadership.

In ops, we've struggled with attrition and inability to backfill positions. That, combined with increased workload around compliance activity, has made for a challenging environment. Keeping team members motivated is an ongoing task. Consistently dependable leaders like Terry and Dusty were heavily loaded with tasks and continue to have a lot of work on the horizon. New teammates from support will lighten that load and allow them to do more long-term strategy and higher level work (e.g., Armada/Genesis/Wanda/etc.) as well as more in-depth compliance efforts (e.g., retrofitting systems with encrypted disks)

Many of the support staff that has joined the ops team have come up to speed tremendously fast -- Shane is now running nearly all deployments and maintenance of Terraform scripts, and we work closely every day to set future direction and do one-on-one tutoring on technologies he's interested in learning. Simon has taken on several long-standing issues (Sensu performance, RethinkDB) and driven toward solutions that have benefited the entire team. Jonathan is focusing on learning Kubernetes and has already helped Joe deploy some apps on the internal k8s stack.

Getting Merrill back from STD is a relief. Prior to her leave, she'd been focused on helping bring out more of an SRE approach to the team from her experience and I look forward to making progress in 2018.

From a customer-deliverables standpoint, we've hit our marks well. Despite less staff and frequent priority shifts, we've deployed numerous clusters, scaled others, and maintained excellent uptime for multitenant and enterprise. We continue to work toward financial optimization, however, this is a difficult task so leave to *10% time* and could benefit from more focused attention.

Looking inward, I feel as though I've done an adequate job focusing on the staff and their needs, though there's room for improved communication, specifically communication cadence. Some prefer more frequent check-ins than others; balancing everyone's preference is a bit tricky. I'm quite proud of the achievements made by Shane and Jonathan in particular. Both are self-starters, though Shane has asked for more direction and communication. I've enjoyed working with him very much and find that his inquisitive nature lends itself well to all the new technologies we're able to expose him to; his ability to consistently make end users happy is a tremendous asset.

I'd like to work on my own skills more in 2018. Throughout 2017, I've frequently felt as though my skillset is stagnant. While there's a demarcation between a technical manager and a people manager, I don't want to fully check-out on the technical aspect otherwise I'm doing my team a disservice by not fully understanding the work I'm asking of them. It's difficult finding the time to spend focused on learning. I encourage everyone on my team to make time to learn, but I don't give myself that same benefit.

Required action: Jozef de Vries's comments to support the rating decisions

Tim has continued to be the core nucleus of our operational efforts spanning compose.com through to bluemix and compose enterprise. Much of Tim's work and contributions goes unnoticed, ranging anywhere from maintaining cost optimization through our infra accounts, keeping systems healthy, and mentoring the jr operators in the team, and unnoticed in a good way. He is addressing problems before they are problems. Conversely, Tim is equally active in an external facing capacity, regularly address any number of customer issues, challenges, or inquiries. He engages productively and regularly with his peers across the Cloud organization, and is consistently viewed as one of Compose's technical leaders. Going into 2018, we'll want to continue fine tuning the balance between technical contribution and team management as Tim wants to progress his career on both fronts. It is a tricky balance to navigate, and always requires adjustments one way or another. He certainly is well adept on both fronts, so the focus is just to make sure he continues to be a positive contributor on both fronts. He's a great resource to have in the team!

## Enablement Materials and Training

IBM CONFIDENTIAL

IBM 000014

FILED DATE: 1/22/2019 12:00 AM  2019L000717

As a manager, it's your responsibility to help your team members establish goals, provide ongoing feedback throughout the year, give fair and accurate annual assessments and differentiate performance. You may refer to the Manager Assessment Preparation topic on IBM Leadership Academy for additional guidance.

☑ I completed the education and received certification prior to assessing this employee.

## Upline Review (and In-Country Acknowledgement, if in-country manager is different than global manager)

**Upline manager:** Please confirm that you have reviewed the assessment decisions of the global manager. You may also leave comments for the employee (optional) below. These comments will be visible to anyone.

**In-country manager (if different than global manager):** You will receive the employee's assessment for your awareness. You may also leave comments for the employee below (optional). These comments will be visible to anyone.

Please note: If the employee's in-country and global manager are the same person, then the in-country manager step will not occur in the performance assessment route.

☑ Upline Manager: I acknowledge that I've reviewed the assessment decisions of the global manager.

Optional: Upline Manager Comments

Optional: In-Country Manager Comments

## Acknowledgement

IMPORTANT: By clicking "Agree" you are confirming that you have had a discussion with your employee about their assessment, and are digitally signing the form.  A copy of the document will be sent to your Completed folder, and your employee's Completed folder.

Global Manager:  Jozef de Vries                           02/14/2018

FILED DATE: 1/22/2019 12:00 AM   2019L000717

### Bonus Schedule

This Bonus Schedule is subject to the terms and conditions outlined in the attached Compose, Inc. 2015 Bonus Plan (the "**Plan**"). All capitalized terms not defined in this Bonus Schedule are defined in the Plan.

**Participant Name: Timothy Yocum**

**The Total Bonus that you may earn under this Plan is equal to $300,000, which consists of the following:**

1. **Closing Bonus: $50,000**
2. **2016 Bonus: $100,000**
3. **24 Monthly Bonuses each equal to: $6,250**

I have read, understand and accept the terms of the Plan and this Bonus Schedule.

*Tim Yocum*
_____          Dated: ___07 / 22 / 2015_____
Signature

Timothy Yocum
_____
Timothy Yocum

OHSUSA:762735708.1

I

IBM CONFIDENTIAL

Doc ID: 07506f94506ac0c97aa1625ba0f4e50a043b9ca8

IBM 000016

## ▽ HELLOSIGN

Audit Trail

| | |
|---|---|
| **TITLE** | Founder bonus agreement (Tim) |
| **FILE NAME** | Compose 2015 Bonu...Timothy Yocum.pdf |
| **DOCUMENT ID** | 07506f94506ac0c97aa1625ba0f4e50a043b9ca8 |
| **STATUS** | ■ Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | 7/22/15<br>20:42:50 UTC | Sent for signature to Timothy Yocum (tim@compose.io)<br>IP: 67.180.238.86 |
| **VIEWED** | 7/22/15<br>20:44:34 UTC | Viewed by Timothy Yocum (tim@compose.io)<br>IP: 98.223.131.146 |
| **SIGNED** | 7/22/15<br>20:44:58 UTC | Signed by Timothy Yocum (tim@compose.io)<br>IP: 98.223.131.146 |
| **COMPLETED** | 7/22/15<br>20:44:58 UTC | The document has been completed. |

FILED DATE: 1/22/2019 12:00 AM   2019L000717

IBM CONFIDENTIAL

IBM 000017

FILED DATE: 1/22/2019 12:00 AM   2019L000717

To:     **IBM**
From:   **Tim Yocum**
RE:     **Investigation**
Date:   **29 May 2018**

---

## Introduction and background

I began working at MongoHQ in February 2014. I was responsible for hiring and setting up a support team, and later focused on operations. MongoHQ changed its name to Compose in August, 2014, and was acquired by IBM in July, 2015.

My title at IBM is "Program Director, IBM Cloud Databases," which means I am responsible for the day-to-day technical architecture, implementation, support, compliance, security, and, ultimately, the ability of customers to utilize a suite of nine different database technologies within IBM's cloud platform. I am responsible for managing the procurement of computer systems on IBM's cloud and other cloud providers where we offer our services. I lead a team of eight employees and report to the Engineering Director, Jozef de Vries, who works out of our Cambridge, Massachusetts office.

## Accusation and notification

On 24 April, I had a phone call with Jozef, who explained that I would be placed on leave as accusations of misconduct had been raised. I left my computer and access card at the Cleversafe/IBM office in Chicago and left the premises as directed.

On 27 April, I had a phone call with Jozef where he explained the accusations. According to Jozef, someone had noticed eight virtual computers running on Amazon's cloud platform (AWS) and this person could not identify a business need. Without asking me about the systems or their purpose, an investigation was launched into these systems. I explained to Jozef that there was a misunderstanding, and that at no time did I intend to abuse resources for personal gain nor did I benefit in any way from the work that I'd done, but instead I was utilizing them as part of a performance/benchmark testing project I had started earlier in the year and had not had time to complete. Jozef stated that he would relay the explanation to the investigators. Jozef also asked if one of my colleagues could text me and ask some questions related to systems I knew best. I said yes, and I helped him accordingly.

On 10 May, Jozef sent me a text message and asked for details about accessing the systems in question. I responded with details as to how access could be achieved, explaining two methods to access the systems - either directly within AWS or via SSH key.

## Technical summary of my actions:

There is a bug in computer processors that could cause a security issue if exploited by an attacker (Exhibit A). All published workarounds to prevent a security issue are known to cause performance issues (Exhibit B). I wanted to generate CPU load as a means to evaluate whether these patches would impact a CPU and, if so, in what way. I downloaded and installed Monero, a cryptocurrency software, on several machines because it is known to generate heavy CPU load. In retrospect, I would have used some other tool because people assumed

FILED DATE: 1/22/2019 12:00 AM   2019L000717

the worse when they saw Monero. I did not consider that my intent and motives would be in question. At Compose, we have always been encouraged to "fail fast, fail often" and be innovative, which is why I thought my technique would be easily understood and it would create a clear metric if performance was impacted.

**Technical detail behind my actions:**

In late 2008, a vulnerability named "Meltdown" that impacts Intel CPUs was identified and researched. (Exhibit A.) This vulnerability targets a feature in Intel processors called "speculative execution," which allows a computer's processor (or CPU) to execute code that it may or may not need to run in the immediate future to make the resulting data available before its explicit execution, which will increase performance. Meltdown describes a process by which an attacker can read memory that they should otherwise be unable to read, thus allowing an attacker to theoretically access data that they do not have permission to access.

Compose uses Linux as its operating system on servers that are deployed at IBM, Amazon, and other facilities. The particular distribution, or version, of Linux that IBM uses is called Ubuntu. The Ubuntu team (non-IBM) has been releasing patches for Meltdown to mitigate the Meltdown CPU bug. These patches do not actually fix the bug -- the bug is within the microcode of the processor and is impossible to fix without physically replacing the old CPU with a new CPU. Rather, the fix is implemented in the "kernel" or the "heart" of the Linux operating system, and there is a possibility that these patches will decrease system performance. The performance impact was such a concern that the Ubuntu team published links to publicly-disclosed performance measurement data provided by third-party sources. (Exhibit B.) These third-party sources include workloads on Postgres, Elasticsearch, ScyllaDB, and nginx - all software packages that IBM and Compose utilize to provide Cloud Database Services to customers.

My team discussed at length, via Slack, the concern that these patches might have a detrimental impact on customer database performance. We discussed the need to patch systems and how we could measure whether patches would impact CPU performance to an extent that would require us to "scale up" customer clusters. To "scale up" a cluster means to add more computers to the cluster and thereby increase the amount of money IBM spends on each cluster. For example, a 5% performance decrease might have little adverse impact in the immediate term; however, a 10% performance decrease might indicate that we need to adjust the type of servers we purchase and deploy for customers. I am responsible for this purchasing activity from AWS and other vendors and I have been praised by IBM coworkers and even our Amazon account manager (via e-mail, in my inbox that I am unable to access) for saving IBM in excess of $1 million annually by properly managing system purchasing. (Exhibit C.) I needed to figure out how a Meltdown patch might impact the performance of CPUs in the equipment we use in order to accurately forecast what types of systems we may need to add to preserve performance as well as adjust for new cluster additions.

Compose's database workloads are highly variable because we serve thousands of customers with unique workloads. Because of this, testing the performance of a single database (e.g., only Postgres, or only Elasticsearch - both databases offered to customers) would be insufficient to gauge actual performance impact of any Meltdown patch. Further, any database-specific benchmarking would likely be insufficient by virtue of per-database data manipulation techniques (e.g., caching) or customer-specific instructions (e.g., indexing) that

FILED DATE: 1/22/2019 12:00 AM 2019L000717

may not apply enough "stress" to the CPU before and after a test.

Because we did not have a single test methodology, I decided to attempt a novel experiment to measure CPU performance in a consistent manner that would produce an easily measurable metric. I had recently heard that "Monero" is ASIC-resistant. This simply means that Monero utilizes as much CPU time as possible, as it is designed to utilize the CPU and no other components of a server. My working theory was that I could run the Monero software for a while, compute the average hash rate (indicative of performance), apply patches as they become available, and track the hash rate over time to gauge any losses of performance. During my research into CPU performance reduction, I noticed others had specifically observed a CPU performance decrease while using Monero (Exhibit D), so I was further convinced that this methodology would make a good test that the team could relate to, as most of the team understands cryptocurrency and how it consumes a CPU.

To move forward with this CPU benchmarking experiment, I performed the following work:

1. Identified a region within our team's AWS account that had no customers.
2. Identified virtual machines I could create that would be covered by an unused reserved instance (RI). (Exhibit E.)
3. Created eight virtual machines that I knew would cost nothing to IBM, and named them approximately, "tky-test1" through "tky-test8." **These are net-new systems that were not in production, had never been in production, and had no client data or any attachments to any client systems or data at any time.**
4. Launched the Monero "mining software" (open source, via GitHub.com) using my personal email address as the "user id" (tim@yocum.org). I used my own email address instead of my IBM email address because I did not want any third-party to see an IBM address in a log file or similar and take interest in these test systems as a potential target for sales pitches or any sort of attack. Use of personal email addresses is not uncommon at IBM or Compose: just a week prior, I had asked an IBM Watson team to switch their account from a Gmail address to their IBM.com address so we could more easily identify it in our system as an internal account. There are even instances of employees using accounts with obvious ties to IBM such as "jimatibm@gmail.com". In the case of the Watson account using a Gmail account, the operator of the account stated that they selected use of a Gmail account because it was easier for multiple employees to share the account.

Experiments of this type are not uncommon. I have performed similar work examining disk performance using AWS RIs not attached to any customer, a personal key, and open-source software. (Exhibit E.)

Important notes:

• When Monero software runs, it needs a "user ID" in order to retrieve data from a server. This data essentially represents very hard math that each system will process and then send results back. As noted in #4 above, the use of a personal email address is to protect IBM, not hide my own actions. My email address is "tim@yocum.org." Further, I am the only Tim Yocum at IBM. I never attempted to obfuscate my identity.

• I did not recognize any financial gain from the use of these systems, and I did not intend to. I selected virtual machines on Amazon that would run at no cost to IBM for these tests and

FILED DATE: 1/22/2019 12:00 AM    2019L000717

would be well-suited for stress testing and benchmarking. (Exhibit E.) I know very little about cryptocurrency mining, but it is my understanding that any currency that was mined as a side effect of the test would be de minimis. Any such cryptocurrency, of course, belongs to IBM. I have not monetized it and never had any intention of doing so.

- As noted in #3, the virtual machines were named with my initials ("tky") to identify them as test systems that I was responsible for. At Compose, we use our initials frequently to identify users of "test" instances so others with access can track down owners, and any of my coworkers would know offhand that "tky" refers to me.

- Jozef told me that he was concerned that these virtual machines were running in Seoul, South Korea, and their proximity to China - a "cryptocurrency hotbed" - was a red flag. The reason these systems were running there is because, as stated in #1 and #2, and illustrated in Exhibit E, we had no customers there and there were available "reserved instances," which meant that the eight instances I ran would incur no costs. Reserved instances are region-specific, so in order to utilize these systems at no cost, they needed to be in the region where the RIs were available.

- There was concern that others could not independently log in to these hosts. That is true: I used a login key generated specifically for these systems. This is an industry best practice and it is how we have used test systems in the past in our team at Compose. For me to use a production key used on customer systems would be a severe anti-pattern in the world of computer security.

It is common practice for Compose employees to use personal keys on non-client equipment to run tests and for employee education and experimentation (which we refer to as "sandboxing" at Compose). For example, I recall that Ben Anderson and Merrill Ferguson have both utilized personal keys on non-client equipment in order to test systems and learn more about AWS.

Compose does not yet utilize key management software. On 21 February, I spoke with Chris Dotson and requested that Compose be part of IBM's pilot program to implement Thycotic credential management software. Using this software would close a long-standing security concern with respect to SSH keys and, in this case, it would have catalogued my personal key as part of a standard access policy. This solution will address the concern of key usage, whether personal or shared.

I never had an opportunity to generate the graphs I had hoped to create from these systems because the IBM "Code Blue" (i.e., extremely critical) security mandate was removed from our product line, thus making the effort unnecessary in the immediate term. The mandate was handled by an IBM security engineer and temporarily closed by that individual and not myself.

Because the vulnerability will still need to be patched (or in some cases already has been) this data would be useful for understanding how we purchase systems in the future. However, my focus was taken away from these efforts and placed squarely on GDPR remediation, as changing requirements and deadlines kept us extraordinarily busy working on thousands of systems.

I did not feel it was necessary to stop collecting data by shutting these systems off because

FILED DATE: 1/22/2019 12:00 AM   2019L000717

they were running at no cost. I had a calendar entry on my computer for when they **would** become a billable item so that I wouldn't forget to remove them. That date was 1 May 2018.

**Questions raised during interview**

I spoke with IBM investigators on Tuesday, 22 May. They raised several questions regarding these hosts and I would like to provide a more detailed explanation:

1.  The investigators asked whether there was a policy surrounding the installation of software on hosts. My understanding is that my staff and I are not required to seek formal approval to install software on test systems, but we would certainly need permission to install software on production systems.

    All of the systems I used were test systems, isolated at the network, region, and permission levels. All of the software that I used, from the operating system (Ubuntu) to the software to generate load (Monero), is open source and publicly accessible without restriction on use.

    Compose operates in a "pre-Transfer of Business" mode, which means that not all aspects of IBM's practices are followed. To that end, there is not a defined "approved software list" or process for Compose employees to follow with respect to freely available, open source software for test purposes. Numerous projects at Compose have been made possible by the use of third-party, open source software, such as Terry Corley's disk encryption suite that leverages numerous open source libraries and JP Philips's dev-to-prod pipeline. To the best of my knowledge, these projects did not entail any approval to get started and there was no formal review process for any of the software that was utilized.

    Further, a recent requirement that Compose perform a full system security scan was made an urgent issue because of GDPR. Jozef and I spent many hours over several days attempting to get support from IBM's own CISO team that runs the software ("Nessus") used to generate external vulnerability details. We were told individually and together that they would not provide the access needed to perform the scan because Compose was not yet integrated into their system (as Compose is pre-ToB) and therefore we had to procure the software on our own and run the test ourselves, outside of IBM's standard practices and technical mandates.

2.  The investigators asked whether IBM had software designed to perform CPU stress testing. I could find no such software internally and I did not become aware of any such software later on. As is common practice, teams are often left to their own devices to accomplish tasks at hand. To wit, Compose and Cloudant are under the same divisional umbrella, yet use 2 different ticketing systems for support, 2 different orchestration platforms for systems management, 3 different documentation systems, different system authentication platforms, different host management policies, have different SLA definitions, and utilize different software and software languages to accomplish the same product: hosting databases for customers.

3.  The investigators asked why I had not told Jozef about my stress tests on the reserved instances, and why I did not share details about my work with the team at large. First, I

FILED DATE: 1/22/2019 12:00 AM   2019L000717

did not ask Jozef if I could perform the work because I had done similar independent benchmarking work in the past (Exhibit F). Because Compose is a remote team, I have no local colleagues with whom to confer casually. The Compose ops team conducts weekly "stand up" meetings via video conference, and I had mentioned my concerns about CPU utilization and my plan to benchmark systems accordingly, though I did not discuss methodology.

In recent months, I had discussed my desire to do more technical work as part of my split role as a technical and operational manager. As part of this effort, I had taken several projects on independently: benchmarking CPU for the Meltdown issue and refactoring our documentation to provide a more easily accessible, editable, and resilient platform. I had finished the documentation redesign, including code and text, and announced it to the operations team during a weekly meeting. Prior to that effort, it had not been largely discussed.

One might ask why, if we have these meetings, I had not explained my intent with benchmarking. If you refer to the Compose Slack channel #general on 24 April in the mid-morning hours, you will see that I expressed an idea for utilizing a homegrown system we use to praise others for their work in a new, novel way: to track accomplishments related to team goals and independent work. This suggestion was met with insult and contempt from several IBM coworkers. I felt as though I was being attacked and shut-down before even having the opportunity to fully discuss my idea. Numerous colleagues expressed their surprise and disappointment in the attacker to me via private message, and encouraged me to carry on in spite of the attack. This is not an isolated event: this has happened to numerous employees and me in the past. This abusive conduct has been the subject of conversations I have had with Jozef and Jason McCay because, as managers, it's our job to identify why this behavior is manifesting and correct it.

Doing independent work means less friction from outside and more ability to experiment and produce work that can be presented to the group without having doubt and uncertainty cast before the work is even attempted. Unfortunately, it also leads to misinformed assumptions as we find in this case and in others.

I apologize for the confusion. Had I known that there was a concern about my project, I would have immediately explained everything. I am confident that my work has value to IBM and others in the security community can build upon my research. I would like to return to my work and teammates at IBM as soon as possible.

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Exhibit A**



# SpectreAndMeltdown

## Information leak via speculative execution side channel attacks

In January 2018, security researchers announced a new class of side channel attacks that impact most processors, including processors from Intel, AMD, ARM and IBM. The attack allows malicious userspace processes to read kernel memory and malicious code in guests to read hypervisor memory.

To address the issue in Ubuntu, updates to the kernel, processor microcode, hypervisor, and various other userspace packages will be needed. These updates are being announced in Ubuntu Security Notices as they are available.

There were three original vulnerabilities involved, with one new related disclosing in May, 2018:

| Group | Name | Variant | Description | Ubuntu CVE Tracker | |
|-------|------|---------|-------------|--------------------|---|
| Jan 2018 | Spectre | Variant 1 | Bounds Check Bypass | CVE-2017-5753 | |
| Jan 2018 | Spectre | Variant 2 | Branch Target Injection | CVE-2017-5715 | |
| Jan 2018 | Meltdown | Variant 3 | Rogue Data Cache Load | CVE-2017-5754 | |
| May 2018 | | Variant 4 | Speculative Store Bypass | CVE-2018-3639 | More details in Separate KB |

Contents

1. Information leak via speculative execution side channel attacks
  1. Current Status
    1. Kernel Mitigations
    2. Processor Firmware Availability
    3. Userspace Mitigations
    4. Cloud Images
    5. Ubuntu Core Images
    6. Pre-release Updates Available For Testing
  2. Timeline

The Spectre and Meltdown vulnerabilities have varying impacts in different environments, and the mitigations available can be difficult to understand. We've prepared a Technical FAQ to help answer many common questions.

*This article will be updated periodically with new information as it becomes available, until the issues have been resolved.*

Source: https://wiki.ubuntu.com/SecurityTeam/KnowledgeBase/SpectreAndMeltdown

Further reading:
https://meltdownattack.com
https://en.wikipedia.org/wiki/Speculative_execution

FILED DATE: 1/22/2019 12:00 AM 2019L000717

**Exhibit B**



Source:
https://wiki.ubuntu.com/SecurityTeam/KnowledgeBase/SpectreAndMeltdown/PublishedApplicationData

IBM CONFIDENTIAL

IBM 000025

FILED DATE: 1/22/2019 12:00 AM  2019L000717

**Exhibit C**

## Background

### Metrics

- 613 AWS EC2 instances
  - 460 US-East
  - 31 US-West
  - 68 Ireland
  - 13 Frankfurt
  - 14 Singapore
  - 7 Sydney
- 236 are currently covered by RI (54% savings)
- 33% coverage rate for instances that would benefit from an RI.
- Previous coverage rate: 72%.

RI purchases are annually renewed. Each renewal requires analysis of the RIs previously purchased, their utilization over the previous year and expected utilization over the next 12 months to evaluate appropriate next steps (e.g., renew or let lapse)

You can see in the graph below where a bulk of our RIs expired, dropping us from a good 72% coverage rate to 33%.



IBM Compose

## March RI Renewal - Results

- 27 RIs purchased to cover i2.4xlarge instances
  - 57.327% discount on list price
  - $461,339 saved over 1 year
- 7 RIs purchased to cover i2.8xlarge instances
  - 57.351% discount on list price
  - $239,456 saved over 1 year

Total annual savings: $700,795

Results are immediately visible:

| Month-to-Date Spend | Est. Monthly Spend |
|---|---|
| **$92,993** | **$413,269** |
| LAST MONTH TO DATE $100,011 | LAST MONTH'S $784,635 |

IBM Compose

IBM CONFIDENTIAL

IBM 000026

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## April RI Renewal – Action Plan

- ~390 RI purchases
  - Likely fewer depending on usage at the time the purchase is executed and ongoing work to reduce instance count.

- ~$866,000 purchase request
  - Will likely come in under budget by trimming excess usage where possible and optimizing.
  - Same strategy as March.

  Net result:

- $1,693,160 saved in 2017
- 52% reduction in instance cost

Example savings for 28 I2.8xlarge instances:

| Estimated Savings | $308,737 (57%) |
|---|---|

| 1 Year On-Demand | | 1 Year Reserved | |
|---|---|---|---|
| Upfront Fee | $0 | Upfront Fee | $131,040 |
| Monthly | $44,807 | Amortized | $19,079 |
| Total | $537,689 | Total | $228,951 |

**Total Cost Comparison**



IBM

Source: Presentation written by myself, sent to Kristine Toone, et al. during normal AWS spending conversations.

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM  2019L000717

**Exhibit D**

| 𝕬 | DATA CENTER | SOFTWARE | SECURITY | DEVOPS | BUSINESS | PERSONAL TECH | SCIENCE |
|---|---|---|---|---|---|---|---|

Epic Games on Friday explained the cause of recent login and stability issues experienced by its players, noting: "All of our cloud services are affected by updates required to mitigate the Meltdown vulnerability."

The company, which relies on AWS servers, posted a screenshot of a graph depicting a spike in CPU utilization after a host was patched. *The Register* asked Epic to elaborate on its findings, but a spokesperson said the developer had nothing further to add at the moment.

Discussions on the mailing list for Lustre, a parallel distributed filesystem, described slowdowns ranging from 10 per cent to as high as 45 per cent for certain IO intensive applications.

"We found terrible performance on the test system with zfs+compression+lustre," wrote Arman Khalatyan of the Leibniz Institute for Astrophysics Potsdam in a memo on Monday.

On Reddit, a Monero coin miner reported a slowdown of about 45 per cent after applying the Meltdown patch. On that thread, another person cited a hash rate decrease of 10 to 15 per cent.

Quora, which relies on AWS, on Saturday said it is "facing a slowdown due to the patch applied by AWS for Intel's Meltdown and Spectre issues."

Via Twitter, Francis Wolinski, a data scientist with Paris-based Blueprint Strategy, noted that Python slowed significantly (about 37 per cent) after applying the Meltdown patch for Windows 7.

Also via Twitter, Ian Chan, director of engineering for analytics firm Branch Metrics, described CPU utilization increases of five to 20 per cent after the Meltdown patch was applied to the AWS EC2 hypervisor handling its Kafka instances.

Source: https://www.theregister.co.uk/2018/01/09/meltdown_spectre_slowdown/

IBM CONFIDENTIAL

IBM 000028

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Exhibit E**

# How do RIs Work?

EC2 RIs provide a discounted hourly rate and an optional capacity reservation for EC2 instances. AWS Billing automatically applies your RI's discounted rate when attributes of EC2 instance usage match attributes of an active RI.

If an Availability Zone is specified, EC2 reserves capacity matching the attributes of the RI. The capacity reservation of an RI is automatically utilized by running instances matching these attributes.

You can also choose to forego the capacity reservation and purchase an RI that is scoped to a region. RIs that are scoped to a region automatically apply the RI's discount to instance usage across AZs and instance sizes in a region, making it easier for you to take advantage of the RI's discounted rate.

# Amazon EC2 RI Types

With RIs, you can choose the type that best fits your applications needs.

- Standard RIs: These provide the most significant discount (up to 75% off On-Demand) and are best suited for steady-state usage.

- Convertible RIs: These provide a discount (up to 54% off On-Demand) and the capability to change the attributes of the RI as long as the exchange results in the creation of Reserved Instances of equal or greater value. Like Standard RIs, Convertible RIs are best suited for steady-state usage.

- Scheduled RIs: These are available to launch within the time windows you reserve. This option allows you to match your capacity reservation to a predictable recurring schedule that only requires a fraction of a day, a week, or a month.

### Standard and Convertible RI Features

**The following summarizes features of all RIs.**

Provide a significant discount compared to running instances On-Demand.

- Can apply to usage across all Availability Zones in an AWS region, or can provide a capacity reservation when assigned to a specific Availability Zone.

- Are offered under three upfront payment options to provide you with payment flexibility at the point of purchase.

- Can be shared between multiple accounts within a consolidated billing family.

Source: https://aws.amazon.com/ec2/pricing/reserved-instances/

Compose has, for years prior to IBM's acquisition and years after, utilized AWS Reserved Instances (RIs) to reduce cost of systems we know will be fully utilized for a given term. Here's an example of how it works:

Customer A has a cluster of 3 AWS hosts in Ireland. When making RI purchases on the next cycle (e.g., when other RIs are expiring), I examine nodes in use and factor in additional RI purchases that will include the 3 AWS hosts so that instead of paying current-rate, we pre-pay and have a lower monthly cost for the systems. This work drives IBM's cost down and improves margins. We utilize similar measures when provisioning internal-use systems (e.g., those that support logging, automation, or orchestration). Exhibit C, above, demonstrates this work.

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM  2019L000717

Consider a case where Customer A terminates their services 8 months after initiating service. Compose will delete the AWS instances to ensure that the data is permanently erased following best practices to do so. Because Customer A's instances were included in a RI purchase, there is now a 4-month window where these instances are paid for, but are unused. RIs are not tied to specific customers or virtual machines; they are applied wherever possible. Important to note is that RIs are region-specific when we purchase them. Therefore, when Customer A leaves, we now have 3 RIs available – in Ireland.

To make the best of unused RIs, Compose often uses any RI capacity for test, development, or short-lived projects. I have provided RI-backed instances to Ben Anderson and Merrill Ferguson in recent months to perform benchmark testing and Elasticsearch logging development resources, respectively. It is common for me to remind Compose ops whenever they're deploying systems for test purposes to check with me for available RIs. I say this in the Compose Slack #ops channel often. Using RIs instead of on-demand pricing allows us to instantiate virtual machines and complete testing at no cost to IBM as long as we use virtual machine types that are covered by RIs in regions where unused RIs exist.

In recent months, I'd been asking Amazon to help us migrate unused RIs between regions so that we could maximize savings. RIs are use-it-or-lose-it. There are no refunds for RIs that go unused.

Conversations related to regional RI transfer can be found in my inbox as a thread with Eric Kalin (Amazon) and myself. We were not able to get instances transferred; I was effectively asking for an exception to the rule given our account size.

FILED DATE: 1/22/2019 12:00 AM   2019L000717

### Exhibit F

I generated the plots below as part of a prior benchmarking project to evaluate disk performance across multiple clusters. Had I been able to complete my CPU benchmarking, similar plots would have been produced and presented to the team.





FILED DATE: 1/22/2019 12:00 AM 2019L000717

## Verification of Information

3g7958  10/1/15  **IBM.**

*To Be Used For:* Those individuals integrating into IBM US through an acquisition.

● **Instructions**

All information should be typed or printed legibly with black ink, using capital letters or numeric characters, as this application will be scanned. Please leave one blank space between words within items, if applicable.

Example | A B C D E F G H I J K L M N O P Q R S T U V W X Y Z | 1 2 3 4 5 6 7 8 9

● **Personal Data**

| Legal Last Name | Social Security Number |
|---|---|
| Yocum | |

| Legal First Name | Middle Initial | Suffix, Jr., Sr., III |
|---|---|---|
| Timothy | K | |

| Former Name (Last) | First Name | Middle Initial |
|---|---|---|

| Dates former name used: | From | To | Are you under 18 years of age? Yes ☐ No ☒ | If yes, please indicate date of birth |
|---|---|---|---|---|

| Current Mailing Address (Number/Street) | Apartment Number |
|---|---|

| City | State | Zip + 4 |
|---|---|---|
| | Illinois | |

| County | Country |
|---|---|
| Cook | US |

| Area Code | Telephone | Alternate (9am-4pm) Telephone (Area Code/Number) |
|---|---|---|

| Non US Phone | E-mail Address |
|---|---|

| Permanent Address (if different than current mailing address) | Apartment Number |
|---|---|

| City | State | Zip + 4 |
|---|---|---|

| County | Country |
|---|---|

**Additional Information Required**
Previous addresses: Other than your current mailing address and permanent address, list all other permanent and temporary addresses for the last seven years.

| Street Address | Apartment Number |
|---|---|

| City | State | Zip |
|---|---|---|

| County | Country |
|---|---|
| | US |

| Dates at this address: | From | To |
|---|---|---|

002 (Rev 07/12)     IBM Confidential when Completed     Page 1 of 8

IBM CONFIDENTIAL

IBM 000032

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Street Address _____   Apartment Number _____

City _____   State _____   Zip _____

County _____   Country [US]

Dates at this address:   From _____   To _____

Street Address _____   Apartment Number _____

City _____   State _____   Zip _____

County _____   Country [US]

Dates at this address:   From _____   To _____

Street Address _____   Apartment Number _____

City _____   State _____   Zip _____

County _____   Country [US]

Dates at this address:   From _____   To _____

Street Address _____   Apartment Number _____

City _____   State _____   Zip _____

County _____   Country [US]

Dates at this address:   From _____   To _____

If more space is needed, include additional residence information on a separate sheet of paper and attach.

Are you legally authorized to work in the United States?   Yes   No

Will you now or in the future require IBM to file a petition or application for employment-based visa status on your behalf to begin or continue employment with our company? If you have non-immigrant status, for example F-1 or H-1, your answer to this question should be "Yes".   Yes   No

The Visa Status/Residency shown is based on your selection from the Drop Down menu on the Online Application.

*EAD = Employment Authorization Status
If Other, indicate your visa type/basis for employment authorization:

Are you a U.S. citizen or national, a permanent resident?   Yes   No      Are you a refugee, an asylee or authorized to work under the amnesty provisions of U.S. immigration law? (If you have non-immigrant status, for example, E-1, F-1, H-1, J-1, etc., then your answer to this should be no )   Yes   No

Have you ever been employed by IBM or one of its subsidiaries?   Yes ☐   No ☒      If yes, please indicate status      Regular ☐   Temporary ☐   Date left _____

IBM location last worked (City) _____   State _____   Former IBM Serial Number (if known) _____

002 (Rev 07/12)                    IBM Confidential when Completed                    Page 2 of 8

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Have you signed or accepted any agreement or are you otherwise subject to any restrictions, whether you believe they are enforceable or not, that 1) restrict the job responsibilities that you can perform for IBM or 2) prohibit you from working for IBM in any capacity e.g. non-competition agreement, non-disclosure agreement, non-solicitation agreement, stock option or restricted stock grant agreement with your current or former employers or pursuant to applicable government conflict of interest restrictions?

| | Yes | No |
|---|---|---|
| | ☐ | ☒ |

IBM is an Equal Opportunity Employer and is committed to Affirmative Action. A description of IBM's Affirmative Action Program is available at IBM facilities on request.

## ● Education

Please indicate all applicable items. If certain items are not applicable, please leave blank.

Technical School, College or University Last Attended or Currently Attending

Name of School

City ████████████████████     State

Country
US

Major
N/A

Graduation date (if applicable)

## ● Employment Experience

Provide your job history for the past seven years. If applicable, please include summer/part-time jobs, and cooperative education assignments.      In the space provided include unpaid experience and periods in which you were not employed and explain what you were doing during that time. Please complete all appropriate items.

I have no previous employment experience. ☐

Explain unemployment period(s) within the last seven years (include dates):

Current / Last Employer Name
ServerCentral, Inc.

City               State    Country
Chicago            IL       US

Start Date         End Date
09-2005            02-2014

Job Title and Duties (use extra sheet if necessary)
Director, Technology Operations

Explain reason for leaving:
Joining Compose.io

Previous Employer Name
Playboy Enterprises, Inc.

City               State    Country
Chicago            IL       US

Start Date         End Date
06-2000            09-2005

Job Title and Duties (use extra sheet if necessary)
Sr. Systems Analyst

Explain reason for leaving:
Joining ServerCentral

IBM CONFIDENTIAL                                           IBM 000034

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Previous Employer Name**
Verio, Inc / VWA, Inc.

| City | State | Country |
|------|-------|---------|
| Chicago | IL | US |

**Start Date**  10-1998
**End Date**  08-2000

**Job Title and Duties (use extra sheet if necessary)**
Systems Administrator

**Explain reason for leaving:**
Joining Playboy

**Previous Employer Name**
Compose, Inc.

| City | State | Country |
|------|-------|---------|
| Chicago | IL | US |

**Start Date**  02-2014
**End Date**

**Job Title and Duties (use extra sheet if necessary)**
Operations

**Explain reason for leaving:**

**Previous Employer Name**

| City | State | Country |
|------|-------|---------|
| | | |

**Start Date**
**End Date**

**Job Title and Duties (use extra sheet if necessary)**

**Explain reason for leaving:**

**Previous Employer Name**

| City | State | Country |
|------|-------|---------|
| | | |

**Start Date**
**End Date**

**Job Title and Duties (use extra sheet if necessary)**

**Explain reason for leaving:**

IBM CONFIDENTIAL                    IBM 000035

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Please read the following statements carefully, as they represent matters of importance to both you and IBM in connection with this Verification of Information.**

I understand and agree that:

1. The information that I have provided on this Verification of Information including the Security Data Sheet is accurate to the best of my knowledge. Any misrepresentation or deliberate omission of a fact provided to IBM will justify terminating consideration of my integrating into IBM or, if employed, terminating my employment.

2A. **Authorization for Procurement of Consumer Report:** IBM may verify all the information that I have provided and may have a Consumer Report or Investigative Consumer Report prepared as part of the pre-employment background investigation. If I become employed, this authorization shall remain on file and shall serve as an ongoing authorization for IBM to procure such reports at any time during my employment. By signing below, I voluntarily authorize IBM to have such reports prepared and release from liability all persons, schools, companies, corporations or other entities supplying or collecting such information. I further acknowledge that I have been given a stand-alone "Consumer Report Notification" (IBM form ZM10-0007) stating that a consumer report may be requested and used for the purpose of evaluating me for employment, promotion, reassignment, or retention as an employee. Any copy of this authorization shall have the same authority as the original.

2B. **California Notice of Investigative Consumer Report:** If you live and work in California, you have a right to contact ADP during reasonable hours to obtain all information in your file for review. Please read for additional information.

2C. **Article 23-A (New York Correction Law Article 23-A Licensure and Employments of Persons Previously Convicted of One or More Criminal Offenses):** The law provides that any individual subject to a criminal background check in New York State must receive a copy 1.) at the time the report is requested and 2) when the report contains criminal conviction information. Please read for additional information.

3. A medical assessment/examination, including a drug screening urinalysis may be required if an offer of employment is made. Failure to successfully complete any required drug screening or medical assessment will result in withdrawal of an offer.

4. Although management attempts to accommodate individual circumstances, including religious observance requirements, business needs may at times make the following conditions required: overtime, shift work, a rotating work schedule, or a schedule that includes Saturday and Sunday.

5. If employed, I will sign IBM's agreement regarding confidential information and intellectual property. I understand that upon request I may obtain a copy of this agreement.

6. I will provide appropriate documentation establishing my identity and employment authorization prior to employment as required to complete the U.S. Government Employment Eligibility Verification form.

7. I will apply for the United States Government security clearance, if required, after employment.

8. IBM may terminate my employment for any reason, with or without cause, and I am free to terminate my employment at any time for any reason.

9. IBM may provide to its subsidiaries and other affiliates, all the information that I have provided, including the results of any investigative report prepared, for purposes of employment consideration.

---

Signature of Applicant:   **CREATED VIA THE VERIFICATION OF INFORMATION**      Date   09/15/2015

FILED DATE: 1/22/2019 12:00 AM 2019L000717

**Consumer Report Notification**

By this document, IBM discloses to you that a Consumer Report or Investigative Consumer Report may be obtained from a consumer reporting agency for employment purposes as part of the preemployment background investigation and/or at any time during your employment for the purpose of evaluating you for employment, promotion, reassignment or retention as an employee.

**CALIFORNIA**

**NOTICE OF INVESTIGATIVE CONSUMER REPORT**

In connection with the Verification of Information, we may order an investigative consumer report (as defined by California law). This report may contain information on your character, general reputation, personal characteristics and mode of living.

This report has been or will be ordered from Automatic Data Processing, Inc. (ADP), 301 Remington Street, Fort Collins, CO 80524. The telephone number for ADP is 1.888.606.7868.

The scope of the report may include but is not limited to the following: names and date of previous employers, reason for termination of employment and work experience. Such report may also contain public record information concerning your driving record, credit, bankruptcy proceedings, and criminal records from federal, state and other agencies that maintain such records.

You have the right under Section 1786.22 of the California Civil Code to contact ADP Inc. during reasonable hours to obtain all information in your file for your review. You may obtain such information as follows:

1. In person at ADP offices, which address is listed above. You can have someone accompany you to ADP offices. ADP may require this third party to present reasonable identification. You may be required at the time of such visit to sign an authorization for ADP to disclose to or discuss your information with this third party.

2. By certified mail, if you have previously provided proper identification in a written request that your file be sent to you or to a third party identified by you.

3. By telephone, if you have previously provided proper identification in writing to ADP.

ADP has trained personnel to explain any information in your file to you and if the file contains any information that is coded, such will be explained to you.

IBM CONFIDENTIAL                                                          IBM 000037

FILED DATE: 1/22/2019 12:00 AM 2019L000717

IBM Serial Number: 3G7958    IBM Date of Hire (MM-DD-YYYY): 10 - 01 - 2015

# IBM    Agreement Regarding Confidential Information, Intellectual Property, and Other Matters

In consideration of my employment or my continued employment by International Business Machines Corporation or one of its subsidiaries or affiliates (collectively, "IBM"), which I acknowledge is employment at will, and the payment to me of a salary or other compensation during my employment, I agree as follows:

1. I will not, without IBM's prior written permission, disclose to anyone outside of IBM or use in other than IBM's business, either during or after my employment, any confidential information or material of IBM, or any information or material received by IBM in confidence from third parties, such as suppliers or customers. If I leave the employ of IBM or at the request of IBM, I will return to IBM all property in my possession belonging to IBM or received by IBM from any third party, whether or not containing confidential information and whether stored on an IBM owned asset or a personally owned asset, including, but not limited to, electronic data, electronic files, diskettes and other storage media, drawings, notebooks, reports, and any other hard copy or electronic documents or records.

Confidential information or material of IBM is any information or material: (a) generated or collected by or utilized in the operations of IBM; received from any third party; obtained from an entity IBM acquired or in which IBM purchased a controlling interest (including information or material received by that entity from a third party); or suggested by or resulting from any task assigned to me or work performed by me for or on behalf of IBM; and (b) which has not been made available generally to the public, whether or not expressed in a document or other medium and whether or not marked "IBM Confidential" or with any similar legend of IBM or any third party. Confidential information or material may include, but is not limited to, information and material related to past, present and future development, manufacturing activities, or personnel matters; marketing and business plans; pricing information; customer lists; technical specifications, drawings, and designs; prototypes; computer programs; and databases.

2. (a) During my employment with IBM and for two years following the termination of my employment from IBM for any reason, I will not directly or indirectly within the Restricted Area solicit, or attempt to or participate or assist in any effort to solicit, any employee of IBM to be employed or perform services outside of IBM. For purposes of this Paragraph 2(a), "Restricted Area" shall mean any geographic area in the world in which I worked or for which I had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of my employment with IBM. Also, for purposes of this Paragraph 2(a), "employee of IBM" shall mean any employee of IBM who worked within the Restricted Area at any time in the 12-month period immediately preceding any actual or attempted solicitation.

   (b) I agree that during my employment with IBM and for one year following the termination of my employment for any reason, I will not directly or indirectly solicit for competitive business purposes any customer with which I was directly or indirectly involved as part of my job responsibilities during the twelve (12) months prior to the termination of my employment with IBM. This paragraph 2(b) does not apply to any IBM employee whose work location as reflected in IBM records is within the state of California.

I acknowledge that IBM would suffer irreparable harm if I fail to comply with Paragraph 2(a) or (b), and that IBM would be entitled to any appropriate relief, including money damages, equitable relief and attorneys' fees.

3. I will not disclose to IBM, use in its business, or cause it to use, any information or material which is confidential to any third party unless authorized by IBM. In addition, I will not incorporate into any product used and/or sold by IBM, any copyrighted materials or patented inventions of any third party, unless authorized by IBM.

4. I will comply, and do all things necessary for IBM to comply, with (a) the laws and regulations of all governments under which IBM does business, (b) the provisions of contracts between any such government or its contractors and IBM that relate to intellectual property or to the safeguarding of information, and (c) IBM's corporate directives, including, without limitation, policies and information technology security standards issued from time to time as well as the IBM Business Conduct Guidelines as amended from time to time.

5. I hereby assign to IBM my entire right, title, and interest in any idea, concept, technique, invention, design (whether the design is ornamental or otherwise), computer programs and related documentation, other works of authorship, mask works, and the like (all hereinafter called "Developments"), hereafter made, conceived, written, or otherwise created solely or jointly by me, whether or not such Developments are patentable, subject to copyright or trademark protection or susceptible to any other form of protection which: (a) relate to the actual or anticipated business or research or development of IBM or its subsidiaries or (b) are suggested by or result from any task assigned to me or work performed by me for or on behalf of IBM or its subsidiaries. Also, I hereby assign to IBM my entire right, title and interest in any such Developments that were suggested by or resulted from any task assigned to me or work performed by me for or on behalf of any entity that IBM acquired or in which IBM purchased a controlling interest.

In the case of any "other works of authorship", such assignment shall be limited to those works of authorship which meet both conditions (a) and (b) above.

   *California Notice: For Developments subject to California law, notwithstanding anything above to the contrary, I understand that this assignment does not apply to a Development which qualifies fully under the provisions of Section 2870 of the California Labor Code.*

The above provisions concerning assignment of Developments apply to Developments created while I am employed by IBM in an executive, managerial, professional, product or technical planning, technical, research, programming, or engineering capacity (including development, product, manufacturing, systems, applied science, and field engineering).

Excluded are any Developments that I cannot assign to IBM because of prior agreement with (select one): ☑ None ☐ Have Prior Agreements

List Prior Agreements: _____

_____

_____

With (Give Name): _____    Effective Date (Give Date): Select - _____ -

I acknowledge that the copyright and any other intellectual property right in designs, computer programs and related documentation, and other works of authorship, created within the scope of my employment, belong to IBM by operation of law.

6. In connection with any of the Developments assigned by Paragraph 5: (a) I will promptly disclose them in writing to the IBM Intellectual Property Law Department; and (b) I will, at IBM's request, promptly execute a specific assignment of title to IBM or its designee, and do anything else reasonably necessary to enable IBM or such designee to secure a patent, copyright or other form of protection therefore in the United States and in other countries. In addition, I agree to promptly notify the IBM Intellectual Property Law Department in writing of any patent or patent application in which I am an inventor but which is not assigned by Paragraph 5 and which discloses or claims any Development made, conceived, or written while I am employed by IBM. I also agree to promptly notify the IBM Intellectual Property Law Department if, after I leave the employ of IBM, I am contacted by anyone or any entity outside of IBM regarding any transaction, legal or governmental proceeding, litigation or other legal dispute concerning or relating to any of the Developments assigned by Paragraph 5.

*PERSONNEL COPY*
Updated October 2013

IBM CONFIDENTIAL    IBM 000038

IBM Serial Number: 367955    Date of Hire: 10 - 01 - 2015

# IBM Agreement Regarding Confidential Information, Intellectual Property, and Other Matters

7. IBM and its licensees, successors, or assigns (direct or indirect) are not required to designate me as an author of any Development which is subject to Paragraph 5, when it is distributed, publicly or otherwise, or to secure my permission to change or otherwise alter its integrity. I hereby waive and release, to the extent permitted by law, all rights in and to such designation and any rights I may have concerning modifications of such Developments.

I understand that any rights, waivers, releases, and assignments herein granted and made by me are freely assignable by IBM and its subsidiaries, licensees, successors, and assigns.

8. I have identified all Developments not assigned by Paragraph 5 in which I have any right, title, or interest, and which were previously made or conceived solely or jointly by me, or written wholly or in part by me, but neither published nor filed in any patent office.

If I do not have any to identify, I have written "none" on this line (Select one): ☒ None ☐ Identify

None

9. I consent to IBM (or authorized services providers on IBM's behalf) collecting, using, storing, transferring, and making available information about me, such as my name, photo, contact information, career development and skills, in internal and external IBM databases or websites (including, without limitation, its online directories) anywhere in the world for legitimate business purposes.

IBM provides numerous opportunities for social computing through blogs, wikis, social networks, virtual worlds and other social media. I agree to comply with all IBM policies and practices regarding use of social computing tools and I understand that I am personally responsible for the content I post on any social computing tools (whether on IBM's internal platforms or on third party sites) and that any information I post, including any of my personal information, may be made broadly available to others, potentially inside or outside IBM, who have access to these tools.

10. The term "subsidiaries", as used in this Agreement, includes any entity owned or controlled, directly or indirectly, by International Business Machines Corporation.

11. The term "employment at will", as used in this Agreement, means the employment at the mutual consent of both me and IBM. Accordingly, either IBM or I can terminate the employment relationship at will, at any time, with or without cause or advance notice.

12. This Agreement supersedes all previous oral or written communications, representations, understandings, undertakings, or agreements relating to the subject matter hereof, except as expressly agreed otherwise by IBM in writing upon my hire or transfer of employment to IBM. Any waiver of a term in this Agreement and any amendment to this Agreement may only be made in a writing signed by the Senior Vice President of Human Resources for International Business Machines Corporation and myself.

13. This Agreement shall be governed by the laws of the State of New York, as if it had been executed and fully performed within such state, without regard to choice of law principles of New York or any other state. If any provision of this Agreement is unenforceable at law, the remainder shall remain in effect.

14. I recognize that any violation of my obligations described herein would cause IBM to suffer irreparable harm and can result in disciplinary action, including dismissal from IBM, and any other appropriate relief for IBM including money damages, equitable relief and attorneys fees.

My agreement, and my acknowledgment of receipt of a copy of this Agreement, are indicated by my signature below.    Select - 9 - 19 - 15 - Select

| | | | |
|---|---|---|---|
| Timothy K Yuwin | Tim K Yu | 367954 | 9-19-15 |
| Employee's Full Name (please type or print) | Employee's Signature | Employee IBM Serial | Date (MM-DD-YYYY) |

(If you have entered "none" in Paragraph 8, do not fill in this section.)

The following are Developments not covered by Paragraph 5, in which I have any right, title, or interest, and which were previously conceived or written either wholly or in part by me, but neither published nor filed in any Patent Office:

**Description of Documents (if applicable):**

| Title on Document | Date on Document | Name of Witness on Document |
|---|---|---|
| | Select - - | |
| | Select - - | |
| | Select - - | |
| | Select - - | |

Signed: _____
Employee's Full Name

Date (MM-DD-YYYY): Select - - Select

(It is in your interest to establish that any of the above were made, conceived, or written before your employment by IBM. You should not disclose them in detail, but identify them only by the titles and dates of documents describing them. If you wish to interest IBM in any of them, you may contact the Intellectual Property and Licensing Department at Corporate Headquarters, which will provide you with instructions for submitting them to IBM.)

*PERSONNEL COPY*
Updated October 2013

FILED DATE: 1/22/2019 12:00 AM  2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717

3g7958
10|1|15



Personal and Confidential

July 30, 2015.

Timothy Yocum

Dear Timothy,

As you know, IBM Corporation has completed its acquisition of Compose, Inc. IBM is very
excited about the addition of Compose and the important role you will play in driving IBM's
strategy.

Enclosed you will find the details of the offer to participate in the special Milestone
Achievement Program (the "Program"). We recognize your valuable contributions and role
within Compose and feel you will play a critical role in the successful integration into IBM. I
am confident that you will enjoy the business, the people and the opportunities associated with
joining our team. There is still much work ahead of us in integrating Compose, its processes,
and its technology. As we work through these challenges, you will discover you have much in
common with your new IBM colleagues. Like you, they are highly creative, innovative people
who enjoy what they do. They share your passion, commitment to excellence and quality, and
focus for your clients' success.

I am confident we have the right team in place to accomplish great things together. Even more
exciting is the long-term future and the prospect to positively impact the business of our clients. I
look forward to this exciting new chapter and to working closely with you to enable our success.
Please send the signed letter back to Pamela Gage, IBM HR Transition Lead, by August 13,
2015.

Once again, welcome! IBM is glad to have you as part of this team.

Sincerely,

Derek Schoettle
General Manager, Cloud Data Services
IBM Analytics

Attachment A: Program description
Attachment B: Program milestones

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

IBM CONFIDENTIAL

IBM 000040

FILED DATE: 1/22/2019 12:00 AM 2019L000717

2

## ATTACHMENT A

As you know, IBM Corporation has completed its acquisition of Compose. This is an exciting time for us all. We recognize that your active involvement is critical to a successful integration of Compose into IBM.

It's my pleasure to confirm that you will be eligible to participate in and potentially receive payments under the Milestone Achievement Program (the "Program"). This Program was developed exclusively for a select group of Compose employees. The Program milestones are contained in Attachment "B."

The start date of this Program is the date of the closing of IBM's acquisition of Compose (the "Closing").

The intent of this Program is to recognize key contributions that Compose and IBM believe will be necessary for the successful integration of our two businesses. Since the opportunity to receive payments is being offered only to a limited number of Compose employees, you should treat your participation in the Program and any award under it with appropriate sensitivity and in strict confidence.

The terms and conditions of the Program are as follows:

You will be eligible to receive payments under the Program up to, but not to exceed, $400,000 (the "Total Maximum Potential Payment") as set forth below, provided that (1) you remain an employee of IBM and its subsidiaries for the periods listed below and (2) the relevant milestone targets are met as determined by IBM. The milestone targets are contained in Attachment B and the relevant milestone targets are met as determined by the Compose Integration Executive.

Payments may become payable to you under the Program pursuant to the following schedule:

- The first milestone period will begin on the Closing and will end on the one-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 10% of the Total Maximum Potential Payment.

- The second milestone period will begin on the one-year anniversary of the Closing and end on the two-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 15% of the Total Maximum Potential Payment.

- The third milestone period will begin on the two-year anniversary of the Closing and will end on the three-year anniversary of the Closing. The maximum potential payment for the achievement of the milestones with respect to that period will be 75% of the Total Maximum Potential Payment.

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

FILED DATE: 1/22/2019 12:00 AM   2019L000717

3

The additional terms and conditions of the Program are as follows:

- Except as expressly provided below (i) you must be employed on the payment date in order to be eligible to receive payment under the program, and (ii) if you cease to be an active full-time employee of IBM or its subsidiaries for any reason (including your voluntary resignation), during the period of time covered under the Program, then you will no longer participate in the Program and no further payments, partial or otherwise, will be made or be payable including, without limitation, any payment under the Program for the then current milestone period.

- If you are terminated by IBM with "cause" (as determined by IBM in accordance with its standard policies and procedures, which includes, among other things, any violation of IBM's policies and/or failure to perform satisfactorily, and without regard to how "cause" is defined in any plan, policy or program, any offer letter, any agreement between you and Compose, or any amendment thereto) at any point prior to the completion of the period of time covered under the Program, then you will no longer participate in the Program and no further payments, partial or otherwise, will be made or be payable as from the date you are given notice of termination.

- If you are terminated by IBM without cause (as described above) at any point prior to the completion of the period of time covered under the Program, the milestone payment for the then current milestone period will be paid in full to you within a reasonable period of time after such termination, in full satisfaction of IBM's obligations under this Program; provided, however, that (i) IBM's standard release of claims must be executed after termination of your employment and (ii) such release must become effective and irrevocable no later than the 61st day after termination of your employment. You shall not be entitled to receive any other payments under the Program. Failure to execute IBM's standard release of claims within a period sufficient to allow it to become effective and irrevocable as set forth above shall preclude any entitlement to benefits under this paragraph.

- If you cease to be an employee of IBM due to death or long term disability (the latter to be determined under IBM's generally applicable process) during the period of time covered under the Program, and a release of claims (as described in the preceding paragraph) has been received and is effective and irrevocable within the time period specified in the preceding paragraph, IBM will pay the milestone payment for the then current milestone period (if any) to you or your estate. You shall not be entitled to receive any other payments under the Program. Failure to execute IBM's standard release of claims within a period sufficient to allow it to become effective and irrevocable as set forth above shall preclude any entitlement to benefits under this paragraph.

- Payments under this Program are subject to applicable tax withholdings and other requirements set by mandatory law.

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

FILED DATE: 1/22/2019 12:00 AM   2019L000717

4

- Payments under this Program are not considered part of your earnings for purposes of calculating current or future benefits under any compensation or benefit programs maintained or sponsored by Compose, or IBM, including retirement plans, etc.

This letter shall be interpreted such that the payments made under this offer letter comply with, or are exempt from, Section 409A. To help ensure compliance with the short-term deferral exception of Section 409A, any payment or benefit that you become entitled to receive pursuant to the Program will be paid to you no later than March 15th of the year following the first taxable year in which the amount is no longer subject to a substantial risk of forfeiture (within the meaning of Section 409A and the Treasury Regulations thereunder). To the extent that IBM determines that any payment or benefit pursuant to the Program constitutes deferred compensation (within the meaning of Section 409A), such payment or benefit shall be made at such times such in such forms as IBM determines are required to comply with Section 409A and the Treasury Regulations and any applicable guidance thereunder (including, without limitation, in the case of a "specified employee" within the meaning of Section 409A, the six-month delay for amounts payable upon a separation from service). However, nothing in this letter shall be interpreted or construed to transfer any liability for any tax (including a tax or penalty due as a result of a failure to comply with Section 409A) from you to IBM or to any other individual or entity, and IBM shall not pay any additional payment or benefit in the event that IBM changes the time or form of your payments or benefits in accordance with this section.

Please sign and return the duplicate copy of this letter to Pamela Gage, IBM HR Transition Lead to indicate your acceptance of the terms set out.

Accepted: _____*Tim Yocum*_____          Date: 08 / 03 / 2015

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

FILED DATE: 1/22/2019 12:00 AM   2019L000717

5

## Attachment B

IBM Retention Agreement Milestones - Applies To All Periods of Retention

**Customers:** **(Sales, Marketing, and Services only)** Establish and maintain positive customer and business partner relationships and team closely with the combined Compose/IBM customer facing teams to quickly assist in resolving customer/partner issues as required in accelerating and closing sales. Further, with the broader Cloud Data Services (CDS) and IBM Sales and Marketing teams, help to enable sales and marketing staff by transferring knowledge, educating the sales team, and contributing to marketing and sales collateral.

**Business Results:** **(All)** Align your Personal Business Commitments (PBC's) to IBM CDS and Analytics business objectives; and maintain a PBC rating of "Solid Contributor" or better (numerically a "2" or better) during the milestone periods; remain focused in disciplined execution to drive business results for your business unit delivering revenue & expense targets. In addition, familiarize yourself with and adhere to IBM's Business Conduct Guidelines.

**Effective Integration:** **(All)** Act as a leader in your functional area, positively influencing morale and contribution to CDS and IBM; learn and integrate into IBM's policies, practices and procedures; follow all IBM Business Conduct Guidelines; and be accountable for the implementation of appropriate IBM programs.

**Teaming:** **(All)** Foster teaming and networking within your own organization, across the CDS Group, and throughout the broader IBM to drive cross brand synergy and sales.

**Product delivery:** **(Development only)** Together with the broader CDS and IBM development teams, assist in meeting all product delivery milestones including the "bluewashing" of activities (as applicable), integration of Compose offerings with the Bluemix platform, enabling Compose offerings to be sold via IBM Bluemix/CDS platforms, support of the Sales team with development expertise to close business, and support our customers (post-sales) with timely action to resolve critical problems, ensure satisfactory resolution of all open source and IP issues

**Management:** **(Managers only)** Demonstrate leadership in managing the employee side of the transition into CDS and IBM, including attracting, developing, motivating and retaining employees; effectively executing people related programs such as performance commitments, professional development plans, base pay plans, technical resources, etc.; and effectively and proactively communicate in appropriate forums the status of changes and new developments to keep your teams up to date. Encourage people managers in your organization to do the same.

**Retention:** **(Senior Leaders)** Act to maintain high employee morale of all employees joining IBM CDS from Compose and help to retain a high % of all former Compose personnel over the retention period. Appropriate consideration will be given to actions related to business decisions, poor or marginal performance.

**All milestones will be assessed by the Integration Executive.**

Doc ID: ae253fdac18f1569c7a2c03e62370b53d2275870

**▽ HELLOSIGN**                                                    Audit Trail

| | |
|---|---|
| **TITLE** | Compose Retention Letter - Tim Yocum |
| **FILE NAME** | Compose retention...othy Yocum v1.pdf |
| **DOCUMENT ID** | ae253fdac18f1569c7a2c03e62370b53d2275870 |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| ⟳ **SENT** | 8/3/15 22:25:56 UTC | Sent for signature to Tim Yocum (tim@compose.io) IP: 71.12.188.45 |
| ◉ **VIEWED** | 8/3/15 22:34:48 UTC | Viewed by Tim Yocum (tim@compose.io) IP: 98.223.131.146 |
| ⤶ **SIGNED** | 8/3/15 22:36:19 UTC | Signed by Tim Yocum (tim@compose.io) IP: 98.223.131.146 |
| ☑ **COMPLETED** | 8/3/15 22:36:19 UTC | The document has been completed. |

FILED DATE: 1/22/2019 12:00 AM 2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019.000717

IBM Date of Hire: __10__ / __01__ / __2015__     IBM Serial Number: **3G7956**

## Employment Eligibility Verification

USCIS
Form I-9

Department of Homeland Security
U.S. Citizenship and Immigration Services

OMB No. 1615-0047
Expires 03/31/2016

▶**START HERE.** Read instructions carefully before completing this form. The instructions must be available during completion of this form.
**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

### Section 1. Employee Information and Attestation (*Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.*)

| Last Name (Family Name) | First Name (Given Name) | Middle Initial | Other Names Used (if any) |
|---|---|---|---|
| Yocum | Timothy | K | N/A |

| Address (Street Number and Name) | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|
| ▪ | | ▪ | IL | ▪ |

| Date of Birth (mm/dd/yyyy) | U.S. Social Security Number | E-mail Address | Telephone Number |
|---|---|---|---|
| ▪ | | ▪ | ▪ |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

▪ A citizen of the United States

▪ A noncitizen national of the United States (*See instructions*)

▪ A lawful permanent resident (Alien Registration Number/USCIS Number): _____

▪ An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) _____ . Some aliens may write "N/A" in this field.
(*See instructions*)

*For aliens authorized to work, provide your Alien Registration Number/USCIS Number OR Form I-94 Admission Number:*

1. Alien Registration Number/USCIS Number: _____

**OR**

2. Form I-94 Admission Number: _____

If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

Foreign Passport Number: _____

Country of Issuance: _____

Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. (*See instructions*)

**3-D Barcode
Do Not Write In This Space**

| Signature of Employee: *Tim K. Yocum* | Date (mm/dd/yyyy): 09/19/2015 |
|---|---|

### Preparer and/or Translator Certification (*To be completed and signed if Section 1 is prepared by a person other than the employee.*)

I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator: | Date (mm/dd/yyyy): |
|---|---|

| Last Name (Family Name) | First Name (Given Name) |
|---|---|

| Address (Street Number and Name) | City or Town | State | Zip Code |
|---|---|---|---|

🛑 *Employer Completes Next Page* 🛑

Form I-9  03/08/13  N

IBM CONFIDENTIAL                                          IBM 000046

FILED DATE: 1/22/2019 12:00 AM 2019L000717

IBM Date of Hire: 10 / 01/ 2015    IBM Serial Number: 3G799

## Section 2. Employer or Authorized Representative Review and Verification
*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)*

Employee Last Name, First Name and Middle Initial from Section 1:    Yocum  Timothy  K.

| List A OR | List B AND | List C |
|---|---|---|
| Identity and Employment Authorization | Identity | Employment Authorization |
| Document Title: U.S. Passport | Document Title: | Document Title: |
| Issuing Authority: U.S. Dpt. of State | Issuing Authority: | Issuing Authority: |
| Document Number: ▮▮▮▮ | Document Number: | Document Number: |
| Expiration Date (if any) (mm/dd/yyyy): ▮▮▮▮ | Expiration Date (if any) (mm/dd/yyyy): | Expiration Date (if any)(mm/dd/yyyy): |
| Document Title: | | |
| Issuing Authority: | | |
| Document Number: | | |
| Expiration Date (if any)(mm/dd/yyyy): | | |
| Document Title: | | |
| Issuing Authority: | | |
| Document Number: | | |
| Expiration Date (if any)(mm/dd/yyyy): | | 3-D Barcode<br>Do Not Write in This Space |

## Certification
I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment (mm/dd/yyyy): 10 / 1/ 2015 (See instructions for exemptions.)

| Signature of Employer or Authorized Representative | Date (mm/dd/yyyy): 8/19/2015 | Title of Employer or Authorized Representative HR Manager |
|---|---|---|
| Last Name (Family Name) FRITZ | First Name (Given Name) Michael | Employer's Business or Organization Name IBM |
| Employer's Business or Organization Address (Street Number and Name) 3039 Cornwallis Rd | City or Town RTP | State NC / Zip Code 27709 |

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name (if applicable) Last Name (Family Name)  First Name (Given Name)  Middle Initial | B. Date of Rehire (if applicable) (mm/dd/yyyy): |
|---|---|

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date (if any)(mm/dd/yyyy): |
|---|---|---|

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative: | Date (mm/dd/yyyy): | Print Name of Employer or Authorized Representative: |
|---|---|---|

Form I-9  03/08/13 N                                                                 Page 8 of 9

IBM CONFIDENTIAL    IBM 000047

FILED DATE: 1/22/2019 12:00 AM 2019L000717



IBM 000048

FILED DATE: 1/22/2019 12:00 AM 2019L000717

Case Details - Preview                                    https://e-verify.uscis.gov/emp/BpCaseDetailsLetter.aspx?CaseVerNu...

FILED DATE: 1/22/2019 12:00 AM   2019L000717

### SENSITIVE BUT UNCLASSIFIED

| Department of Homeland Security | Report Prepared: 08/24/2015 |
|---|---|
| E-Verify | Page: 1 of 1 |

#### Case Verification Number: 2015236091734MT

**Case Information:**

**Employee Information:**

| | | | |
|---|---|---|---|
| Last Name: | Yocum | First Name: | Timothy |
| Middle Initial: | K | Other Names Used: | |
| Social Security Number: | ■■■■■■ | Date of Birth: | ■■■■■■ |
| Citizenship Status: | A citizen of the United States | Email Address: | |

**Document Information:**

| | | | |
|---|---|---|---|
| List A Document: | U.S. Passport or Passport Card | | |
| Passport or Passport Card Number: | ■■■■■■ | Document Expiration Date: | ■■■■■■ |
| Alien Number: | | I-94 Number: | |

**Additional Information:**

| | | | |
|---|---|---|---|
| Hire Date: | 10/01/2015 | Employer Case ID: | |
| Three-Day Rule Reason: | | Three-Day Rule - Other: | |
| Submitted By: | MOR14999 | Submitted On: | 08/24/2015 |

**Initial Case Result:**

| | |
|---|---|
| Case Result: | Employment Authorized |

**Employee Referred to SSA:**

| | |
|---|---|
| Referred By: | Referred On: |

**Case Result from SSA (after SSA Tentative Nonconfirmation):**

| | |
|---|---|
| Case Result: | Response Date: |

**Resubmitted to SSA (after Review and Update Employee Data):**

| | |
|---|---|
| Last Name: | First Name: |
| Middle Initial: | Other Names Used: |
| Social Security Number: | Date of Birth: |
| Resubmitted By: | Resubmitted On: |

**Case Result from SSA (after Resubmission):**

| |
|---|
| Case Result: |

**Request Name Review:**

| | |
|---|---|
| Comments: | |
| Submitted By: | Submitted On: |

**Case Result from DHS (after DHS Verification in Process):**

| | |
|---|---|
| Case Result: | Response Date: |

**Employee Referred to DHS:**

| | |
|---|---|
| Referred By: | Referred On: |

**Case Result from DHS (after DHS Tentative Nonconfirmation):**

| | |
|---|---|
| Case Result: | Response Date: |

8/24/2015 10:18 AM

IBM CONFIDENTIAL                                                          IBM 000050

E-Verify - Print Case Details - Preview                    https://e-verify.uscis.gov/emp/BpCaseDetailsLetter.asp

**Photo Matching Results:**

Determination:

**Employee Referred to DHS (Additional):**

Referred By:                                      Referred On:

**Case Result from DHS (after Additional DHS Tentative Nonconfirmation):**

Case Result:                                      Response Date:

**Case Closure:**

| | |
|---|---|
| Closure Statement: | The employee continues to work for the employer after receiving an Employment Authorized result. |
| Closed By: | MORJ4999                      Closed On:              08/24/2015 |

**SENSITIVE BUT UNCLASSIFIED**

8/24/2015 10:18 AM

IBM CONFIDENTIAL                                      IBM 000051

FILED DATE: 1/22/2019 12:00 AM  2019L000717

FILED DATE: 1/22/2019 12:00 AM  2019.000717

**Drug Free Workplace**

**Safety and Health**
IBM has a long tradition of excellence in the area of employee safety and health. There are many processes and procedures in place to meet these objectives, including meeting applicable regulatory requirements. Additional information on these subjects, including the outlining of the rights and responsibilities of employers and employees to promote safety in the workplace can be found at You and IBM (http://w3.ibm.com/hr/us/) under Health – Well-Being – Workplace Safety.

## IBM Substance Abuse Policy and Testing Program

A drug free environment is vital to IBM, the safety of its workplace, the quality of its product, the productivity of its employees, the interest of its customers, and the general public. In order to achieve a drug free environment, IBM has adopted the following substance abuse policy:

The manufacture, use, dispensation, distribution, sale or possession of illegal drugs and/or non-medically prescribed controlled substances on IBM premises or any other IBM work environment, including but not limited to any customer site, IBM owned or leased vehicle, or other locations where IBM business is being conducted is prohibited. Employees who violate this policy are subject to disciplinary action.

Name: Last _Yocum_ , First _Timothy_ , MI _K_
Serial Number _3G7958_ Date of Hire _10-1-2015_

I acknowledge that I have read the above drug policy statement and have received a copy of IBM's drug and alcohol testing policy.

Signature _[signature]_ Date _8-19-15_

*(Page 2 to be filed in the employee's personnel folder)*

*Revalidated 10/09

IBM CONFIDENTIAL                                                        IBM 000052

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM  2019L000717

# IBM

## Personal Information Form

**Purpose:** The information you will provide on this form is used to help create and update your New Hire Record with IBM. The information is only provided to those responsible for processing your record and those with a need-to-know basis.

Last Name: **Yocum**     First Name: **Timothy**

Middle Initial (optional): **K**     Preferred First Name: **Tim**

IBM Date of Hire (MM–DD–YYYY): **10 - 01 - 2015**     IBM Serial Number: **397958**

**Address** – Please note your first paychecks will be sent to the address you provide us below.

Street Name: ██████████████     Apartment #: ████

Street Name: _____     City: ████████

State: **IL**     Zip Code: ████   Phone # : ██████████

If different than above, please provide the state, city and zip in which you have relocated as you begin work with IBM

City: _____     State: _____     Zip Code: _____

Information identified with an asterisk (*), is requested on a voluntary basis only.

As a federal contractor, IBM is required to maintain records of the gender, ethnic origin, and race of applicants and employees in connection with its affirmative action plan. For this reason, and this reason only, IBM invites you to indicate the categories which apply to you below. If you choose not to fill in the gender, ethnic origin or race, IBM will designate them from observation.

*Gender:   ▪ Male   ▪ Female

*Ethnic Origin – Select one:   ▪ Hispanic/Latino   ▪ Not Hispanic/Latino

*Race – Select all that apply:   ▪ White   ▪ Asian   ▪ Black

▪ American Indian or Alaska Native   ▪ Native Hawaiian or Other Pacific Islander

**Marital Status** – IBM requests your marital status for tax and benefits purposes. However, should you decide not to provide this information on your First Day, your employee record will be defaulted to Single. After being Onboard, you will have the opportunity to update your status.

▪ Single   ▪ Married   ▪ Widowed   ▪ Domestic Partnership

*IBM Confidential When Completed*
*Revised 1/2015*
*Page 1 of 2*

FILED DATE: 1/22/2019 12:00 AM 2019L000717

# IBM

### Personal Information Form

IBM Serial # 347958     IBM Date of Hire: 10 / 01 / 2015

**Emergency Contacts** – Please provide us with two contacts that we may reach out to on your behalf in the event of an emergency.

1. Name: ▮▮▮▮▮▮     Phone #: ▮▮▮▮     Relationship: Select Spouse

2. Name: _____     Phone #: (   )-   -     Relationship: Select

**Education Attainment** – Please complete all of the below fields for the highest education level you have attained. If you are an Intern or Co-op hire, put the planned graduation date in the "Graduation Date" field.

Institution (Full Name) & Location Attended: ▮▮▮▮▮▮▮

Degree or Certificate Type (ex. Bachelor of Science): ▮▮▮▮

Graduation Date or date last attended (MM/YYYY):   Select / ▮▮▮

Subject of Study (Major): ▮▮▮

## Personal Information Form

The information that I have provided on this document is accurate to the best of my knowledge. Any misrepresentation or deliberate omission of a fact provided to IBM will justify terminating consideration of my application for employment, or if employed, terminating my employment.

Name (Please Print): Timothy K Yocum     IBM Serial # 347958

Signature: _Tim K Yo_     Date (MM–DD–YYYY): 10 - 01 - 2015

*IBM Confidential When Completed*
*Revised 1/2015*
*Page 2 of 2*

IBM Serial Number: 3G7958    IBM Date of Hire (MM-DD-YYYY): 10 - 01 - 2015

## AUTHORIZATION FOR IBM TO SEND PERSONAL INFORMATION TO AMERICAN EXPRESS

In order for IBM to initiate the corporate charge card process, it is necessary for certain information you provide, including your Social Security Number, to be forwarded to American Express. Please complete this form and return it to your HR Transition Manager.

**Note: You are not required to complete this form if you do not require an American Express Corporate Charge Card.**

**Please place a check (X) next to one of the options below:**

[X] **I authorize IBM to send my personal information, including my Social Security Number, to American Express for purposes of initiating the American Express Corporate Card.**

The corporate charge card is to be used for IBM business purposes only. Please keep in mind that all charges put on the corporate card are subject to applicable IBM policies, including IBM's travel guidelines and will require management approval. The card will be mailed to your home address, as shown on the application. Additionally, you will receive an AT&T calling card at your home address.

[ ] *I do not authorize IBM to send my personal information to American Express.*

If you indicate you do not agree to IBM sending your personal information to American Express but you still require an American Express Corporate Card, you will be responsible for manually faxing all pages of the American Express Corporate Charge Card request to American Express at 1-623-492-4195. The corporate charge card is to be used for IBM business purposes only.

Please keep in mind that all charges put on the corporate card are subject to applicable IBM policies, including IBM's travel guidelines and will require management approval.

Print Name: Timothy K. Yoam

Signature: Tim K. Ya

IBM Serial # 3G7959

Date (MM-DD-YYYY): Select - - Select

08 - 19 - 2015

FILED DATE: 1/22/2019 12:00 AM 2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717

| From: | Jozef F Devries/Lexington/IBM |
|---|---|
| To: | Ed Matchak/San Jose/IBM@IBMUS |
| Cc: | Javier Diaz/Chicago/IBM@IBMUS, Phil Buckellew/Austin/IBM@Lotus |
| Date: | 04/23/2018 12:39 PM |
| Subject: | Re: *Confidential: BCG Violation Discussion |

One other attribute i meant to call out in the first server inventory screenshot; the 'key name' is specific to Tim, meaning no one else can actually login to those servers without that key, and that key is not made available to anyone else. This runs counter to how server keys are managed in Compose, and further suggests he was trying to lock down access to what is going on in these machines.

| Key Name | Monitoring |
|---|---|
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |
| tky-ap | disabled |

Jozef de Vries
Director, IBM Cloud Databases

| Jozef F Devries | Ed, Javier (cc; Phil) – As discusse... | 04/23/2018 02:58:22 PM |
|---|---|---|

| From: | Jozef F Devries/Lexington/IBM |
|---|---|
| To: | Ed Matchak/San Jose/IBM@IBMUS, Javier Diaz/Chicago/IBM@IBMUS |
| Cc: | Phil Buckellew/Austin/IBM@Lotus |
| Date: | 04/23/2018 02:58 PM |
| Subject: | *Confidential: BCG Violation Discussion |

Ed, Javier (cc; Phil) –

As discussed, it was reported to me last week that one of my Compose employees, Tim Yocum, who manages our Operations and Security team has servers provisioned in the IBM Compose

FILED DATE: 1/22/2019 12:00 AM 2019L000717

AWS account for personal reasons; specifically setup and configured to mine crypto currency. This was reported to me by someone on Tim's team who came across these servers while he was performing a manual health audit of provisioned servers in our AWS account and noticed a collection of servers in an AWS region that we do not otherwise have presence in.

Details on how we suspect this is for crypto mining:

The following screenshot is a list of the servers in question.
The following screenshot is a list of the servers in question.

Key attributes to note:

- They are provisioned in the 'ap-northeast-2c' Availability Zone, which is in Seoul South Korea. The only presence Compose has in AP is in the 'ap-southeast' Availability Zone, which is in Singapore.
- Monitoring is 'disabled'. All our servers are actively monitored for availability and system health. That monitoring of these systems is specifically disabled suggests he was trying to keep them under the radar.
- The Owner ID is Tim's AWS ID.
- These severs date back to the Jan timeframe.



The following screenshot specifically suggest these servers are used for Crypto Currency min...
The following screenshot specifically suggest these servers are used for Crypto Currency mining.

This screenshot is taken from a 'snapshot' of the servers configurations. This type of configuration does not resemble any other server configuration that we have provisioned for business reasons across Compose's worldwide footprint.

Key attributes to note:
- "pool_address" and "wallet_address" are common crypto mining configurations easily validated through a google search.
- He has used his personal email address for the user login. Even if these servers were used

FILED DATE: 1/22/2019 12:00 AM 2019L000717

for business purposes, there is no reason whatsoever that he would be using a personal
email for authentication.

```
*/
'pool_list' :
[
        {'pool_address' : 'vegas-1.xmrpool.net:7777', 'wallet_address' : '4AvNzqXYS3G\wBuBvcfs7S4a4MJw7PkkgoWTmQJasbqq3Fg\
e_tls' : false, 'tls_fingerprint' : '', 'pool_weight' : 1 },
],
```

The following screenshot highlights that these machines are actively under use.

The following screenshot highlights that these machines are actively under use.

Key attributes to note:
- Under the 'Cloud Watch' metrics section, specifically note that CPU utilization is upwards of 75%+. This is a clear indicator that the machines are actively being used, and specifically, crypto mining is know for its high intensity CPU consumption. Running consistently over 75% under a normal database system, which is what Compose runs would definitely warrant attention from our Operations team for not being typical.

FILED DATE: 1/22/2019 12:00 AM 2019L000717



Jozef de Vries
Director, IBM Cloud Databases

OMB No. 1615-0047; Expires 08/31/12

Department of Homeland Security
U.S. Citizenship and Immigration Services

**Form I-9, Employment
Eligibility Verification**

Read instructions carefully before completing this form. The instructions must be available during completion of this form.

**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because the documents have a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification** *(To be completed and signed by employee at the time employment begins.)*

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Yocum | Timothy | K | |

| Address *(Street Name and Number)* | Apt. # | Date of Birth *(month/day/year)* |
|---|---|---|
| ██████████ | | ██████████ |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| ██████████ | IL | ██████████ | ██████████ |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☒ A citizen of the United States
☐ A noncitizen national of the United States (see instructions)
☐ A lawful permanent resident (Alien #) _____
☐ An alien authorized to work (Alien # or Admission #) _____
   until (expiration date, if applicable - *month/day/year*) _____

Employee's Signature _~signature~_   Date *(month/day/year)* 2/11/14

**Preparer and/or Translator Certification** *(To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.*

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address *(Street Name and Number, City, State, Zip Code)* | Date *(month/day/year)* |
|---|---|
| | |

**Section 2. Employer Review and Verification** *(To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C, as listed on the reverse of this form, and record the title, number, and expiration date, if any, of the document(s).)*

| | List A | OR | List B | AND | List C |
|---|---|---|---|---|---|
| Document title: | US Passport | | _____ | | _____ |
| Issuing authority: | US | | _____ | | _____ |
| Document #: | ██████████ | | _____ | | _____ |
| Expiration Date *(if any)*: | ██████████ | | _____ | | _____ |
| Document #: | | | | | |
| Expiration Date *(if any)*: | _____ | | | | |

**CERTIFICATION:** I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on *(month/day/year)* 02/26/2014 and that to the best of my knowledge the employee is authorized to work in the United States. (State employment agencies may omit the date the employee began employment.)

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| _~signature~_ | Kristine Toone | Executive Assistant |

| Business or Organization Name and Address *(Street Name and Number, City, State, Zip Code)* | Date *(month/day/year)* |
|---|---|
| MongoHQ   273 S Railroad Ave.  San Mateo, CA  94401 | 02/26/2014 |

**Section 3. Updating and Reverification** *(To be completed and signed by employer.)*

| A. New Name *(if applicable)* | B. Date of Rehire *(month/day/year)* *(if applicable)* |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment authorization.

| Document Title: | Document #: | Expiration Date *(if any)*: |
|---|---|---|
| | | |

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date *(month/day/year)* |
|---|---|
| | |

Form I-9 (Rev. 08/07/09) Y Page 4

IBM CONFIDENTIAL

IBM 000062

FILED DATE: 1/22/2019 12:00 AM  2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717



IBM 000063

BM CON DEN IA

FILED DATE: 1/22/2019 12:00 AM   2019L000717



273 Railroad Ave, San Mateo CA 94403

## January 29, 2014

Dear Tim Yocum:

MongoHQ Inc., a Delaware corporation (the "Company"), is pleased to of-
fer you employment with the Company on the terms described below.

1.   **Position.**  You will start in a full-time position as Operations
Engineer and you will report to the Company's CEO, Kurt Mackey.  Your primary
duties, amon                          ) manage datacenter projects, purchasing,
and advancing the Company's customer facing operations and communication
efforts.  By signing this letter, you confirm with the Company that you are under
no contractual or other legal obligations that would prohibit you from perform-
ing your duties with the Company.

2.   **Compensation and Employee Ben**      .            aid a starting
salary at the rate of $150,000 per year, payable on the Company's regular pay-
roll dates.

3.   **Stock Options.**  Subject to the approval of the Company's Board of
Directors, you will be granted an option to purchase 135,905 (of 27,181,156
outstanding) shares of the Company's common stock.  The option will be sub-
ject to the terms and conditions applicable to options granted under the Com-
pany's 2012 Stock Plan, as described in that plan and the applicable stock op-
tion agreement, which you will be required to sign.  You will vest in 25% of the
option shares on the 12-month anniversary of your vesting commencement
date and 1/48th of the total option shares will vest in monthly installments
thereafter during continuous service, as described in the applicable stock option
agreement.

Doc ID: t93c395a6af2de9615373cc93708086c859ddc68

The exercise price per share will be equal to the fair market value per share on the date the option is granted, as determined by the Company's Board of Directors in good faith compliance with applicable guidance in order to avoid having the option be treated as deferred compensation under Section 409A of the Internal Revenue Code of 1986, as amended. There is no guarantee that the Internal Revenue Service will agree with this value. You should consult with your own tax advisor concerning the tax risks associated with accepting an option to purchase the Company's common stock.

4. **Confidential Information and Invention Assignment Agreement.** Like all Company employees, you will be required, as a condition of your employment with the Company, to sign the Company's enclosed standard Confidential Information and Invention Assignment Agreement.

5. **Employment Relationship.** Employment with the Company is for no specific period of time. Your employment with the Company will be "at will," meaning that either you or the Company may terminate your employment at any time and for any reason, with or without cause. Any contrary representations which may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement si                   mpany's Chief Executive Officer.

6. **Outside Activities.** While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the company, you will not assist any person or entity in competing with the Company, in preparing to cc          mpany or in hiring any employees or consultants of the Company.

7. **Withholding Taxes.** All forms of cc                 :d to in this letter are subject to applicable withholding and .

8. **Entire Agreement.** This letter supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter.

[Signature Page Follows]

Doc ID: t93c395a6af2de9615373cc93708086c859ddc68

IBM 000065

FILED DATE: 1/22/2019 12:00 AM 2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

If you wish to accept this offer, please sign and date both the enclosed duplicate original of this letter and the enclosed Confidential Information and Invention Assignment Agreement and return them to me. As required, by law, your employment with the Company is also contingent upon your providing legal proof of your identity and authorization to work in the United States. This offer, if not accepted, will expire at the close of business on February 3, 2014.

We look forward to having you join us no later than February 14, 2014.

Very truly yours,

MongoHQ Inc.

By: _____

Name: Kurt Mackey
Title: Chief Executive Officer

ACCEPTED AND AGREED:

Tim Yocum
_____
(Print Employee Name)

_____
(Signature)

02 / 03 / 2014
_____
Date

Anticipated Start Date:_____

Attachment A: Confidential Information and Invention Assignment Agreement

Doc ID: t93c395n6nf2de9615373cc93708086c859dcdc68

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM 2019L000717

# ATTACHMENT A

## CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

(See Attached)

FILED DATE: 1/22/2019 12:00 AM 2019L000717

## MongoHQ Inc.

## CONFIDENTIAL INFORMATION AND INVENTION ASSIGNMENT AGREEMENT

*Employee Name:* Tim Yocum

*Effective Date:* 2/14/2014

As a condition of becoming employed (or my employment being continued) by MongoHQ Inc., a Delaware corporation, or any of its current or future subsidiaries, affiliates, successors or assigns (collectively, the "Company"), and in consideration of my employment with the Company and receipt of the compensation now and hereafter paid by the Company, I agree to the following:

1.    1.    **Relationship.** This Confidential Information and Invention Assignment Agreement (this "Agreement") will apply to my employment relationship with the Company.  If that relationship ends and the Company, within a year thereafter, either reemploys me or engages me as a consultant, this Agreement will also apply to such later employment or consulting relationship, unless the parties hereto otherwise agree in writing.  Any such employment or consulting relationship between the parties hereto, whether commenced prior to, upon or after the date of this Agreement, is referred to herein as the "Relationship."

2.    2.    **Duties.** I will perform for the Company such duties as may be designated by the Company from time to time or that are otherwise within the scope of the Relationship and not contrary to instructions from the Company.  During the Relationship, I will devote my entire best business efforts to the interests of the Company and will                    ner employment or in any activities detrimental to                    of the Company without the prior written consent of the Company.

3.    3.    **Confidential Information.**

a.    (a)    **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company.  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the

Doc ID: a93c395a6af2de9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM 2019L000717

Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

b. (b) **Confidential Information.** I understand that "Confidential Information" means information and physical material not generally known or available outside the Company and information and physical material entrusted to the Company in confidence by third parties. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information. business plans, financial forecasts, historical financial dat.                         iness information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

c. (c) **Third Party Information.** My agreements in this Section 3 are intended to be for the benefit of the Company and any third party that has entrusted information or physic                    Company in confidence.

d. (d) **Other Rights.** This A               ed to supplement, and not to supersede, any rights           .        have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

e. 4. **Ownership of Inventions.**

f. (a) **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a complete list describing with particularity all Inventions (as defined below) that, as of the Effective Date, belong solely to me or belong to me jointly with others, and that relate in any way to any of the Company's actual or proposed businesses, products, services, or

Doc ID: π93c395π6af2de9615373cc93708086c859ddc68

research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Inventions at the time of signing this Agreement.

g. **(b)** **Use or Incorporation of Inventions.** If in the course of the Relationship, I use or incorporate into a product, process or machine any Invention not covered by Section 4(d) of this Agreement in which I have an interest, I will promptly so inform the Company. Whether or not I give such notice, I hereby irrevocably grant to the Company a nonexclusive, fully paid-up, royalty-free, assumable, perpetual, worldwide license, with right to transfer and to sublicense, to practice and exploit such Invention and to make, have made, copy, modify, make derivative works of, use, sell, import, and otherwise distribute such Invention under all applicable intellectual property laws without restriction of any kind.

h. **(c)** **Inventions.** I understand that "Inventions" means discoveries, developments, concepts, designs, ideas, know how, improvements, inventions, trade secrets and/or original works of authorship, whether or not patentable, copyrightable or otherwise legally protectable. I understand this includes, but is not limited to, any new product, machine, article of manufacture, biological material, method, procedure, process, technique, use, equipment, device, apparatus, system, compound, formulation, composition of matter, design or configuration of any kind, or any improvement thereon. I understand that "Company Inventions" means any and all Inventions that I may solely or jointly author, discover, develop, conceive, or                          ng the period of the Relationship, except as otherwise provided in Section 4(g) below.

i. **(d)** **Assignment of Company Inventions.** I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title an                    out the world in and to any and all Company Invention  and all patent, copyright, trademark, trade secret and other intellectual property rights therein. I hereby waive and irrevocably quitclaim to the                    signee any and all claims, of any nature whatsoever, that              hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary.

j. **(e)** **Maintenance of Records.** I agree to keep and maintain adequate and current written records of all Company Inventions made or conceived by me (solely or jointly with others) during the term of the Relationship. The records may be in the form of notes, sketches,

FILED DATE: 1/22/2019 12:00 AM  2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717

drawings, flow charts, electronic data or recordings, laboratory notebooks, or any other format. The records will be available to and remain the sole property of the Company at all times. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole discretion of the Company for the purpose of furthering the Company's business. I agree to deliver all such records (including any copies thereof) to the Company at the time of termination of the Relationship as provided for in Sections 5 and 6.

k.    (f)    **Patent and Copyright Rights.** I agree to assist the Company, or its designee, at its expense, in every proper way to secure the Company's, or its designee's, rights in the Company Inventions and any copyrights, patents, trademarks, mask work rights, moral rights, or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, recordations, and all other instruments which the Company or its designee shall deem necessary in order to apply for, obtain, maintain and transfer such rights, or if not transferable, waive such rights, and in order to assign and convey to the Company or its designee, and any successors, assigns and nominees the sole and exclusive right, title and interest in and to such Company Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, wi                          do so, any such instrument or papers shall continue during and at all times after the end of the Relationship and until the expiration of the last such intellectual property right to expire in any country of the world. I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf an '  '  ' '          ' · and file any such instruments and papers and to do all othe                    ed acts to further the application for, prosecution, issuance, maintenance or transfer of letters patent, copyright, mask work and other registrations related to such Company Inventions. This power of attorney i:                          nterest and shall not be affected by my subsequent incapacity.

l.    (g)    **Exception to Assignments.** Subject to the requirements of applicable state law, if any, I understand that the Company Inventions will not include, and the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to, any Invention which qualifies fully for exclusion under the provisions of applicable state law, if any. In order to assist in the determination of which Inventions may qualify for such exclusion, I will advise the Company promptly in writing, during and after the term of the Relationship, of all Inventions solely or jointly conceived or developed or reduced to practice by me during the

Doc ID: a93c395a6af2dd9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM 2019L000717

period of the Relationship.

m. 5. **Company Property; Returning Company Documents.**
I acknowledge and agree that I have no expectation of privacy with respect
to the Company's telecommunications, networking or information processing
systems (including, without limitation, files, e-mail messages, and voice
messages) and that my activity and any files or messages on or using any of
those systems may be monitored or reviewed at any time without notice. I
further agree that any property situated on the Company's premises and
owned by the Company, including disks and other storage media, filing
cabinets or other work areas, is subject to inspection by Company personnel
at any time with or without notice. I agree that, at the time of termination of
the Relationship, I will deliver to the Company (and will not keep in my
possession, recreate or deliver to anyone else) any and all devices, records,
data, notes, reports, proposals, lists, correspondence, specifications,
drawings, blueprints, sketches, laboratory notebooks, materials, flow charts,
equipment, other documents or property, or reproductions of any of the
aforementioned items developed by me pursuant to the Relationship or
otherwise belonging to the Company, its successors or assigns.

n. 6. **Termination Certification.** In the event of the
termination of the Relationship, I agree to sign and deliver the "Termination
Certification" attached hereto as Exhibit B; however, my failure to sign and
deliver the Termination Certification shall in no way diminish my continuing
obligations under this Agreement.

o. 7. **Notice to Third Parties.** I agree that during the periods
of time during which I am restricted in taking certain actions by the terms of
this Agreement (the "Restriction Period"), I shall inform any entity or person
with whom I may seek to enter into a business relationship (whether as an
owner, employee, independent contractor, or otherwise) of my contractual
obligations under this Agreement. I also under             hat the
Company may, with or without prior notice to me and during or after the
term of the Relationship, notify third parties of my agreements and
obligations under this Agreement. I further ag             ten request
by the Company, I will respond to the Compan             ng the
status of my employment or proposed employment with any party during the
Restriction Period.

p. 8. **Solicitation of Employees, Consultants and Other
Parties.** As described above, I acknowledge and agree that the Company's
Confidential Information includes information relating to the Company's
employees, consultants, customers and others, and that I will not use or
disclose such Confidential Information except as authorized by the Company.
I further agree as follows:

FILED DATE: 1/22/2019 12:00 AM 2019L000717

q. **(a) Employees, Consultants.** I agree that during the term of the Relationship, and for a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

r. **(b) Other Parties.** I agree that during the term of the Relationship, I will not negatively influence any of the Company's clients, licensors, licensees or customers from purchasing Company products or services or solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company. In addition, I acknowledge that the Company has valuable Trade Secrets (as defined by applicable law from time to time) to which I will have access during the term of the Relationship. I understand that the Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months immediately following the termination of the Relationship for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition                   e Company. Thereafter, the Company intends to vigorously pursue its rights under applicable Trade Secrets law as the circumstances warrant.

s. 9. **At-Will Relationship.** I understand and acknowledge that, except as may be otherwise explicitly pr                     written agreement between the Company and me, my                          the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without furth                        bility, other than those provisions of this Agreement that e                         e termination of the Relationship.

t. 10. **Representations and Covenants.**

u. **(a) Facilitation of Agreement.** I agree to execute promptly, both during and after the end of the Relationship, any proper oath, and to verify any proper document, required to carry out the terms of this Agreement, upon the Company's written request to do so.

v. **(b) No Conflicts.** I represent that my performance of all

Doc ID: b93c395a6af2de9615373cc93708086c859ddc68

the terms of this Agreement does not and will not breach any agreement I have entered into, or will enter into, with any third party, including without limitation any agreement to keep in confidence proprietary information or materials acquired by me in confidence or in trust prior to or during the Relationship. I will not disclose to the Company or use any inventions, confidential or non-public proprietary information or material belonging to any previous client, employer or any other party. I will not induce the Company to use any inventions, confidential or non-public proprietary information, or material belonging to any previous client, employer or any other party. I acknowledge and agree that I have listed on <u>Exhibit A</u> all agreements (*e.g.*, non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.), if any, with a current or former client, employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties for the Company or any obligation I may have to the Company. I agree not to enter into any written or oral agreement that conflicts with the provisions of this Agreement.

w. (c) **Voluntary Execution.** I certify and acknowledge that I have carefully read all of the provisions of this Agreement, that I understand and have voluntarily accepted such provisions, and that I will fully and faithfully comply with such provisions.

x. : ⟩ns.

y. (a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Alabama, without giving effect to the principles of conflict of laws.

z. (b) **Entire Agreement.** 1 ..... .g. ......... ...s forth the entire agreement and understanding between the Company and me relating to its subject matter and merges all prior disc⟨ ' ' ⟨ '' e parties to this Agreement. No amendment to this Agree ve unless in writing signed by both parties to this Agreement. The Company shall not be deemed hereby to have waived any rights or remedies it may have in law or equity, nor to have given any authorizations or waived any of its rights under this Agreement, unless, and only to the extent, it does so by a specific writing signed by a duly authorized officer of the Company, it being understood that, even if I am an officer of the Company, I will not have authority to give any such authorizations or waivers for the Company under this Agreement without specific approval by the Board of Directors. Any subsequent change or changes in my duties, obligations, rights or compensation will not affect the validity or scope of this Agreement.

Doc ID: n93c395a6af2de9615373cc93708086c859ddc68

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM 2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

aa.  (c)  **Severability.** If one or more of the provisions in this Agreement are deemed void or unenforceable to any extent in any context, such provisions shall nevertheless be enforced to the fullest extent allowed by law in that and other contexts, and the validity and force of the remainder of this Agreement shall not be affected. The Company and I have attempted to limit my right to use, maintain and disclose the Company's Confidential Information, and to limit my right to solicit employees and customers only to the extent necessary to protect the Company from unfair competition. Should a court of competent jurisdiction determine that the scope of the covenants contained in Section 8 exceeds the maximum restrictiveness such court deems reasonable and enforceable, the parties intend that the court should reform, modify and enforce the provision to such narrower scope as it determines to be reasonable and enforceable under the circumstances existing at that time.

bb.  (d)  **Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives, and my successors and assigns, and will be for the benefit of the Company, its successors, and its assigns.

cc.  (e)  **Remedies.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm, and therefore agree that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bo                          , where such a bond or security is required, I agree that a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

dd.  (f)  **Advice of Counsel.** I acknowledge THAT, IN EXECUTING THIS AGREEMENT, I Have HAD THE                    SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I have read and understood ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAI                    REASON OF THE DRAFTING OR PREPARATION HEREOF.

*[Signature Page Follows]*

Doc ID: n93c395a6af2de9615373cc93708086c859ddc68

The parties have executed this Agreement on the respective dates set forth below, to be effective as of the Effective Date first above written.

**the company:**

MongoHQ Inc.

By: _____
(Signature)

Name: Kurt Mackey
_____

Title: CEO
_____

Address:_____
_____ _____ United StatesFax:
_____

Date: _____

**Employee:**

Tim Yocum
_____
(Print Name)

_____
(Signature)

Address: _____

_____ ____ _____
United States

Date 02 / 03 / 2014
_____

## EXHIBIT A

## LIST OF PRIOR INVENTIONSAND ORIGINAL WORKS OF AUTHORSHIP EXCLUDED UNDER SECTION 4(a)

| Title | Date | Identifying Numberor Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

Doc ID: r93c395a6af2de9615373cc93708086c859ddc68

FILED DATE: 1/22/2019 12:00 AM  2019L000717

FILED DATE: 1/22/2019 12:00 AM 2019L000717

|  |  |  |
|---|---|---|
|  |  |  |

\_\_\_ No inventions, improvements, or original works of authorship

\_\_\_ No agreements under Section 10(b) \_\_\_ Additional sheets attached

Signature of Employee:_____

Print Name of Employee: _____

Date:_____

## <u>EXHIBIT B</u>

## TERMINATION CERTIFICATION

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items belonging to MongoHQ Inc., a Delaware corporation, its subsidiaries, affiliates, successors

or assigns (collectively, the "Company").

I further certify that I have complied with all the terms of the Company's Confidential Information and Invention Assignment Agreement signed by me, including the reporting of any inventions (as defined therein), conceived or made by me (solely or jointly with others) covered by that agreement, and I acknowledge my continuing obligations under that agreement.

I further agree that, in compliance with the Confidential Information and Invention Assignment Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from the date of this Certification, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company, either for myself or for any other person or entity.

Furthe ˙ · · ··· ·· Company intends to vigorously pursue its rights under applicable Trade Secrets law if, during a period of twelve (12) months from the date of this Certification for any reason, whether with or without cause, I solicit or influence or attempt to influence any client, licensor, licensee, customer or other person, either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in comp           siness of the Company and that, thereafter, the Company in.......  ........y pursue its rights under applicable Trade Secrets law as the circumstances warrant.

Date:_____          Emp

_____

(Print Employee's Name)

_____(Signature)

Doc ID: a93c395a6af2da9615373cc93708086c859ddc68

**hello sign**

## Audit Trail

Unique document ID: a93c395a6af2de9615373cc93708086c859ddc68
Document name: Now with e-signature amazingness
Status: Signed and closed

**01/30/2014**

19:21:28 UTC    Document (tim-yocum-offer-letter.pdf) uploaded by
hello@mongohq.com
IP: 67.180.97.12

19:21:31 UTC    Document (Yocum, Tim - CIIAA.rtf) uploaded by
hello@mongohq.com
IP: 67.180.97.12

19:26:21 UTC    Document signed by hello@mongohq.com
IP: 67.180.97.12

19:26:21 UTC    Document sent for signature to: Tim Yocum
██████████
IP: 67.180.97.12

**02/03/2014**

16:54:52 UTC    Document viewed by Tim Yocum ████████
IP: 205.234.237.186

16:56:56 UTC    Document signed by Tim Yocum ████████████
IP: 205.234.237.186

16:56:56 UTC    The document has been signed and is now closed.

FILED DATE: 1/22/2019 12:00 AM 2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**MONGOHQ INC.**

**2012 STOCK PLAN**

**NOTICE OF STOCK OPTION GRANT**

Timothy Yocum

You have been granted an option to purchase Common Stock of MongoHQ Inc., a Delaware corporation (the "Company"), as follows:

| | |
|---|---|
| Date of Grant: | April 16, 2014 |
| Exercise Price Per Share: | $0.33 |
| Total Number of Shares: | 135,905 |
| Total Exercise Price: | $44,848.65 |
| Type of Option: | ___X___ Incentive Stock Option |
| | _____ Nonstatutory Stock Option |
| Expiration Date: | April 15, 2024 |
| First Vesting Date: | February 19, 2014 |
| Vesting/Exercise Schedule: | So long as your Continuous Service Status does not terminate, the Shares underlying this Option shall vest and become exercisable in accordance with the following schedule: 25% of the Total Number of Shares shall vest and become exercisable on February 19, 2015 and 1/48th of the Total Number of Shares shall vest and become exercisable on the 19th day of each month thereafter (and if there is no corresponding day, the last day of the month). |
| Termination Period: | You may exercise this Option for 3 month(s) after termination of your Continuous Service Status except as set out in Section 5 of the Stock Option Agreement (but in no event later than the Expiration Date). You are responsible for keeping track of these exercise periods following the termination of your Continuous Service Status for any reason. The Company will not provide further notice of such periods. |
| Transferability: | You may not transfer this Option. |

*[Signature Page Follows]*

OHSUSA:758399162.1

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM 000080

FILED DATE: 1/22/2019 12:00 AM  2019L000717

By your signature and the signature of the Company's representative below, you and the Company agree that this Option is granted under and governed by the terms and conditions of this Notice and the MongoHQ Inc. 2012 Stock Plan and Option Agreement, both of which are attached to and made a part of this Notice.

In addition, you agree and acknowledge that your rights to any Shares underlying this Option will be earned only as you provide services to the Company over time, that the grant of this Option is not as consideration for services you rendered to the Company prior to your date of hire, and that nothing in this Notice or the attached documents confers upon you any right to continue your employment or consulting relationship with the Company for any period of time, nor does it interfere in any way with your right or the Company's right to terminate that relationship at any time, for any reason, with or without cause. Also, to the extent applicable, the Exercise Price Per Share has been set in good faith compliance with the applicable guidance issued by the IRS under Section 409A of the Code. However, there is no guarantee that the IRS will agree with the valuation, and by signing below, you agree and acknowledge that the Company, its Board, officers, employees and agents shall not be held liable for any applicable costs, taxes, or penalties associated with this Option if, in fact, the IRS or any other person (including, without limitation, a successor corporation or an acquirer in a Change of Control) were to determine that this Option constitutes deferred compensation under Section 409A of the Code. You should consult with your own tax advisor concerning the tax consequences of such a determination by the IRS. For purposes of this paragraph, the term "Company" will be interpreted to include any Parent, Subsidiary or Affiliate.

**THE COMPANY:**

MONGOHQ INC.

By: _____
(Signature)

Name: __Kurt Mackey_____
Title: __CEO_____

**OPTIONEE:**

TIMOTHY YOCUM_____
(PRINT NAME)

_Tim Yocum_____
(Signature)

**Address:**

_____

Doc ID: 3b03cb43330215b66b34a8a134242c2b279b6c3a

IBM CONFIDENTIAL                                      IBM 000081

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# MONGOHQ INC.

## 2012 STOCK PLAN

### STOCK OPTION AGREEMENT

1.     **Grant of Option.** MongoHQ Inc., a Delaware corporation (the "Company"), hereby grants to Timothy Yocum ("Optionee"), an option (the "Option") to purchase the total number of shares of Common Stock (the "Shares") set forth in the Notice of Stock Option Grant (the "Notice"), at the exercise price per Share set forth in the Notice (the "Exercise Price") subject to the terms, definitions and provisions of the MongoHQ Inc. 2012 Stock Plan (the "Plan") adopted by the Company, which is incorporated in this Stock Option Agreement (this "Agreement") by reference. Unless otherwise defined in this Agreement, the terms used in this Agreement or the Notice shall have the meanings defined in the Plan.

2.     **Designation of Option.** This Option is intended to be an Incentive Stock Option as defined in Section 422 of the Code only to the extent so designated in the Notice, and to the extent it is not so designated or to the extent this Option does not qualify as an Incentive Stock Option, it is intended to be a Nonstatutory Stock Option.

Notwithstanding the above, if designated as an Incentive Stock Option, in the event that the Shares subject to this Option (and all other incentive stock options granted to Optionee by the Company or any Parent or Subsidiary, including under other plans) that first become exercisable in any calendar year have an aggregate fair market value (determined for each Share as of the date of grant of the option covering such Share) in excess of $100,000, the Shares in excess of $100,000 shall be treated as subject to a nonstatutory stock option, in accordance with Section 5(c) of the Plan.

3.     **Exercise of Option.** This Option shall be exercisable during its term in accordance with the Vesting/Exercise Schedule set out in the Notice and with the provisions of Section 7(c) of the Plan as follows:

    (a)     **Right to Exercise.**

        (i)     This Option may not be exercised for a fraction of a share.

        (ii)     In the event of Optionee's death, Disability or other termination of Continuous Service Status, the exercisability of this Option is governed by Section 5 below, subject to the limitations contained in this Section 3.

        (iii)     In no event may this Option be exercised after the Expiration Date set forth in the Notice.

    (b)     **Method of Exercise.**

        (i)     This Option shall be exercisable by execution and delivery of the Exercise Agreement attached hereto as Exhibit A or of any other form of written notice approved

OHSUSA:758399162.1

FILED DATE: 1/22/2019 12:00 AM    2019L000717

for such purpose by the Company which shall state Optionee's election to exercise this Option, the number of Shares in respect of which this Option is being exercised, and such other representations and agreements as to the holder's investment intent with respect to such Shares as may be required by the Company pursuant to the provisions of the Plan. Such written notice shall be signed by Optionee and shall be delivered to the Company by such means as are determined by the Company in its discretion to constitute adequate delivery. The written notice shall be accompanied by payment of the aggregate Exercise Price for the purchased Shares. In addition, as a further condition to exercise of this Option, the Company may require Optionee to execute and deliver a counterpart signature page (attached hereto as Attachment A) to that certain Voting Agreement dated October 4, 2012, by and among the Company and certain of its stockholders (as may be amended from time to time) (the "Voting Agreement") so as to become a party thereto, and to be bound by the terms and conditions thereof.

(ii)     As a further condition to the exercise of this Option and as further set forth in Section 9 of the Plan, Optionee agrees to make adequate provision for federal, state or other applicable tax, withholding, required deductions or other payments, if any, which arise upon the grant, vesting or exercise of this Option, or disposition of Shares, whether by withholding, direct payment to the Company, or otherwise, as determined by the Company in its sole discretion.

(iii)     The Company is not obligated, and will have no liability for failure, to issue or deliver any Shares upon exercise of this Option unless such issuance or delivery would comply with the Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel. This Option may not be exercised until such time as the Plan has been approved by the holders of capital stock of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such Shares would constitute a violation of any Applicable Laws, including any applicable U.S. federal or state securities laws or any other law or regulation, including any rule under Part 221 of Title 12 of the Code of Federal Regulations as promulgated by the Federal Reserve Board. As a condition to the exercise of this Option, the Company may require Optionee to make any representation and warranty to the Company as may be required by the Applicable Laws. Assuming such compliance, for income tax purposes the Shares shall be considered transferred to Optionee on the date on which this Option is exercised with respect to such Shares.

(iv)     Subject to compliance with Applicable Laws, this Option shall be deemed to be exercised upon receipt by the Company of the appropriate written notice of exercise accompanied by the Exercise Price and a copy of Attachment A executed by Optionee, and the satisfaction of any applicable obligations described in Section 3(b)(ii) above.

4.     **Method of Payment.** Payment of the Exercise Price shall be by cash or check or, following the initial public offering of the Company's Common Stock, by Cashless Exercise pursuant to which the Optionee delivers an irrevocable direction to a securities broker (on a form prescribed by the Company and according to a procedure established by the Company).

5.     **Termination of Relationship.** Following the date of termination of Optionee's Continuous Service Status for any reason (the "Termination Date"), Optionee may exercise this Option only as set forth in the Notice and this Section 5. If Optionee does not exercise this

OHSUSA:758399162.1                          -2-

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Option within the Termination Period set forth in the Notice or the termination periods set forth below, this Option shall terminate in its entirety. In no event, may any Option be exercised after the Expiration Date of this Option as set forth in the Notice.

(a) **General Termination.** In the event of termination of Optionee's Continuous Service Status other than as a result of Optionee's Disability or death or Optionee's termination for Cause, Optionee may, to the extent Optionee is vested in the Optioned Stock at the date of such termination, exercise this Option during the Termination Period set forth in the Notice.

(b) **Termination upon Disability of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's Disability, Optionee may, but only within 12 month(s) following the Termination Date, exercise this Option to the extent Optionee is vested in the Optioned Stock.

(c) **Death of Optionee.** In the event of termination of Optionee's Continuous Service Status as a result of Optionee's death, or in the event of Optionee's death within 3 month(s) following Optionee's Termination Date, this Option may be exercised at any time within 12 month(s) following the Termination Date, or if later, 12 month(s) following the date of death by any beneficiaries designated in accordance with Section 15 of the Plan or, if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent Optionee is vested in this Option.

(d) **Termination for Cause.** In the event of termination of Optionee's Continuous Service Status for Cause, this Option (including any vested portion thereof) shall immediately terminate in its entirety upon first notification to Optionee of such termination for Cause. If Optionee's Continuous Service Status is suspended pending an investigation of whether Optionee's Continuous Service Status will be terminated for Cause, all Optionee's rights under this Option, including the right to exercise this Option, shall be suspended during the investigation period.

6. **Non-Transferability of Option.** This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by him or her. The terms of this Option shall be binding upon the executors, administrators, heirs, successors and assigns of Optionee. Further, beginning with (i) the period when the Company begins to rely on the exemption described in Rule 12h-1(f)(1) promulgated under the Exchange Act, as determined by the Board in its sole discretion, and (ii) ending on the earlier of (A) the date when the Company ceases to rely on such exemption, as determined by the Board in its sole discretion, or (B) the date when the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, an Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are Family Members through gifts or domestic relations orders, or (ii) to an executor or guardian of Optionee upon the death or disability of Optionee. Notwithstanding the foregoing sentence, the Board, in its sole discretion, may permit transfers of Nonstatutory Stock Options to the Company

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                    IBM 000084

FILED DATE: 1/22/2019 12:00 AM   2019L000717

or in connection with a Change of Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f).

      7.    **Lock-Up Agreement.** In connection with the initial public offering of the Company's securities and upon request of the Company or the underwriters managing such offering of the Company's securities, Optionee hereby agrees not to sell, make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of any securities of the Company however or whenever acquired (other than those included in the registration) without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) from the effective date of such registration as may be requested by the Company or such managing underwriters and to execute an agreement reflecting the foregoing as may be requested by the underwriters at the time of the Company's initial public offering. Notwithstanding the foregoing, if during the last 17 days of the restricted period, the Company issues an earnings release or material news or a material event relating to the Company occurs, or prior to the expiration of the restricted period the Company announces that it will release earnings results during the 16-day period beginning on the last day of the restricted period, then, upon the request of the managing underwriter, to the extent required by any FINRA rules, the restrictions imposed by this subsection shall continue to apply until the end of the third trading day following the expiration of the 15-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. In no event will the restricted period extend beyond 216 days after the effective date of the registration statement.

      8.    **Effect of Agreement.** Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof (and has had an opportunity to consult counsel regarding the Option terms), and hereby accepts this Option and agrees to be bound by its contractual terms as set forth herein and in the Plan. Optionee hereby agrees to accept as binding, conclusive and final all decisions and interpretations of the Administrator regarding any questions relating to this Option. In the event of a conflict between the terms and provisions of the Plan and the terms and provisions of the Notice and this Agreement, the Plan terms and provisions shall prevail.

      9.    **Imposition of Other Requirements.** The Company reserves the right to impose other requirements on Optionee's participation in the Plan, on the Option and on any Award or Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable in order to comply with Applicable Laws or facilitate the administration of the Plan. Optionee agrees to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing. Furthermore, Optionee acknowledges that the laws of the country in which Optionee is working at the time of grant, vesting and exercise of the Option or the sale of Shares received pursuant to this Agreement (including any rules or regulations governing securities, foreign exchange, tax, labor, or other matters) may subject Optionee to additional procedural or regulatory requirements that Optionee is and will be solely responsible for and must fulfill.

      10.    **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents related to Optionee's current or future participation in the Plan by electronic means or to request Optionee's consent to participate in the Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and agrees to participate in the

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                         IBM 000085

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

11. **Miscellaneous.**

(a) **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b) **Entire Agreement; Enforcement of Rights.** This Agreement, together with the Notice to which this Agreement is attached and the Plan, sets forth the entire agreement and understanding of the parties relating to the subject matter herein and therein and merges all prior or contemporaneous discussions between the parties. Except as contemplated under the Plan, no modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of this Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of this Agreement shall be enforceable in accordance with its terms.

(d) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f) **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights and obligations of Optionee under this Agreement may not be assigned without the prior written consent of the Company.

OHSUSA:758399162.1

-5-

FILED DATE: 1/22/2019 12:00 AM  2019L000717

## EXHIBIT A

## MONGOHQ INC.

## 2012 STOCK PLAN

## EXERCISE AGREEMENT

This Exercise Agreement (this "Agreement") is made as of _____, by and between MongoHQ Inc., a Delaware corporation (the "Company"), and _____ ("Purchaser").  To the extent any capitalized terms used in this Agreement are not defined, they shall have the meaning ascribed to them in the Company's 2012 Stock Plan (the "Plan") and the Option Agreement (as defined below).

1.  **Exercise of Option.**  Subject to the terms and conditions hereof, Purchaser hereby elects to exercise his or her option to purchase _____ shares of the Common Stock (the "Shares") of the Company under and pursuant to the Plan, the Notice of Stock Option Grant and the Stock Option Agreement granted _____ (the "Option Agreement").  The purchase price for the Shares shall be $_____ per Share for a total purchase price of $_____.  The term "Shares" refers to the purchased Shares and all securities received in connection with the Shares pursuant to stock dividends or splits, all securities received in replacement of the Shares in a recapitalization, merger, reorganization, exchange or the like, and all new, substituted or additional securities or other property to which Purchaser is entitled by reason of Purchaser's ownership of the Shares.

2.  **Time and Place of Exercise.**  The purchase and sale of the Shares under this Agreement shall occur at the principal office of the Company simultaneously with the execution and delivery of this Agreement, the payment of the aggregate exercise price by any method listed in Section 4 of the Option Agreement, and the satisfaction of any applicable tax, withholding, required deductions or other payments, all in accordance with the provisions of Section 3(b) of the Option Agreement.  The Company shall issue the Shares to Purchaser by entering such Shares in Purchaser's name as of such date in the books and records of the Company or, if applicable, a duly authorized transfer agent of the Company, against payment of the exercise price therefor by Purchaser.  If applicable, the Company will deliver to Purchaser a certificate representing the Shares as soon as practicable following such date.

3.  **Limitations on Transfer.**  In addition to any other limitation on transfer created by Applicable Laws, Purchaser shall not assign, encumber or dispose of any interest in the Shares except in compliance with the provisions below and Applicable Laws.

(a)  **Right of First Refusal.**  Before any Shares held by Purchaser or any transferee of Purchaser (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section 3(a) (the "Right of First Refusal").

OHSUSA:758399162.1

IBM CONFIDENTIAL

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM 000087

FILED DATE: 1/22/2019 12:00 AM 2019L000717

(i) **Notice of Proposed Transfer.** The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (A) the Holder's bona fide intention to sell or otherwise transfer such Shares; (B) the name of each proposed purchaser or other transferee ("Proposed Transferee"); (C) the number of Shares to be transferred to each Proposed Transferee; and (D) the terms and conditions of each proposed sale or transfer, including (without limitation) the purchase price for such Shares (the "Purchase Price"). The Holder shall offer the Shares at the Purchase Price and upon the same terms (or terms as similar as reasonably possible) to the Company or its assignee(s).

(ii) **Exercise of Right of First Refusal.** At any time within 30 days after receipt of the Notice, the Company and/or its assignee(s) may, by giving written notice to the Holder, elect to purchase any or all of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the Purchase Price. If the Purchase Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board in good faith.

(iii) **Payment.** Payment of the Purchase Price shall be made, at the election of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness, or by any combination thereof within 60 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(iv) **Holder's Right to Transfer.** If any of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section 3(a), then the Holder may sell or otherwise transfer any unpurchased Shares to that Proposed Transferee at the Purchase Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice and provided further that any such sale or other transfer is effected in accordance with any Applicable Laws and the Proposed Transferee agrees in writing that the provisions of this Section 3 and the waiver of statutory information rights in Section 8 shall continue to apply to the Shares in the hands of such Proposed Transferee. The Company, in consultation with its legal counsel, may require the Holder to provide an opinion of counsel evidencing compliance with Applicable Laws. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, or if the Holder proposes to change the price or other terms to make them more favorable to the Proposed Transferee, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(v) **Exception for Certain Family Transfers.** Anything to the contrary contained in this Section 3(a) notwithstanding, the transfer of any or all of the Shares during Holder's lifetime or on Holder's death by will or intestacy to Holder's Immediate Family or a trust for the benefit of Holder's Immediate Family shall be exempt from the provisions of this Section 3(a). "Immediate Family" as used herein shall mean lineal descendant or antecedent, spouse (or spouse's antecedents), father, mother, brother or sister (or their descendants), stepchild (or their antecedents or descendants), aunt or uncle (or their antecedents or descendants), brother-in-law or sister-in-law (or their antecedents or descendants) and shall include adoptive relationships. In such case, the transferee or other recipient shall receive and

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL

IBM 000088

FILED DATE: 1/22/2019 12:00 AM   2019L000717

hold the Shares so transferred subject to the provisions of this Section 3, and there shall be no further transfer of such Shares except in accordance with the terms of this Section 3.

(b) **Company's Right to Purchase upon Involuntary Transfer.** In the event of any transfer by operation of law or other involuntary transfer (including death or divorce, but excluding a transfer to Immediate Family as set forth in Section 3(a)(v) above) of all or a portion of the Shares by the record holder thereof, the Company shall have an option to purchase any or all of the Shares transferred at the greater of the purchase price paid by Purchaser pursuant to this Agreement or the Fair Market Value of the Shares on the date of transfer (as determined by the Company). Upon such a transfer, the Holder shall promptly notify the Secretary of the Company of such transfer. The right to purchase such Shares shall be provided to the Company for a period of 30 days following receipt by the Company of written notice from the Holder.

(c) **Assignment.** The right of the Company to purchase any part of the Shares may be assigned in whole or in part to any holder or holders of capital stock of the Company or other persons or organizations.

(d) **Restrictions Binding on Transferees.** All transferees of Shares or any interest therein will receive and hold such Shares or interest subject to the provisions of this Agreement and the terms of the Option Agreement, including, without limitation, Section 7 of the Option Agreement. Any sale or transfer of the Shares shall be void unless the provisions of this Agreement are satisfied.

(e) **Termination of Rights.** The Right of First Refusal granted the Company by Section 3(a) above and the option to repurchase the Shares in the event of an involuntary transfer granted the Company by Section 3(b) above shall terminate upon the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act. Upon termination of such transfer restrictions, the Company will remove any stop-transfer notices referred to in Section 5(b) below and related to the restrictions in this Section 3 and, if certificates are issued, a new certificate or certificates representing the Shares not repurchased shall be issued, on request, without the legend referred to in Section 5(a)(ii) below and delivered to Holder.

4. **Investment and Taxation Representations.** In connection with the purchase of the Shares, Purchaser represents to the Company the following:

(a) Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Shares. Purchaser is purchasing the Shares for investment for Purchaser's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act or under any applicable provision of state law. Purchaser does not have any present intention to transfer the Shares to any other person or entity.

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                    IBM 000089

FILED DATE: 1/22/2019 12:00 AM    2019L000717

(b)     Purchaser understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Purchaser's investment intent as expressed herein.

(c)     Purchaser further acknowledges and understands that the securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Purchaser further acknowledges and understands that the Company is under no obligation to register the securities.

(d)     Purchaser is familiar with the provisions of Rule 144, promulgated under the Securities Act, which, in substance, permits limited public resale of "restricted securities" acquired, directly or indirectly, from the issuer of the securities (or from an affiliate of such issuer), in a non-public offering subject to the satisfaction of certain conditions. Purchaser understands that the Company provides no assurances as to whether he or she will be able to resell any or all of the Shares pursuant to Rule 144, which rule requires, among other things, that the Company be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, that resales of securities take place only after the holder of the Shares has held the Shares for certain specified time periods, and under certain circumstances, that resales of securities be limited in volume and take place only pursuant to brokered transactions. Notwithstanding this Section 4(d), Purchaser acknowledges and agrees to the restrictions set forth in Section 4(e) below.

(e)     Purchaser further understands that in the event all of the applicable requirements of Rule 144 are not satisfied, registration under the Securities Act, compliance with Regulation A, or some other registration exemption will be required; and that, notwithstanding the fact that Rule 144 is not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk.

(f)     Purchaser understands that Purchaser may suffer adverse tax consequences as a result of Purchaser's purchase or disposition of the Shares. Purchaser represents that Purchaser has consulted any tax consultants Purchaser deems advisable in connection with the purchase or disposition of the Shares and that Purchaser is not relying on the Company for any tax advice.

5.     **Restrictive Legends and Stop-Transfer Orders.**

(a)     **Legends.** Any certificate or certificates representing the Shares shall bear the following legends (as well as any legends required by the Company or applicable state and federal corporate and securities laws):

(i)     "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                              IBM 000090

FILED DATE: 1/22/2019 12:00 AM   2019L000717

DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii)     "THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE TRANSFERRED ONLY IN ACCORDANCE WITH THE TERMS OF AN AGREEMENT BETWEEN THE COMPANY AND THE STOCKHOLDER, A COPY OF WHICH IS ON FILE WITH AND MAY BE OBTAINED FROM THE SECRETARY OF THE COMPANY AT NO CHARGE."

(b)    **Stop-Transfer Notices.** Purchaser agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)    **Refusal to Transfer.** The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

6.    **No Employment Rights.** Nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company, or a parent, subsidiary or affiliate of the Company, to terminate Purchaser's employment or consulting relationship, for any reason, with or without cause.

7.    **Lock-Up Agreement.** The lock-up provisions set forth in Section 7 of the Option Agreement shall apply to the Shares issued upon exercise of the Option hereunder and Purchaser reaffirms Purchaser's obligations set forth therein.

8.    **Waiver of Statutory Information Rights.** Optionee acknowledges and understands that, but for the waiver made herein, Optionee would be entitled, upon written demand under oath stating the purpose thereof, to inspect for any proper purpose, and to make copies and extracts from, the Company's stock ledger, a list of its stockholders, and its other books and records, and the books and records of subsidiaries of the Company, if any, under the circumstances and in the manner provided in Section 220 of the General Corporation Law of Delaware (any and all such rights, and any and all such other rights of Optionee as may be provided for in Section 220, the "Inspection Rights"). In light of the foregoing, until the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, Optionee hereby unconditionally and irrevocably waives the Inspection Rights, whether such Inspection Rights would be exercised or pursued directly or indirectly pursuant to Section 220 or otherwise, and covenants and agrees never to directly or indirectly commence, voluntarily aid in any way, prosecute, assign, transfer, or cause to be

OHSUSA:758399162.1

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                        IBM 000091

FILED DATE: 1/22/2019 12:00 AM   2019L000717

commenced any claim, action, cause of action, or other proceeding to pursue or exercise the Inspection Rights. The foregoing waiver applies to the Inspection Rights of Optionee in Optionee's capacity as a stockholder and shall not affect any rights of a director, in his or her capacity as such, under Section 220. The foregoing waiver shall not apply to any contractual inspection rights of Optionee under any written agreement with the Company.

9.   **Miscellaneous.**

(a)   **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law. For purposes of litigating any dispute that may arise directly or indirectly from this Agreement, the parties hereby submit and consent to the exclusive jurisdiction of the State of California and agree that any such litigation shall be conducted only in the courts of California or the federal courts of the United States located in California and no other courts.

(b)   **Entire Agreement; Enforcement of Rights.** This Agreement, together with the Option Agreement and the Plan and any required Voting Agreement, sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior or contemporaneous discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement. The failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of any rights of such party.

(c)   **Severability.** If one or more provisions of this Agreement are held to be unenforceable under Applicable Laws, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(d)   **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email or fax (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address or fax number as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(e)   **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f)   **Successors and Assigns.** The rights and benefits of this Agreement shall inure to the benefit of, and be enforceable by the Company's successors and assigns. The rights

OHSUSA:758399162.1

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b8c3a

IBM CONFIDENTIAL

IBM 000092

FILED DATE: 1/22/2019 12:00 AM   2019L000717

and obligations of Purchaser under this Agreement may only be assigned with the prior written consent of the Company.

       (g)    **California Corporate Securities Law.** THE SALE OF THE SECURITIES WHICH ARE THE SUBJECT OF THIS AGREEMENT HAS NOT BEEN QUALIFIED WITH THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA AND THE ISSUANCE OF THE SECURITIES OR THE PAYMENT OR RECEIPT OF ANY PART OF THE CONSIDERATION THEREFOR PRIOR TO THE QUALIFICATION IS UNLAWFUL, UNLESS THE SALE OF SECURITIES IS EXEMPT FROM QUALIFICATION BY SECTION 25100, 25102 OR 25105 OF THE CALIFORNIA CORPORATIONS CODE. THE RIGHTS OF ALL PARTIES TO THIS AGREEMENT ARE EXPRESSLY CONDITIONED UPON THE QUALIFICATION BEING OBTAINED, UNLESS THE SALE IS SO EXEMPT.

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL        IBM 000093

FILED DATE: 1/22/2019 12:00 AM   2019L000717

The parties have executed this Exercise Agreement as of the date first set forth above.

**THE COMPANY:**

MONGOHQ INC.

By:_____
                  (Signature)

Name:_____
Title:_____

Address:

_____

_____ _____

United States
Fax: _____

**PURCHASER:**

_____

(PRINT NAME)

_____

(Signature)

Address:

_____

_____

Fax:_____
email:_____

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                     IBM 000094

FILED DATE: 1/22/2019 12:00 AM   2019L000717

I, _____, spouse of _____ ("Purchaser"), have read and hereby approve the foregoing Agreement.  In consideration of the Company's granting my spouse the right to purchase the Shares as set forth in the Agreement, I hereby agree to be bound irrevocably by the Agreement and further agree that any community property or other such interest that I may have in the Shares shall hereby be similarly bound by the Agreement.  I hereby appoint my spouse as my attorney-in-fact with respect to any amendment or exercise of any rights under the Agreement.

_____
Spouse of Purchaser (if applicable)

OHSUSA:758399162.1

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL

IBM 000095

FILED DATE: 1/22/2019 12:00 AM   2019L000717

**Attachment A**

**Adoption Agreement**

This Adoption Agreement ("***Adoption Agreement***") is executed on _____, 20__, by the undersigned (the "***Holder***") pursuant to the terms of that certain Voting Agreement dated as of October 4, 2012 (the "***Agreement***"), by and among the Company and certain of its Stockholders, as such Agreement may be amended or amended and restated hereafter. Capitalized terms used but not defined in this Adoption Agreement shall have the respective meanings ascribed to such terms in the Agreement. By the execution of this Adoption Agreement, the Holder agrees as follows.

1.1     Acknowledgement.  Holder acknowledges that Holder is acquiring certain shares of the capital stock of the Company (the "***Stock***"), for one of the following reasons (Check the correct box):

☐       as a transferee of Shares from a party in such party's capacity as an "Investor" bound by the Agreement, and after such transfer, Holder shall be considered an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐       as a transferee of Shares from a party in such party's capacity as a "Key Holder" bound by the Agreement, and after such transfer, Holder shall be considered a "Key Holder" and a "Stockholder" for all purposes of the Agreement.

☐       as a new Investor in accordance with Section 4.11(a) of the Agreement, in which case Holder will be an "Investor" and a "Stockholder" for all purposes of the Agreement.

☐       in accordance with Section 4.11(b) of the Agreement, as a new party who is not a new Investor, in which case Holder will be a "Stockholder" for all purposes of the Agreement.

1.2     Agreement.  Holder hereby (a) agrees that the Stock, and any other shares of capital stock or securities required by the Agreement to be bound thereby, shall be bound by and subject to the terms of the Agreement and (b) adopts the Agreement with the same force and effect as if Holder were originally a party thereto.

1.3     Notice.  Any notice required or permitted by the Agreement shall be given to Holder at the address or facsimile number listed below Holder's signature hereto.

HOLDER: _____          ACCEPTED AND AGREED:

By: _____          MongoHQ Inc.
   Name and Title of Signatory

Address: _____          By: _____

_____          Title: _____

Facsimile Number: _____

OHSUSA:758399162.1                              -10-

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                    IBM 000096

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## MONGOHQ INC.

### 2012 STOCK PLAN

1.     **Purposes of the Plan.**  The purposes of this 2012 Stock Plan are to attract and retain the best available personnel for positions of substantial responsibility, to provide additional incentive to Employees and Consultants, and to promote the success of the Company's business.  Options granted under the Plan may be Incentive Stock Options or Nonstatutory Stock Options, as determined by the Administrator at the time of grant of an Option and subject to the applicable provisions of Section 422 of the Code and the regulations promulgated thereunder. Restricted Stock may also be granted under the Plan.

2.     **Definitions.**  As used herein, the following definitions shall apply:

(a)     "**Administrator**" means the Board or a Committee.

(b)     "**Affiliate**" means (i) an entity other than a Subsidiary which, together with the Company, is under common control of a third person or entity and (ii) an entity other than a Subsidiary in which the Company and /or one or more Subsidiaries own a controlling interest.

(c)     "**Applicable Laws**" means all applicable laws, rules, regulations and requirements, including, but not limited to, all applicable U.S. federal or state laws, any Stock Exchange rules or regulations, and the applicable laws, rules or regulations of any other country or jurisdiction where Options or Restricted Stock are granted under the Plan or Participants reside or provide services, as such laws, rules, and regulations shall be in effect from time to time.

(d)     "**Award**" means any award of an Option or Restricted Stock under the Plan.

(e)     "**Board**" means the Board of Directors of the Company.

(f)     "**California Participant**" means a Participant whose Award is issued in reliance on Section 25102(o) of the California Corporations Code.

(g)     "**Cashless Exercise**" means a program approved by the Administrator in which payment of the Option exercise price or tax withholding obligations or other required deductions may be satisfied, in whole or in part, with Shares subject to the Option, including by delivery of an irrevocable direction to a securities broker (on a form prescribed by the Company) to sell Shares and to deliver all or part of the sale proceeds to the Company in payment of such amount.

(h)     "**Cause**" for termination of a Participant's Continuous Service Status will exist (unless another definition is provided in an applicable Option Agreement, Restricted Stock Purchase Agreement, employment agreement or other applicable written agreement) if the Participant's Continuous Service Status is terminated for any of the following reasons:  (i) any

OHSUSA:751544840.1

material breach by Participant of any material written agreement between Participant and the Company and Participant's failure to cure such breach within 30 days after receiving written notice thereof; (ii) any failure by Participant to comply with the Company's material written policies or rules as they may be in effect from time to time; (iii) neglect or persistent unsatisfactory performance of Participant's duties and Participant's failure to cure such condition within 30 days after receiving written notice thereof; (iv) Participant's repeated failure to follow reasonable and lawful instructions from the Board or Chief Executive Officer and Participant's failure to cure such condition within 30 days after receiving written notice thereof; (v) Participant's conviction of, or plea of guilty or nolo contendre to, any felony or crime that results in, or is reasonably expected to result in, a material adverse effect on the business or reputation of the Company; (vi) Participant's commission of or participation in an act of fraud against the Company; (vii) Participant's intentional material damage to the Company's business, property or reputation; or (viii) Participant's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company. For purposes of clarity, a termination without "Cause" does not include any termination that occurs as a result of Participant's death or Disability. The determination as to whether a Participant's Continuous Service Status has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on the Participant. The foregoing definition does not in any way limit the Company's ability to terminate a Participant's employment or consulting relationship at any time, and the term "Company" will be interpreted to include any Subsidiary, Parent, Affiliate, or any successor thereto, if appropriate.

(i) **"Change of Control"** means (i) a sale of all or substantially all of the Company's assets other than to an Excluded Entity (as defined below), (ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, limited liability company or other entity other than an Excluded Entity, or (iii) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of all of the Company's then outstanding voting securities.

Notwithstanding the foregoing, a transaction shall not constitute a Change of Control if its purpose is to (A) change the jurisdiction of the Company's incorporation, (B) create a holding company that will be owned in substantially the same proportions by the persons who hold the Company's securities immediately before such transaction, or (C) obtain funding for the Company in a financing that is approved by the Company's Board. An "Excluded Entity" means a corporation or other entity of which the holders of voting capital stock of the Company outstanding immediately prior to such transaction are the direct or indirect holders of voting securities representing at least a majority of the votes entitled to be cast by all of such corporation's or other entity's voting securities outstanding immediately after such transaction.

(j) **"Code"** means the Internal Revenue Code of 1986, as amended.

(k) **"Committee"** means one or more committees or subcommittees of the Board consisting of two (2) or more Directors (or such lesser or greater number of Directors as shall constitute the minimum number permitted by Applicable Laws to establish a committee or

OHSUSA:751544840.1                                    -2-

IBM CONFIDENTIAL

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM 000098

FILED DATE: 1/22/2019 12:00 AM 2019L000717

sub-committee of the Board) appointed by the Board to administer the Plan in accordance with Section 4 below.

(l)  "**Common Stock**" means the Company's common stock, par value $0.00001 per share, as adjusted in accordance with Section 11 below.

(m)  "**Company**" means MongoHQ Inc., a Delaware corporation.

(n)  "**Consultant**" means any person or entity, including an advisor but not an Employee, that renders, or has rendered, services to the Company, or any Parent, Subsidiary or Affiliate and is compensated for such services, and any Director whether compensated for such services or not.

(o)  "**Continuous Service Status**" means the absence of any interruption or termination of service as an Employee or Consultant.  Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of:  (i) Company approved sick leave; (ii) military leave; (iii) any other bona fide leave of absence approved by the Company, provided that, if an Employee is holding an Incentive Stock Option and such leave exceeds 3 months, such Employee's service as an Employee shall be deemed terminated on the 1st day following such 3-month period and the Incentive Stock Option shall thereafter automatically become a Nonstatutory Stock Option in accordance with Applicable Laws, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy.  Also, Continuous Service Status as an Employee or Consultant shall not be considered interrupted or terminated in the case of a transfer between locations of the Company or between the Company, its Parents, Subsidiaries or Affiliates, or their respective successors, or a change in status from an Employee to a Consultant or from a Consultant to an Employee.

(p)  "**Director**" means a member of the Board.

(q)  "**Disability**" means "disability" within the meaning of Section 22(e)(3) of the Code.

(r)  "**Employee**" means any person employed by the Company, or any Parent, Subsidiary or Affiliate, with the status of employment determined pursuant to such factors as are deemed appropriate by the Company in its sole discretion, subject to any requirements of Applicable Laws, including the Code.  The payment by the Company of a director's fee shall not be sufficient to constitute "employment" of such director by the Company or any Parent, Subsidiary or Affiliate.

(s)  "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(t)  "**Fair Market Value**" means, as of any date, the per share fair market value of the Common Stock, as determined by the Administrator in good faith on such basis as it deems appropriate and applied consistently with respect to Participants.  Whenever possible, the determination of Fair Market Value shall be based upon the per share closing price for the Shares as reported in The Wall Street Journal for the applicable date.

OHSUSA:751544840.1                             -3-

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                    IBM 000099

FILED DATE: 1/22/2019 12:00 AM   2019L000717

    (u)    **"Family Members"** means any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law (including adoptive relationships) of the Participant, any person sharing the Participant's household (other than a tenant or employee), a trust in which these persons (or the Participant) have more than 50% of the beneficial interest, a foundation in which these persons (or the Participant) control the management of assets, and any other entity in which these persons (or the Participant) own more than 50% of the voting interests.

    (v)    **"Incentive Stock Option"** means an Option intended to, and which does, in fact, qualify as an incentive stock option within the meaning of Section 422 of the Code.

    (w)    **"Involuntary Termination"** means (unless another definition is provided in the applicable Option Agreement, Restricted Stock Purchase Agreement, employment agreement or other applicable written agreement) the termination of a Participant's Continuous Service Status other than for (i) death, (ii) Disability or (iii) for Cause by the Company or a Parent, Subsidiary, Affiliate or successor thereto, as appropriate.

    (x)    **"Listed Security"** means any security of the Company that is listed or approved for listing on a national securities exchange or designated or approved for designation as a national market system security on an interdealer quotation system by the Financial Industry Regulatory Authority (or any successor thereto).

    (y)    **"Nonstatutory Stock Option"** means an Option that is not intended to, or does not, in fact, qualify as an Incentive Stock Option.

    (z)    **"Option"** means a stock option granted pursuant to the Plan.

    (aa)    **"Option Agreement"** means a written document, the form(s) of which shall be approved from time to time by the Administrator, reflecting the terms of an Option granted under the Plan and includes any documents attached to or incorporated into such Option Agreement, including, but not limited to, a notice of stock option grant and a form of exercise notice.

    (bb)    **"Option Exchange Program"** means a program approved by the Administrator whereby outstanding Options (i) are exchanged for Options with a lower exercise price, Restricted Stock, cash or other property or (ii) are amended to decrease the exercise price as a result of a decline in the Fair Market Value.

    (cc)    **"Optioned Stock"** means Shares that are subject to an Option or that were issued pursuant to the exercise of an Option.

    (dd)    **"Optionee"** means an Employee or Consultant who receives an Option.

    (ee)    **"Parent"** means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if, at the time of grant of the Award, each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                           IBM 000100

corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(ff) **"Participant"** means any holder of one or more Awards or Shares issued pursuant to an Award.

(gg) **"Plan"** means this 2012 Stock Plan.

(hh) **"Restricted Stock"** means Shares acquired pursuant to a right to purchase or receive Common Stock granted pursuant to Section 8 below.

(ii) **"Restricted Stock Purchase Agreement"** means a written document, the form(s) of which shall be approved from time to time by the Administrator, reflecting the terms of Restricted Stock granted under the Plan and includes any documents attached to such agreement.

(jj) **"Rule 16b-3"** means Rule 16b-3 promulgated under the Exchange Act, as amended from time to time, or any successor provision.

(kk) **"Share"** means a share of Common Stock, as adjusted in accordance with Section 11 below.

(ll) **"Stock Exchange"** means any stock exchange or consolidated stock price reporting system on which prices for the Common Stock are quoted at any given time.

(mm) **"Subsidiary"** means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if, at the time of grant of the Award, each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

(nn) **"Ten Percent Holder"** means a person who owns stock representing more than 10% of the voting power of all classes of stock of the Company or any Parent or Subsidiary measured as of an Award's date of grant.

3. **Stock Subject to the Plan.** Subject to the provisions of Section 11 below, the maximum aggregate number of Shares that may be issued under the Plan is 3,263,167 Shares, all of which Shares may be issued under the Plan pursuant to Incentive Stock Options. The Shares issued under the Plan may be authorized, but unissued, or reacquired Shares. If an Award should expire or become unexercisable for any reason without having been exercised in full, or is surrendered pursuant to an Option Exchange Program, the unpurchased Shares that were subject thereto shall, unless the Plan shall have been terminated, become available for future grant under the Plan. In addition, any Shares which are retained by the Company upon exercise of an Award in order to satisfy the exercise or purchase price for such Award or any withholding taxes due with respect to such Award shall be treated as not issued and shall continue to be available under the Plan and Shares issued under the Plan and later forfeited to the Company due to the failure to vest or repurchased by the Company at the original purchase price paid to the Company for the

OHSUSA:751544840.1                     -5-

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                    IBM 000101

FILED DATE: 1/22/2019 12:00 AM   2019L000717

FILED DATE: 1/22/2019 12:00 AM   2019L000717

Shares (including, without limitation, upon forfeiture to or repurchase by the Company in connection with the termination of a Participant's Continuous Service Status) shall again be available for future grant under the Plan.

4.   **Administration of the Plan.**

(a)   **General.**  The Plan shall be administered by the Board, a Committee appointed by the Board, or any combination thereof, as determined by the Board.  The Plan may be administered by different administrative bodies with respect to different classes of Participants and, if permitted by Applicable Laws, the Board may authorize one or more officers of the Company to make Awards under the Plan to Employees and Consultants (who are not subject to Section 16 of the Exchange Act) within parameters specified by the Board.

(b)   **Committee Composition.**  If a Committee has been appointed pursuant to this Section 4, such Committee shall continue to serve in its designated capacity until otherwise directed by the Board.  From time to time the Board may increase the size of any Committee and appoint additional members thereof, remove members (with or without cause) and appoint new members in substitution therefor, fill vacancies (however caused) and dissolve a Committee and thereafter directly administer the Plan, all to the extent permitted by Applicable Laws and, in the case of a Committee administering the Plan in accordance with the requirements of Rule 16b-3 or Section 162(m) of the Code, to the extent permitted or required by such provisions.

(c)   **Powers of the Administrator.**  Subject to the provisions of the Plan and, in the case of a Committee, the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its sole discretion:

(i)   to determine the Fair Market Value in accordance with Section 2(t) above, provided that such determination shall be applied consistently with respect to Participants under the Plan;

(ii)   to select the Employees and Consultants to whom Awards may from time to time be granted;

(iii)   to determine the number of Shares to be covered by each Award;

(iv)   to approve the form(s) of agreement(s) and other related documents used under the Plan;

(v)   to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder, which terms and conditions include but are not limited to the exercise or purchase price, the time or times when Awards may vest and/or be exercised (which may be based on performance criteria), the circumstances (if any) when vesting will be accelerated or forfeiture restrictions will be waived, and any restriction or limitation regarding any Award, Optioned Stock, or Restricted Stock;

(vi)   to amend any outstanding Award or agreement related to any Optioned Stock or Restricted Stock, including any amendment adjusting vesting (e.g., in connection with a change in the terms or conditions under which such person is providing

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                        IBM 000102

FILED DATE: 1/22/2019 12:00 AM 2019L000717

services to the Company), provided that no amendment shall be made that would materially and adversely affect the rights of any Participant without his or her consent;

(vii)    to determine whether and under what circumstances an Option may be settled in cash under Section 7(c)(iii) below instead of Common Stock;

(viii)    subject to Applicable Laws, to implement an Option Exchange Program and establish the terms and conditions of such Option Exchange Program without consent of the holders of capital stock of the Company, provided that no amendment or adjustment to an Option that would materially and adversely affect the rights of any Participant shall be made without his or her consent;

(ix)    to approve addenda pursuant to Section 14 below or to grant Awards to, or to modify the terms of, any outstanding Option Agreement or Restricted Stock Purchase Agreement or any agreement related to any Optioned Stock or Restricted Stock held by Participants who are foreign nationals or employed outside of the United States with such terms and conditions as the Administrator deems necessary or appropriate to accommodate differences in local law, tax policy or custom which deviate from the terms and conditions set forth in this Plan to the extent necessary or appropriate to accommodate such differences; and

(x)    to construe and interpret the terms of the Plan, any Option Agreement or Restricted Stock Purchase Agreement, and any agreement related to any Optioned Stock or Restricted Stock, which constructions, interpretations and decisions shall be final and binding on all Participants.

(d)    **Indemnification.**  To the maximum extent permitted by Applicable Laws, each member of the Committee (including officers of the Company, if applicable), or of the Board, as applicable, shall be indemnified and held harmless by the Company against and from (i) any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or resulting from any claim, action, suit, or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken or failure to act under the Plan or pursuant to the terms and conditions of any Award except for actions taken in bad faith or failures to act in bad faith, and (ii) any and all amounts paid by him or her in settlement thereof, with the Company's approval, or paid by him or her in satisfaction of any judgment in any such claim, action, suit, or proceeding against him or her, provided that such member shall give the Company an opportunity, at its own expense, to handle and defend any such claim, action, suit or proceeding before he or she undertakes to handle and defend it on his or her own behalf.  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such persons may be entitled under the Company's Articles of Incorporation, Certificate of Incorporation or Bylaws, by contract, as a matter of law, or otherwise, or under any other power that the Company may have to indemnify or hold harmless each such person.

5.    **Eligibility.**

(a)    **Recipients of Grants.**  Nonstatutory Stock Options and Restricted Stock may be granted to Employees and Consultants.  Incentive Stock Options may be granted only to

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                IBM 000103

Employees, provided that Employees of Affiliates shall not be eligible to receive Incentive Stock Options.

(b)     **Type of Option.**  Each Option shall be designated in the Option Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option.

(c)     **ISO $100,000 Limitation.**  Notwithstanding any designation under Section 5(b) above, to the extent that the aggregate Fair Market Value of Shares with respect to which options designated as incentive stock options are exercisable for the first time by any Optionee during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess options shall be treated as nonstatutory stock options.  For purposes of this Section 5(c), incentive stock options shall be taken into account in the order in which they were granted, and the Fair Market Value of the Shares subject to an incentive stock option shall be determined as of the date of the grant of such option.

(d)     **No Employment Rights.**  Neither the Plan nor any Award shall confer upon any Employee or Consultant any right with respect to continuation of an employment or consulting relationship with the Company (any Parent, Subsidiary or Affiliate), nor shall it interfere in any way with such Employee's or Consultant's right or the Company's (Parent's, Subsidiary's or Affiliate's) right to terminate his or her employment or consulting relationship at any time, with or without cause.

6.     **Term of Plan.**  The Plan shall become effective upon its adoption by the Board and shall continue in effect for a term of 10 years unless sooner terminated under Section 13 below.

7.     **Options.**

(a)     **Term of Option.**  The term of each Option shall be the term stated in the Option Agreement; provided that the term shall be no more than 10 years from the date of grant thereof or such shorter term as may be provided in the Option Agreement and provided further that, in the case of an Incentive Stock Option granted to a person who at the time of such grant is a Ten Percent Holder, the term of the Option shall be 5 years from the date of grant thereof or such shorter term as may be provided in the Option Agreement.

(b)     **Option Exercise Price and Consideration.**

(i)     **Exercise Price.**  The per Share exercise price for the Shares to be issued pursuant to the exercise of an Option shall be such price as is determined by the Administrator and set forth in the Option Agreement, but shall be subject to the following:

(1)     In the case of an Incentive Stock Option

a.     granted to an Employee who at the time of grant is a Ten Percent Holder, the per Share exercise price shall be no less than 110% of the Fair Market Value on the date of grant;

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                        IBM 000104

FILED DATE: 1/22/2019 12:00 AM   2019L000717

    b.  granted to any other Employee, the per Share exercise price shall be no less than 100% of the Fair Market Value on the date of grant;

    (2)  Except as provided in subsection (3) below, in the case of a Nonstatutory Stock Option the per Share exercise price shall be such price as is determined by the Administrator, provided that, if the per Share exercise price is less than 100% of the Fair Market Value on the date of grant, it shall otherwise comply with all Applicable Laws, including Section 409A of the Code; and

    (3)  Notwithstanding the foregoing, Options may be granted with a per Share exercise price other than as required above pursuant to a merger or other corporate transaction.

    (ii)  **Permissible Consideration.**  The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator (and, in the case of an Incentive Stock Option and to the extent required by Applicable Laws, shall be determined at the time of grant) and may consist entirely of (1) cash; (2) check; (3) to the extent permitted under, and in accordance with, Applicable Laws, delivery of a promissory note with such recourse, interest, security and redemption provisions as the Administrator determines to be appropriate (subject to the provisions of Section 152 of the General Corporation Law); (4) cancellation of indebtedness; (5) other previously owned Shares that have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which the Option is exercised; (6) a Cashless Exercise; (7) such other consideration and method of payment permitted under Applicable Laws; or (8) any combination of the foregoing methods of payment. In making its determination as to the type of consideration to accept, the Administrator shall consider if acceptance of such consideration may be reasonably expected to benefit the Company and the Administrator may, in its sole discretion, refuse to accept a particular form of consideration at the time of any Option exercise.

  (c)  **Exercise of Option.**

   (i)  **General.**

    (1)  **Exercisability.**  Any Option granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator, consistent with the terms of the Plan and reflected in the Option Agreement, including vesting requirements and/or performance criteria with respect to the Company, and Parent, Subsidiary or Affiliate, and/or the Optionee.

    (2)  **Leave of Absence.**  The Administrator shall have the discretion to determine whether and to what extent the vesting of Options shall be tolled during any leave of absence; provided, however, that in the absence of such determination, vesting of Options shall be tolled during any leave (unless otherwise required by Applicable Laws). Notwithstanding the foregoing, in the event of military leave, vesting shall toll during any unpaid portion of such leave, provided that, upon an Optionee's returning from military leave (under conditions that would entitle him or her to protection upon such return under the Uniform Services Employment and Reemployment Rights Act), he or she shall be given vesting credit

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL   IBM 000105

FILED DATE: 1/22/2019 12:00 AM   2019L000717

with respect to Options to the same extent as would have applied had the Optionee continued to provide services to the Company (or any Parent, Subsidiary or Affiliate, if applicable) throughout the leave on the same terms as he or she was providing services immediately prior to such leave.

(3)     **Minimum Exercise Requirements.** An Option may not be exercised for a fraction of a Share.  The Administrator may require that an Option be exercised as to a minimum number of Shares, provided that such requirement shall not prevent an Optionee from exercising the full number of Shares as to which the Option is then exercisable.

(4)     **Procedures for and Results of Exercise.** An Option shall be deemed exercised when written notice of such exercise has been received by the Company in accordance with the terms of the Option Agreement by the person entitled to exercise the Option and the Company has received full payment for the Shares with respect to which the Option is exercised and has paid, or made arrangements to satisfy, any applicable taxes, withholding, required deductions or other required payments in accordance with Section 9 below.  The exercise of an Option shall result in a decrease in the number of Shares that thereafter may be available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.

(5)     **Rights as Holder of Capital Stock.** Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a holder of capital stock shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 11 below.

(ii)     **Termination of Continuous Service Status.** The Administrator shall establish and set forth in the applicable Option Agreement the terms and conditions upon which an Option shall remain exercisable, if at all, following termination of an Optionee's Continuous Service Status, which provisions may be waived or modified by the Administrator at any time.  To the extent that an Option Agreement does not specify the terms and conditions upon which an Option shall terminate upon termination of an Optionee's Continuous Service Status, the following provisions shall apply:

(1)     **General Provisions.** If the Optionee (or other person entitled to exercise the Option) does not exercise the Option to the extent so entitled within the time specified below, the Option shall terminate and the Optioned Stock underlying the unexercised portion of the Option shall revert to the Plan.  In no event may any Option be exercised after the expiration of the Option term as set forth in the Option Agreement (and subject to this Section 7).

(2)     **Termination other than Upon Disability or Death or for Cause.** In the event of termination of an Optionee's Continuous Service Status other than under the circumstances set forth in the subsections (3) through (5) below, such Optionee may exercise

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                                    IBM 000106

FILED DATE: 1/22/2019 12:00 AM  2019L000717

any outstanding Option at any time within 3 month(s) following such termination to the extent the Optionee is vested in the Optioned Stock.

(3) **Disability of Optionee.** In the event of termination of an Optionee's Continuous Service Status as a result of his or her Disability, such Optionee may exercise any outstanding Option at any time within 12 month(s) following such termination to the extent the Optionee is vested in the Optioned Stock.

(4) **Death of Optionee.** In the event of the death of an Optionee during the period of Continuous Service Status since the date of grant of any outstanding Option, or within 3 month(s) following termination of the Optionee's Continuous Service Status, the Option may be exercised by any beneficiaries designated in accordance with Section 15 below, or if there are no such beneficiaries, by the Optionee's estate, or by a person who acquired the right to exercise the Option by bequest or inheritance, at any time within 12 month(s) following the date the Optionee's Continuous Service Status terminated, but only to the extent the Optionee is vested in the Optioned Stock.

(5) **Termination for Cause.** In the event of termination of an Optionee's Continuous Service Status for Cause, any outstanding Option (including any vested portion thereof) held by such Optionee shall immediately terminate in its entirety upon first notification to the Optionee of termination of the Optionee's Continuous Service Status for Cause. If an Optionee's Continuous Service Status is suspended pending an investigation of whether the Optionee's Continuous Service Status will be terminated for Cause, all the Optionee's rights under any Option, including the right to exercise the Option, shall be suspended during the investigation period. Nothing in this Section 7(c)(ii)(5) shall in any way limit the Company's right to purchase unvested Shares issued upon exercise of an Option as set forth in the applicable Option Agreement.

(iii) **Buyout Provisions.** The Administrator may at any time offer to buy out for a payment in cash or Shares an Option previously granted under the Plan based on such terms and conditions as the Administrator shall establish and communicate to the Optionee at the time that such offer is made.

8. **Restricted Stock.**

(a) **Rights to Purchase.** When a right to purchase or receive Restricted Stock is granted under the Plan, the Company shall advise the recipient in writing of the terms, conditions and restrictions related to the offer, including the number of Shares that such person shall be entitled to purchase, the price to be paid, if any (which shall be as determined by the Administrator, subject to Applicable Laws, including any applicable securities laws), and the time within which such person must accept such offer. The permissible consideration for Restricted Stock shall be determined by the Administrator and shall be the same as is set forth in Section 7(b)(ii) above with respect to exercise of Options. The offer to purchase Shares shall be accepted by execution of a Restricted Stock Purchase Agreement in the form determined by the Administrator.

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                    IBM 000107

FILED DATE: 1/22/2019 12:00 AM   2019L000717

(b)   **Repurchase Option.**

      (i)   **General.**  Unless the Administrator determines otherwise, the Restricted Stock Purchase Agreement shall grant the Company a repurchase option exercisable upon the voluntary or involuntary termination of the Participant's Continuous Service Status for any reason (including death or Disability) at a purchase price for Shares equal to the original purchase price paid by the purchaser to the Company for such Shares and may be paid by cancellation of any indebtedness of the purchaser to the Company.  The repurchase option shall lapse at such rate as the Administrator may determine.

      (ii)   **Leave of Absence.**  The Administrator shall have the discretion to determine whether and to what extent the lapsing of Company repurchase rights shall be tolled during any leave of absence; provided, however, that in the absence of such determination, such lapsing shall be tolled during any leave (unless otherwise required by Applicable Laws). Notwithstanding the foregoing, in the event of military leave, the lapsing of Company repurchase rights shall toll during any unpaid portion of such leave, provided that, upon a Participant's returning from military leave (under conditions that would entitle him or her to protection upon such return under the Uniform Services Employment and Reemployment Rights Act), he or she shall be given vesting credit with respect to Shares purchased pursuant to the Restricted Stock Purchase Agreement to the same extent as would have applied had the Participant continued to provide services to the Company (or any Parent, Subsidiary or Affiliate, if applicable) throughout the leave on the same terms as he or she was providing services immediately prior to such leave.

      (c)   **Other Provisions.**  The Restricted Stock Purchase Agreement shall contain such other terms, provisions and conditions not inconsistent with the Plan as may be determined by the Administrator in its sole discretion.  In addition, the provisions of Restricted Stock Purchase Agreements need not be the same with respect to each Participant.

      (d)   **Rights as a Holder of Capital Stock.**  Once the Restricted Stock is purchased, the Participant shall have the rights equivalent to those of a holder of capital stock, and shall be a record holder when his or her purchase and the issuance of the Shares is entered upon the records of the duly authorized transfer agent of the Company.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the Restricted Stock is purchased, except as provided in Section 11 below.

9.   **Taxes.**

      (a)   As a condition of the grant, vesting and exercise of an Award, the Participant (or in the case of the Participant's death or a permitted transferee, the person holding or exercising the Award) shall make such arrangements as the Administrator may require for the satisfaction of any applicable U.S. federal, state, local or foreign tax, withholding, and any other required deductions or payments that may arise in connection with such Award.  The Company shall not be required to issue any Shares under the Plan until such obligations are satisfied.

      (b)   The Administrator may, to the extent permitted under Applicable Laws, permit a Participant (or in the case of the Participant's death or a permitted transferee, the person

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL        IBM 000108

FILED DATE: 1/22/2019 12:00 AM  2019L000717

holding or exercising the Award) to satisfy all or part of his or her tax, withholding, or any other required deductions or payments by Cashless Exercise or by surrendering Shares (either directly or by stock attestation) that he or she previously acquired; provided that, unless specifically permitted by the Company, any such Cashless Exercise must be an approved broker-assisted Cashless Exercise or the Shares withheld in the Cashless Exercise must be limited to avoid financial accounting charges under applicable accounting guidance and any such surrendered Shares must have been previously held for any minimum duration required to avoid financial accounting charges under applicable accounting guidance. Any payment of taxes by surrendering Shares to the Company may be subject to restrictions, including, but not limited to, any restrictions required by rules of the Securities and Exchange Commission.

10.     **Non-Transferability of Awards.**

(a)     **General.** Except as set forth in this Section 10, Awards may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution. The designation of a beneficiary by a Participant will not constitute a transfer. An Option may be exercised, during the lifetime of the holder of the Option, only by such holder or a transferee permitted by this Section 10.

(b)     **Limited Transferability Rights.** Notwithstanding anything else in this Section 10, the Administrator may in its sole discretion grant Nonstatutory Stock Options that may be transferred by instrument to an inter vivos or testamentary trust in which the Options are to be passed to beneficiaries upon the death of the trustor (settlor) or by gift to Family Members. Further, beginning with (i) the period when the Company begins to rely on the exemption described in Rule 12h-1(f)(1) promulgated under the Exchange Act, as determined by the Board in its sole discretion, and (ii) ending on the earlier of (A) the date when the Company ceases to rely on such exemption, as determined by the Board in its sole discretion, or (B) the date when the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, an Option, or prior to exercise, the Shares subject to the Option, may not be pledged, hypothecated or otherwise transferred or disposed of, in any manner, including by entering into any short position, any "put equivalent position" or any "call equivalent position" (as defined in Rule 16a-1(h) and Rule 16a-1(b) of the Exchange Act, respectively), other than to (i) persons who are Family Members through gifts or domestic relations orders, or (ii) to an executor or guardian of the Participant upon the death or disability of the Participant. Notwithstanding the foregoing sentence, the Board, in its sole discretion, may permit transfers of Nonstatutory Stock Options to the Company or in connection with a Change of Control or other acquisition transactions involving the Company to the extent permitted by Rule 12h-1(f).

11.     **Adjustments Upon Changes in Capitalization, Merger or Certain Other Transactions.**

(a)     **Changes in Capitalization.** Subject to any action required under Applicable Laws by the holders of capital stock of the Company, (i) the numbers and class of Shares or other stock or securities:  (x) available for future Awards under Section 3 above and (y) covered by each outstanding Award, (ii) the exercise price per Share of each such outstanding Option, and (iii) any repurchase price per Share applicable to Shares issued pursuant to any Award, shall be automatically proportionately adjusted in the event of a stock split, reverse stock

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                        IBM 000109

FILED DATE: 1/22/2019 12:00 AM  2019L000717

split, stock dividend, combination, consolidation, reclassification of the Shares or subdivision of the Shares. In the event of any increase or decrease in the number of issued Shares effected without receipt of consideration by the Company, a declaration of an extraordinary dividend with respect to the Shares payable in a form other than Shares in an amount that has a material effect on the Fair Market Value, a recapitalization (including a recapitalization through a large nonrecurring cash dividend), a rights offering, a reorganization, merger, a spin-off, split-up, change in corporate structure or a similar occurrence, the Administrator shall make appropriate adjustments, in its discretion, in one or more of (i) the numbers and class of Shares or other stock or securities: (x) available for future Awards under Section 3 above and (y) covered by each outstanding Award, (ii) the exercise price per Share of each outstanding Option and (iii) any repurchase price per Share applicable to Shares issued pursuant to any Award, and any such adjustment by the Administrator shall be made in the Administrator's sole and absolute discretion and shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Shares subject to an Award. If, by reason of a transaction described in this Section 11(a) or an adjustment pursuant to this Section 11(a), a Participant's Award agreement or agreement related to any Optioned Stock or Restricted Stock covers additional or different shares of stock or securities, then such additional or different shares, and the Award agreement or agreement related to the Optioned Stock or Restricted Stock in respect thereof, shall be subject to all of the terms, conditions and restrictions which were applicable to the Award, Optioned Stock and Restricted Stock prior to such adjustment.

   (b) <u>Dissolution or Liquidation.</u>  In the event of the dissolution or liquidation of the Company, each Award will terminate immediately prior to the consummation of such action, unless otherwise determined by the Administrator.

   (c) <u>Corporate Transactions.</u>  In the event of (i) a transfer of all or substantially all of the Company's assets, (ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, entity or person, or (iii) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the Company's then outstanding capital stock (a "Corporate Transaction"), each outstanding Award (vested or unvested) will be treated as the Administrator determines (subject to the last sentence of this paragraph), which determination may be made without the consent of any Participant and need not treat all outstanding Awards (or portion thereof) in an identical manner. Such determination, without the consent of any Participant, may dispose of Awards that are not vested as of the effective date of such Corporate Transaction in any manner permitted by Applicable Laws, including (without limitation) the cancellation of such Awards without the payment of any consideration. Without limiting the foregoing, such determination, without the consent of any Participant, may provide for one or more of the following with respect to Awards that are vested and exercisable as of the effective date of such Corporate Transaction: (A) the continuation of such outstanding Awards by the Company (if the Company is the surviving corporation); (B) the assumption of such outstanding Awards by the surviving corporation or its parent; (C) the substitution by the surviving corporation or its parent of new options or equity awards for such Awards; (D) the cancellation

OHSUSA:751544840.1

-14-

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL               IBM 000110

FILED DATE: 1/22/2019 12:00 AM 2019L000717

of such Awards and a payment to the Participants equal to the excess of (1) the Fair Market Value of the Shares subject to such Awards as of the closing date of such Corporate Transaction over (2) the exercise price or purchase price for the Shares to be issued pursuant to the exercise of such Awards (such payment shall be made in the form of cash, cash equivalents and/or securities of the surviving corporation or its parent with a Fair Market Value equal to the required amount; if the exercise price or purchase price per Share of the Shares to be issued pursuant to the exercise of such Awards exceeds the Fair Market Value per Share of such Shares, as of the closing date of the Corporate Transaction, then such Awards may be cancelled without making a payment to the Participants); or (E) the cancellation of such Awards for no consideration. Notwithstanding anything stated herein or in any other agreement to the contrary, whether such agreement was entered into before or after the date this Plan is effective, if any Award, or any agreement applicable to any Award, provides for accelerated vesting in connection with any termination of service that occurs on or after a Corporate Transaction, and the successor does not agree to assume the Award, or to substitute an equivalent award or right for the Award, then any acceleration of vesting that would otherwise occur upon such termination of service shall occur immediately prior to, and contingent upon, the consummation of such Corporate Transaction.

12.    **Time of Granting Awards.**  The date of grant of an Award shall, for all purposes, be the date on which the Administrator makes the determination granting such Award, or such other date as is determined by the Administrator.

13.    **Amendment and Termination of the Plan.**  The Board may at any time amend or terminate the Plan, but no amendment or termination shall be made that would materially and adversely affect the rights of any Participant under any outstanding Award, without his or her consent. In addition, to the extent necessary and desirable to comply with Applicable Laws, the Company shall obtain the approval of holders of capital stock with respect to any Plan amendment in such a manner and to such a degree as required.

14.    **Conditions Upon Issuance of Shares.**  Notwithstanding any other provision of the Plan or any agreement entered into by the Company pursuant to the Plan, the Company shall not be obligated, and shall have no liability for failure, to issue or deliver any Shares under the Plan unless such issuance or delivery would comply with Applicable Laws, with such compliance determined by the Company in consultation with its legal counsel. As a condition to the exercise of any Option or purchase of any Restricted Stock, the Company may require the person exercising the Option or purchasing the Restricted Stock to represent and warrant at the time of any such exercise or purchase that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such representation is advisable or required by Applicable Laws. Shares issued upon exercise of Options or purchase of Restricted Stock prior to the date, if ever, on which the Common Stock becomes a Listed Security shall be subject to a right of first refusal in favor of the Company pursuant to which the Participant will be required to offer Shares to the Company before selling or transferring them to any third party on such terms and subject to such conditions as is reflected in the applicable Option Agreement or Restricted Stock Purchase Agreement.

15.    **Beneficiaries.**  If permitted by the Company, a Participant may designate one or more beneficiaries with respect to an Award by timely filing the prescribed form with the

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL                                                    IBM 000111

FILED DATE: 1/22/2019 12:00 AM    2019L000717

Company. A beneficiary designation may be changed by filing the prescribed form with the Company at any time before the Participant's death. Except as otherwise provided in an Award Agreement, if no beneficiary was designated or if no designated beneficiary survives the Participant, then after a Participant's death any vested Award(s) shall be transferred or distributed to the Participant's estate or to any person who has the right to acquire the Award by bequest or inheritance.

16.   **Approval of Holders of Capital Stock.** If required by Applicable Laws, continuance of the Plan shall be subject to approval by the holders of capital stock of the Company within 12 months before or after the date the Plan is adopted or, to the extent required by Applicable Laws, any date the Plan is amended. Such approval shall be obtained in the manner and to the degree required under Applicable Laws.

17.   **Addenda.** The Administrator may approve such addenda to the Plan as it may consider necessary or appropriate for the purpose of granting Awards to Employees or Consultants, which Awards may contain such terms and conditions as the Administrator deems necessary or appropriate to accommodate differences in local law, tax policy or custom, which may deviate from the terms and conditions set forth in this Plan. The terms of any such addenda shall supersede the terms of the Plan to the extent necessary to accommodate such differences but shall not otherwise affect the terms of the Plan as in effect for any other purpose.

18.   **Information to Holders of Options.** In the event the Company is relying on the exemption provided by Rule 12h-1(f) under the Exchange Act, the Company shall provide the information described in Rule 701(e)(3), (4) and (5) of the Securities Act of 1933, as amended, to all holders of Options in accordance with the requirements thereunder until such time as the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. The Company may request that holders of Options agree to keep the information to be provided pursuant to this Section confidential. If the holder does not agree to keep the information to be provided pursuant to this Section confidential, then the Company will not be required to provide the information unless otherwise required pursuant to Rule 12h-1(f)(1) of the Exchange Act.

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL

IBM 000112

FILED DATE: 1/22/2019 12:00 AM   2019L000717

## ADDENDUM A
## 2012 Stock Plan
### *(California Participants)*

Prior to the date, if ever, on which the Common Stock becomes a Listed Security and/or the Company is subject to the reporting requirements of the Exchange Act, the terms set forth herein shall apply to Awards issued to California Participants. All capitalized terms used herein but not otherwise defined shall have the respective meanings set forth in the Plan.

1.     The following rules shall apply to any Option in the event of termination of the Participant's Continuous Service Status:

(a)     If such termination was for reasons other than death, "Permanent Disability" (as defined below), or Cause, the Participant shall have at least 30 days after the date of such termination to exercise his or her Option to the extent the Participant is entitled to exercise on his or her termination date, provided that in no event shall the Option be exercisable after the expiration of the term as set forth in the Option Agreement.

(b)     If such termination was due to death or Permanent Disability, the Participant shall have at least 6 months after the date of such termination to exercise his or her Option to the extent the Participant is entitled to exercise on his or her termination date, provided that in no event shall the Option be exercisable after the expiration of the term as set forth in the Option Agreement.

"Permanent Disability" for purposes of this Addendum shall mean the inability of the Participant, in the opinion of a qualified physician acceptable to the Company, to perform the major duties of the Participant's position with the Company or any Parent or Subsidiary because of the sickness or injury of the Participant.

2.     Notwithstanding anything to the contrary in Section 11(a) of the Plan, the Administrator shall in any event make such adjustments as may be required by Section 25102(o) of the California Corporations Code.

3.     Notwithstanding anything stated herein to the contrary, no Option shall be exercisable on or after the 10th anniversary of the date of grant and any Award agreement shall terminate on or before the 10th anniversary of the date of grant.

4.     The Company shall furnish summary financial information (audited or unaudited) of the Company's financial condition and results of operations, consistent with the requirements of Applicable Laws, at least annually to each California Participant during the period such Participant has one or more Awards outstanding, and in the case of an individual who acquired Shares pursuant to the Plan, during the period such Participant owns such Shares; provided, however, the Company shall not be required to provide such information if (i) the issuance is limited to key persons whose duties in connection with the Company assure their access to equivalent information or (ii) the Plan or any agreement complies with all conditions of Rule 701 of the Securities Act of 1933, as amended; provided that for purposes of determining such

IBM CONFIDENTIAL

FILED DATE: 1/22/2019 12:00 AM  2019L000717

compliance, any registered domestic partner shall be considered a "family member" as that term is defined in Rule 701.

OHSUSA:751544840.1

Doc ID: 3b03cb43330215b66b34a6a134242c2b279b6c3a

IBM CONFIDENTIAL

IBM 000114

Page 1 of 1



FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Audit Trail

Unique document ID:  3b03cb43330215b66b34a6a134242c2b279b6c3a
Document name: Stock Option Agreement and 2012 Stock Plan
Status:  Signed and closed

### 08/04/2014

| | |
|---|---|
| 14:54:26 UTC-6 | Document (MongoHQ-4_16_14-S...ent-(T-Yocum).pdf) uploaded by kristine@mongohq.com<br>IP: 71.8.45.149 |
| 15:01:50 UTC-6 | Document (MongoHQ-2012-Stock-Plan.pdf) uploaded by kristine@mongohq.com<br>IP: 71.8.45.149 |
| 15:05:06 UTC-6 | Document sent for signature to: Tim Yocum (tim@mongohq.com)<br>IP: 71.8.45.149 |
| 15:08:40 UTC-6 | Document viewed by Tim Yocum (tim@mongohq.com)<br>IP: 73.51.201.189 |
| 15:11:15 UTC-6 | Document signed by Tim Yocum (tim@mongohq.com)<br>IP: 73.51.201.189 |
| 15:11:15 UTC-6 | The document has been signed and is now closed. |

FILED DATE: 1/22/2019 12:00 AM   2019L000717

# Exhibit 9

FILED DATE: 1/22/2019 12:00 AM  2019L000717

| TK YOCUM | SSN: | Federal | Work State: | IL | Res. State | IL |
|---|---|---|---|---|---|---|
| | Pay ID: | Exemptions: | Exemptions: | | Exemptions: | |
| | Rate: | Add'l | Add'l | | Add'l | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | Earnings |
|---|---|---|---|---|---|
| VACATION | | | | | |
| | | | | | |
| Totals: | | | | | |

## TAXES

| Description | Current | YTD |
|---|---|---|
| FICA-MED | | |
| FICA-OASDI | | |
| FED INC TX | | |
| IL STATE | | |
| Totals: | | |

## PRE-TAX BENEFITS

| Description | Current | YTD |
|---|---|---|
| | | |
| Totals: | | |

## AFTER-TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| | | |
| Totals: | | |



| | GROSS less | | PRE-TAX equals | | TAXABLE WAGES | less TAXES | less DEDUCTIONS | equals NET PAY |
|---|---|---|---|---|---|---|---|---|
| CURRENT | | | | | | | | |
| YTD | | | | | | | | |

| BUSINESS UNIT | CO. | M.Z. | COST CTR. | CHECK NO. | CHECK DATE | BEGIN/END DATES | PERIOD |
|---|---|---|---|---|---|---|---|
| IBM CORPORATION | | | DMSA | 69947027 | 06/29/2018 | | OTHER |

## CURRENT PAY DISTRIBUTION

| Check Amount: | |
|---|---|
| Total Current Net Pay: | |

EIN #:13-0871985
For Payroll inquiries call the IBM Employee Services Center at 1-800-796-9876.
For wage rate information, please view at http://w3.ibm.com/hr/web/us/payroll/services/electronic_pay_statement.html